*Amended Complaint!*

DOC # __6__

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF

HABEAS CORPUS BY A PERSON IN STATE CUSTODY



U.S. DISTRICT COURT
Page FILED
AUG 1 3 2009
S. D. OF N.Y.

09CIV6593

| United States District Court | District SOUTHERN |
|---|---|

| Name (under which you were convicted): FELIX GARCIA | Docket or Case No.: 8065/2002 |
|---|---|

| Place of Confinement: AUBURN CORRECTIONAL FACILITY | Prisoner No.: # 04-A-2384 |
|---|---|

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| FELIX GARCIA | v. HAROLD H. GRAHAM |

| The Attorney General of the State of ANDREW M. CUOMO | |
|---|---|

## Amended PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: Supreme Court, New York County, 100 Centre Street, New York, N.Y. 10013 / Part 31

(b) Criminal docket or case number (if you know): 8065 / 2002

2. (a) Date of the judgment of conviction (if you know): March 31st, , 2004

(b) Date of sentencing: April 21, 2004

3. Length of sentence: Twenty-Five years to life, with fifiteen and seven yrs.

4. In this case, were you convicted on more than one count or of more than one crime?   Yes ☒   No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree

6. (a) What was your plea? (Check one)

   (1)   Not guilty ☒          (3)   Nolo contendere (no contest) ☐

   (2)   Guilty ☐          (4)   Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☒          Judge only ☐

7.  Did you testify at either a pretrial hearing, trial or a post-trial hearing?

Yes ☐   No ☒

8.  Did you appeal from the judgment of conviction?

Yes ☒   No ☐

9.  If you did appeal, answer the following:

(a) Name of court: Appellate Division First Department

(b) Docket or case number (if you know): unknown

(c) Result: Affirmed

(d) Date of result (if you know): May 31, 2007

(e) Citation to the case (if you know): 40 A.D.3d 541

(f) Grounds raised:  ** SEE APPELLATE BRIEF ATTACHED **
Exhibit [ A ]

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?   Yes ☒   No ☐

If yes, answer the following:

(1) Name of court: The New York Court of Appeals

(2) Docket or case number (if you know): unknown

(3) Result: Denied

(4) Date of result (if you know): October 3, 2007

(5) Citation to the case (if you know): 9 N.Y.3d 961

(6) Grounds raised: SEE Exhibit [ A ]

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐   No ☒

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or
motions concerning this judgment of conviction in any state court?

    Yes ☒  No ☐

11. If your answer to Question 10 was "Yes," give the following information:

    (a) (1) Name of court: Supreme Court of the State of New York
                                   8065 /2002

        (2) Docket or case number (if you know): _____

        (3) Date of filing (if you know): December 12, 2008

        (4) Nature of the proceeding: CPL § 440.10 / Motion to Vacate Judgement

        (5) Grounds raised: Ineffective Assistance of Trial Cousel for failing
to pursue an Affirmative Defense of Extreme Emotional Disturbance,
as well as failing to utilize pertinent documents which would
support the claim, and trial counsel denied petitioner his
constitutional right to testify at trial.

_____

_____

_____

        (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

            Yes ☒  No ☐

        (7) Result: None given, the hearing is currently in progress

        (8) Date of result (if you know): none £ hearing is currently in progress )

    (b) If you filed any second petition, application, or motion, give the same information: ( Petitioner intends to
file a writ of error coram nobis )
        (1) Name of court: Appellate Division First Department

        (2) Docket or case number (if you know): ( none as of yet )

        (3) Date of filing (if you know): after the State Court makes a ruling on 440

        (4) Nature of the proceeding: Writ of Error Coram Nobis

        (5) Grounds raised: Ineffective Assitance of Appellate Counsel for
failing to raise " The Trial Court's Abuse of Discretion "
for failing to allow the defendants attorney an opportunity
to test the validity of the people's case during a Suppression
Hearing."

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

Yes ☐   No ☐   N/A

(7) Result: _____ N/A _____

(8) Date of result (if you know): _____ N/A _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _____ N/A _____

(2) Docket or case number (if you know): _____ N/A _____

(3) Date of filing (if you know): _____ N/A _____

(4) Nature of the proceeding: _____ N/A _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

Yes ☐   No ☐   N/A

(7) Result: _____ N/A _____

(8) Date of result (if you know): _____ N/A _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:      Yes ☐   No ☒  ( Motion is currently Pending )

(2) Second petition:    Yes ☐   No ☐

(3) Third petition:      Yes ☐   No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: The Collateral motion filed in the State Court is currently pending.

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

> CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: _Petitioner was denied his Constitutional right to to counsel when he was questioned by police while the petitioner_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): _____
_had an unrelated matter pending and the ploice knew of these unrelated matters._
_____
_____
_____
_____
_____
_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____
_____
_____
_____

(c) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒   No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____
_____
_____

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐   No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____ N/A _____

Name and location of the court where the motion or petition was filed: _____ N/A _____
_____

Docket or case number (if you know): _____ N/A _____

Date of the court's decision: _____ N/A _____

Result (attach a copy of the court's opinion or order, if available): __N/A__

(3) Did you receive a hearing on your motion or petition?

    Yes ☐   No ☒

(4) Did you appeal from the denial of your motion or petition?

    Yes ☐   No ☒

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☒

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: __N/A__

Docket or case number (if you know): __N/A__

Date of the court's decision: __N/A__

Result (attach a copy of the court's opinion or order, if available): __N/A__

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

__N/A__

(e)  Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: __N/A__

**GROUND TWO:** __Alleged statements made by the petitioner were the result of Police Misconduct__

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): __The alleged oral statements made by the petitioner to police prior to leaving the police precient and Central Bookins were made as a direct result of the unlawful police conduct, not spontaneously volunteered and should therefore have been suppressed.__

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

_____

(c)  **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒   No ☐

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐   No ☒

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐   No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that

you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

**GROUND THREE:** Statements made were the fruit of this unlawful conduct

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): All physical evdence obtained as a result of the Statements unlawfully obtained from the defendant should have been suppressed as the fruit of this unlawful conduct.

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒  No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐  No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ☐   No ☐

(4) Did you appeal from the denial of your motion or petition?

    Yes ☐   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that

    you have used to exhaust your state remedies on Ground Three: _____

_____

_____

GROUND FOUR: <u>Trial court erred by failing to give preliminary</u>
<u>instructions</u>

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): <u>The court</u>
<u>failed to charge the jury with the preliminary instructions</u>
<u>mandated by the CPL § 270.40 and 310.10(2), and thus deprived</u>
<u>the defendant of a fair trial</u>

_____

_____

[1] SEE Exhibit [ A ] for the remainder of issues raised on appeal,
and to the New York State Court of Appeals.

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)  **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☑  No ☐

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☐  No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐  No ☐

(4) Did you appeal from the denial of your motion or petition?

Yes ☐  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?        Yes ☒   No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

_____

_____

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?  Yes ☐   No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinions or orders, if available. _____

_____

_____

_____

_____

_____

_____

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?      Yes ☒  No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. <u>Ineffective Assistance of Trial Counsel for failing</u> to <u>pursue an affirmative defense, and denying petitioner his right</u> <u>to testify at trial. The motion is presently before the N.Y.</u> <u>Supreme Court, 100 Centret Street, N.Y., N.Y. 10013. ( # 8065/2002 )</u>

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: <u>Daniel Nobel, 401 Broadway, 25th Floor, N.Y., N.Y</u> <u>10013.</u>

(b) At arraignment and plea: <u>- same as above -</u>

(c) At trial: <u>- same as above -</u>

(d) At sentencing: <u>- same as above -</u>

(e) On appeal: <u>Chris M. Dilorenzo, One University Plaza, Suite 210,</u> <u>Hackensack, N.J. 07601</u>

(f) In any post-conviction proceeding: <u>Lori Cohen, 145 Hudson St., N.Y.,N.Y.,</u> <u>10013</u>

(g) On appeal from any ruling against you in a post-conviction proceeding: <u>Post conviction motion</u> <u>is currently pending</u>

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐  No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? Yes ☐  No ☐

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.[*]

Not Applicable. Petitioner's petition is timely.

SEE, 28 U.S.C. § 2244 (d)(2)

---

[*] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —
    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: _that the petition be granted and petitioner be afforded a new trial. Or in the alternative, petitioner asks that an evdentiary hearing be granted._ or any other relief to which petitioner may be entitled.

_Pro SE_
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ _____ (month, date, year).

Executed (signed) on _____ (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____ _____ _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FELIX GARCIA,

                              Plaintiff

            - v. -                            REQUEST TO PROCEED   # 09-6593
                                              *IN FORMA PAUPERIS*

HAROLD H. GRAHAM              Defendant(s)

I, __Felix Garcia_____, am the plaintiff in the above entitled case. I
hereby request to proceed without being required to prepay fees or costs or give security therefore. I state
that because of my poverty I am unable to pay the costs of said proceeding or to give security therefore, and
I believe I am entitled to redress.

1.  If you are presently employed:
    a) give the name and address of your employer
    b) state the amount of your earnings per month

                        N/A
_____

_____

_____

2.  If you are **NOT PRESENTLY EMPLOYED:**
    a) state the date of start and termination of your last employment
    b) state your earnings per month
    YOU MUST ANSWER THIS QUESTION EVEN IF YOU ARE INCARCERATED.

    ____NONE ( petitioner is currently idle and recieves no wages )____

3.  Have you received, within the past twelve months, any money from any source? If so, name the source
and the amount of money you received.

    ____NONE_____

    a) Are you receiving any public benefits?          ☒ No   ☐ Yes, $_____

    b) Do you receive any income from any other source?  ☒ No   ☐ Yes, $_____

4.  Do you have any money, including any money in a checking or savings account? If so, how much?

                        No
_____

Do you own any apartment, house or building, stocks, bonds, notes, automobiles or other property?  If the answer is yes, describe the property and state its approximate value.

☒ No        ☐ Yes, _____

6.  List the person(s) that you pay money to support and the amount you pay each month.

_____ None _____

_____

7.  Do you pay for rent or for a mortgage?  If so, how much each month?

_____ None _____

8.  State any special financial circumstances which the Court should consider.

_____ None _____

_____

_____

I understand that the Court shall dismiss this case if I give a false answer to any questions in this declaration. In addition, if I give a false answer I will be subject to penalties for perjury.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: _Aug 10, 2009_____        _____
                                                                (signature)

Rev. 7/2002

To be argued by Chris M. DiLorenzo, Esq.

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION:  FIRST JUDICIAL DEPARTMENT**

**THE PEOPLE OF THE STATE OF NEW YORK,**
Respondent

-against-

**FELIX GARCIA,**
Defendant/Appellant

On Appeal from the Supreme Court of New York,
New York County
Indictment Number:  8065-02

BRIEF OF DEFENDANT/APPELLANT

Chris M. DiLorenzo, Esq.
Attorney for Defendant/Appellant
944 Gerard Avenue
Bronx, New York 10452
718-537-9885

*Printed on Recycled Paper

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                    <u>PAGE</u>

<u>Allen v. United States</u>, 164 U.S. 492 (1896).........62, 63, 64

<u>Miranda v. Arizona</u>, 384 U.S. 436, (1966)................21, 23, 25, 28, 44, 45, 46, 50, 52, 53

<u>People v. Ali,</u> 65 A.D. 2d 523 (1st Dept. 1978)...........63

<u>People v. Alvarez,</u> 86 N.Y.2d 761 (1995).................64

<u>People v. Aponte,</u> 2 N.Y. 3d 304 (2004)..................64

<u>People v. Barnmore,</u> 11 A.D. 3d 629 (2d Dept. 2004).......40

<u>People v. Bing,</u> 76 N.Y. 2d 331 (1990).................28, 29

<u>People v. Burdo,</u> 91 N.Y. 2d 146 (1997).................28, 29, 52

<u>People v. Centano,</u> 76 N.Y. 2d 837 (1990)...............47

<u>People v. Chapple,</u> 38 N.Y.2d 112 (1975)................31

<u>People v. Cowen,</u> 249 A.D. 2d 560 (2d Dept. 1998).........63

<u>People v. Cotterell,</u> 7 A.D. 3d. 807 (2d Dept. 2004)......42

<u>People v. Diaz,</u> 118 A.D.2d 651, 652 (2d Dept. 1986)......67

<u>People v. Fleming,</u> 270 A.D. 2d 498 (2d Dept. 2000).......40

<u>People v. Giddens,</u> 202 A.D. 2d 976 (4th Dept. 1994).......40

<u>People v Harrison,</u> 120 A.D.2d 358 (1st Dept. 1986).......67

<u>People v. Hepburn,</u> 52 A.D. 2d 958 (2d Dept. 1976).......42

<u>People v. Huarotte,</u> 134 A.D. 2d 166 (1st Dept. 1987)......64

POINT I . . . . . . . . . . . . . . .

WRITTEN AND ORAL STATEMENTS MADE BY
DEFENDNAT TO POLICE WHILE IN CUSTODY ON ONE
MATTER DURING INTERROGATION OF AN UNRELATED
MATTER MUST BE SUPPRESSED BECAUSE DEFENDANT
WAS REPRESENTED BY COUNSEL.

POINT II . . . . . . . . . . . . . .

THE ALLEGED ORAL STATEMENTS MADE BY
DEFENDANT TO THE POLICE PRIOR TO LEAVING THE
PRECINCT AND AT CENTRAL BOOKING WERE MADE AS
A DIRECT RESULT OF THE UNLAWFUL POLICE
CONDUCT, NOT SPONTANEOUSLY VOLUNTEERED AND
SHOULD HAVE BEEN SUPPRESSED.

POINT III . . . . . . . . . . . . .

ALL PHYSICAL EVIDENCE OBTAINED AS A RESULT
OF THE STATEMENTS UNLAWFULLY OBTAINED FROM
THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS
THE FRUIT OF THIS UNLAWFUL CONDUCT.

POINT IV . . . . . . . . . . . . .

THE TRIAL COURT FAILED TO CHARGE THE JURY
WITH THE PRELIMINARY INSTRUCTIONS MANDATED
BY C.P.L. §270.40 AND §310.10(2) AND THUS

DEPRIVED DEFENDANT-APPELLANT OF A FAIR TRIAL PURSUANT TO THE 14TH AMENDMENT, UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 6, NEW YORK STATE CONSTITUTION.

POINT V . . . . . . . . . . . .
THE COURT IMPROPERLY CHARGED THE JURY ON NUMEROUS ISSUES OF THE LAW AND PROVIDED INAPPORPRIATE AND NON-RESPONSIVE ANSWERS TO JUROR QUESTIONS DURING DELIBERATIONS, DENYING DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF LAW.

POINT VI . . . . . . . . . .

THE TRIAL COURT IMPROPERLY CHARGED THE JURY REGARDING A DEADLOCK IN DELIBERATIONS MANDATING REVERSAL OF THE CONVICTION.

POINT VII . . . . . . . . . .

THE MAXIMUM SENTENCE IMPOSED BY THE COURT WAS EXCESSIVE AND MUST BE REDUCED.

People v. Mearling, 46 N.Y. 2d 289 (1978)................33

People v. Mollica, 267 A.D. 2d 479 (2d Dept. 1999).......43

People v. Moore, 161 A.D. 2d 733 (2d Dept. 1990)........39

People v. Notey, 72 A.D.2d 279, 282 (2d Dept. 1982)......67

People v. Pagan, 45 N.Y. 2d 725 (1978)..................64

People v. Paulin, 25 N.Y. 2d 445 (1969) ................35

People v. Robinson, 13 N.Y. 2d 296 (1963) ..............35

People v. Robinson, 8 A.D. 3d 502 (2d Dept. 2004).......40

People v. Rodney, 21 N.Y. 2d 1, (1967)..................47

People v. Rogers, 48 N.Y. 2d, 167 (1979)...............28,
29, 33, 52

People v Sanchez, 112 A.D.2d 840 (1st Dept. 1985)........67

People v. Shortridge, 294 A.D. 2d 182 (1st Dept. 2002)....63

People v. Suitte, 90 A.D. 80, (2d Dept. 1982)..........66,
67

People v. Townsend, 111 A.D. 2d 636 (1st Dept. 1985).....42,
43

People v Young, 113 A.D.2d 852 (2d Dept. 1985)..........67

People v. Wright, 215 A.D. 2d. 299 (1st Dept. 1995).......42

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
———————————————————————————————— X

THE PEOPLE OF THE STATE OF NEW YORK,


                    -against-


FELIX GARCIA,

          Defendant-Appellant.
———————————————————————————————— X


### STATEMENT PURSUANT TO RULE 5531

1.   The indictment number in the court below was 8065/02.

2.   The full names of the original parties were People of
     the State of New York against Felix Garcia.

3.   This action was commenced in Supreme Court, New York
     County.

4.   This action was commenced on or about December 31,
     2005, by filing of an indictment.

5.   This appeal is taken from a judgment convicting
     appellant, after a jury trial, of murder in the second
     degree, criminal possession of a weapon in the second
     degree, and criminal possession of a weapon in the
     third degree.

6.   This is an appeal from a judgment of conviction

rendered on March 31, 2004 by the Honorable James Yates, Justice of the Supreme Court.

7. Appellant has been granted permission to appeal on the original record, and Chris M. DiLorenzo, Esq., of 944 Gerard Avenue, Bronx, New York has been retained to perfect the appeal.

8. The appendix method is not being used.

## PRELIMINARY STATEMENT

This is an appeal from a judgment of the Supreme Court, New York County, rendered on March 31, 2004, convicting appellant of murder in the second degree [P.L. §125.25(1)], criminal possession of a weapon in the second degree [ P.L. §265.03], and criminal possession of a weapon in the third degree [P.L. §265. 02]. Appellant was sentenced to concurrent prison terms of 25 years to life for murder in the second degree, a determinate term of 7 years for criminal possession of a weapon in the second degree, and a determinate term of 5 years for criminal possession of a weapon in the third degree (Berkman, J., at the suppression hearing, Yates, J., at trial and sentencing).

Timely Notice of Appeal was filed, and on May 3, 2004, this court granted appellant leave to appeal on the original record and typewritten briefs. Chris M. DiLorenzo, Esq. was retained as counsel on appeal.

No application for a stay of execution of the sentence has been made and appellant remains incarcerated pursuant to the judgment herein appealed. Appellant had no co-defendants. This matter is currently scheduled for the September 2006 term.

## QUESTIONS PRESENTED

1.) DID THE POLICE IN VIOLAITON OF DEFENDANT'S RIGHT TO COUNSEL UNLAWFULLY OBTAIN WRITTEN AND ORAL STATEMNTS FROM DEFENDANT REGARDING THE HOMICDE WHEN HE WAS BEING HELD IN CUSTODY FOR UNRELATED CHARGES OF TRESPASS AND CRIMINAL POSSESSION OF A WEAPON AND RESPRESENTED BY COUNSEL ON THOSE MATTERS?

2.) WERE THE ORAL STATEMENTS MADE BY THE DEFENDANT PRIOR TO LEAVING THE PRECINCT AND AT CENTRAL BOOKING AFTER ARREST A DIRECT RESULT OF UNLAWFUL POLICE CONDUCT AND NOT SPONTANEOUS?

3.) SHOULD THE PHYSICAL EVIDENCE OBTAINED AS A RESULT OF THE STATEMENTS MADE BY DEFENDANT BE SUPPRESSED AS UNLAWFUL FRUIT?

4.) DID THE TRIAL COURT FAIL TO PROPERLY CHARGE THE JURY WITH PRELIMINARY INSTRUCTIONS MANDATED BY C.P.L. §270.40 AND C.P.L. §310.10(2) AND DENY THE DEFENDANT OF A FAIR TRIAL?

5.) DID THE TRIAL COURT IMPROPERLY CHARGE THE JHURY ON THE LAW AND PROVIDE INAPPROPRIATE AND NON-RESPONSIVE ANSWERS TO JUROR QUESTIONS DURING DELIBERATIONS?

6.) DID THE TRIAL COURT IMPROPERLY CHARGE THE JURY REGARDING A DEADLOCK IN DELIBERATIONS AND DENY THE DEFENDANT OF A FAIR TRIAL?

7.) WAS THE SENTENCE IMPOSED BY THE TRIAL COURT EXCESSIVE?

## STATEMENT OF FACTS

### Introduction

Appellant was indicted in a three (3) count indictment charging him with murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.  On March 31, 2004, Appellant was convicted of all three charges.  On April 21, 2004, Appellant was sentenced to concurrent prison terms of 25 years to life for murder in the second degree, a determinate term of 7 years for criminal possession of a weapon in the second degree, and a determinate term of 5 years for criminal possession of a weapon in the third degree.

### Huntley Hearing

The court conducted a Huntley Hearing on February 24 and 27, 2004.  Detectives Martin, Gomez, Stark, O'Connell, and Rivera, as well as Sgt. Malloy from the New York City Police Department testified on behalf of the people.  Hearing Transcript, hereinafter "H.T.", 12.  Detective Martin was assigned as lead detective to the homicide.  H.T. 14, 33.

Defendant was brought to the Precinct on the December 13, 2002 by Detectives O'Connell and Rivera.  H.T.14-15.

The defendant met with the police in an interview room without handcuffs. H.T. 16. The Defendant informed the police that he saw Jose Adames kill the victim and made a statement without Miranda warnings. H.T. 17. He later was transported without cuffs to give a statement to the DA's office. H.T. 58, 123. While at the DA's office, the police learned that Jose Adames could not have been the shooter because he was in jail at the time. H.T. 125. The police learned during the day that the defendant had an outstanding misdemeanor bench warrant. H.T. 123. Since he was cooperating, they did not arrest him on the warrant. H.T. 122.

Over the next several days, the police tried to convince the defendant to come back to the precinct to speak with them about the homicide. The defendant never came in. H.T. 127-131. Defendant told the police he was afraid to come to the Precinct. H.T. 247.

As a result of his failure to cooperate, Detectives Gomez, Martin, and Sergeant Malloy drove to Newburgh, New York around midnight to 1:00 a.m. on December 17 to pick up the Defendant. H.T. 71. Detectives Martin, Gomez, Rivera, and O'Connell and Sergeant Malloy all testified that the defendant was wanted for an outstanding misdemeanor bench warrant out of New York County at the time they proceeded

to Newburgh.   H.T. 81, 92-93, 102, 104, 122, 131, 148-150, 233, and 261.

The Defendant answered the door and the police, who were in plain clothes, grabbed his arm and escorted him from the building.   H.T. 197.   When Defendant refused to go back to the Precinct with them, they told him he had to go. H.T. 201.   The police frisked the defendant, placed rear handcuffs on him and put him in the back of the unmarked police cruise.   H.T. 75, 155.   Det. Martin arrested the Defendant because he was wanted on the bench warrant.   H.T. 92-93.   Defendant was in handcuffs for the entire ninety minute trip from Newburgh to the precinct.   H.T. 25, 76-77.

At this point of the investigation defendant had still not been advised of his Miranda rights.   H.T. 76.   He slept in the interview room until 8:00 a.m. when he was given breakfast.   H.T. 25, 80.   Defendant was interviewed by Detective Martin and Detective Widgor and was not informed of his Miranda rights.   H.T. 81-82.   During this interview, Defendant made a statement that he saw Irving Sanchez shoot the victim.   H.T. 26.   Defendant was asked and he denied killing the victim.   H.T. 84.

Defendant was finally read his Miranda rights at 4:00 p.m. on December 17.   H.T. 137.   He subsequently made a written confession to the police between 4:00 and 6:00 p.m.

H.T. 136-144. Defendant made another statement to Det. Gomez regarding money he had in Apple Bank at about 6:20 p.m. H.T. 146. At about 8:00 p.m., the defendant told Det. Gomez that he had to kill the victim. H.T. 146-47. Det. Gomez testified that he did not ask any questions prior to this last statement. H.T. 147. Defendant was arrested at 9:30 p.m. on December 17 and taken to Central Booking by Det. Stark. While being processed, the defendant made another statement that as to why he did it. H.T. 251-52. Det. Stark said that he did not ask him any questions prior to the statement. H.T. 252.

## Trial

Police Officer Valasquez testified that he was working patrol in the morning of December 13, 2002, with his partner, Police Officer Jung. They were patrolling in a marked police car. Trial Transcript, hereinafter "T.", 41-43. At approximately 1:10 A.M., they received a radio call saying shots were fired at 635 East 12th street. They headed towards that location. T. 43-44. En route they were flagged down by Ryan Navas, who informed them that his friend had just been shot and he went into the backseat of the police cruiser and they continued to the location T. 45, 76-78.

8

At 635 East 12th street, they observed a black Sports Utility Vehicle (hereinafter S.U.V.) parked in front of the building with a male in front of the S.U.V.  The officers also observed a male laying face-down on the sidewalk by the columns near the entrance of the building T.46. Officer Valasquez directed his partner to assist the victim as he approached the person standing in front of the S.U.V. to question the person.  The officer spoke with Diagne, who worked for a car service and was there to pick up someone. Before the ambulance arrived, he approached the victim, who was bleeding from the facial area but conscious.  The officer remained on the scene probably 10 to 15 minutes, however he took no steps to interview any witnesses.  He then turned Ryan Navas over to a supervisor and left the scene and proceeded to another job.  T. 53-66, 74.

Adam Bailey, who lived on the lower Eastside on 11th Street, between Avenues B and C, testified that at approximately 1:00 A.M. he was watching television with his girlfriend, when he heard a gunshot.  Bailey looked out the window and saw someone laying down on the pavement.  He went to a phone and called 911.  T.125.  After hanging up with the operator, Bailey continued to look out of the window and observed someone slowly walk out of the housing complex and up to the body laying down on the pavement.

Bailey then saw a second individual approaching from a different angle and the first individual started to run away. He saw the second individual shoot the person laying down and then run away. Bailey testified that the first person approached to within about 3 or 4 feet of the victim before running away. The shooter walked up to the victim towards the head area, took a gun and shot, then, walked away. T. 90-104, 132.

Ryan Navas testified he was mopping the hallway of his building at approximately 1:00 a.m. when he heard a shot and a thud outside. He looked out the window and saw feet sticking out from the pillar. He went downstairs and observed the victim laying face down on the ground bleeding profusely from his head with his cell phone to his ear. T.158-159,178. The victim said he did not know who had shot him and asked Navas to call him an ambulance. Before Navas could do so, he observed someone appear from behind the pillars so he back peddled away. As the person moved closer to the victim, the individual put a gun to the back of the victim's head and shot him. Navas ran towards Avenue C and flagged down help from a squad car coming down Avenue C. T.160-161,179. When Navas got into the backseat of the police car, the officers asked him what had happened and he told them that he'd heard shots so he came

downstairs. When he got outside he saw the victim laying there. At no point did Navas tell the officers that he saw defendant shoot the victim. T. 162-163, 216, 443. Approximately a week later at the precinct, Navas first told the police that the defendant had done the shooting. T. 164, 167, 223.

Navas said that he was about five to ten feet away from the victim when he first saw the defendant peek out from behind the pillar, creep closer, pull out a gun, put the gun to the back of the victim's head and pull the trigger, after which defendant put the gun back in his pocket and jogged off back into the building. T. 182-186, 432.

The prosecutor on re-direct elicited testimony from Ryan Navas that when he came to the precinct was the first time he'd told police that he'd seen defendant shoot the victim. T.448. Following an off-the-record discussion, the prosecution was permitted to recall Ryan Navas to the stand and reveal that he had given false testimony during his earlier sworn testimony. T. 450-455.

Hammlett Cuello and Julie Markowski were paramedics employed at Cabrini Medical Center and started work at 11:00 p.m. on December 12, 2002. At approximately 1:14 a.m. they received a call for a possible gunshot wound at

East 12th street and Avenue B.   They arrived at the location that location within three minutes of the call. T. 231, 235, 236.   They noticed a person shot who was laying face-down on the sidewalk, was breathing and had a cell phone was in his hand.   T. 237-238. They cut off the victim's jacket and shirt and attempted to treat his injuries.   T. 239, 240, 241, 243.

Dr. Thomas Gilson, a medical examiner employed by the City of New York, performed the autopsy on the victim on December 13, 2002, which was assigned case number M026571. Based upon this autopsy Dr. Gilson determined the victim's cause of death to be the gunshot wounds that he received to his head, with the injuries he had described and the manner of death to be homicide.   T. 288-89, 296,302-03, 323-24.

Detective Richard Stark was working in the 9th Precinct on the night of December 17, 2002.   On that night, he transported defendant to Manhattan Central Booking.   T.343, 345-46, 349. While waiting in the hallway for the defendant to be logged into Central Booking, he claims that then defendant spoke to him and said spontaneously, "I had to do it. I had to get him; he was going to get me."

Detective Enrique Rivera worked the 8:00 a.m. to 4:00 p.m. shift on December 13, 2002.   T. 530-32.   Rivera saw defendant on that day in the squad room of the 9th Precinct

with a female companion.   He later accompanied defendant
with Detective Gomez in a patrol car to the District
Attorney's office.   T. 532-33.   While driving to the
District Attorney's office, defendant had said that he ran
during the shooting because he was afraid that he too might
be shot since he looked like the victim.   At approximately
6:30 p.m. Defendant was interviewed at the District
Attorney's office.   Officer Rivera said made a statement
naming Kitty, later identified as Jose Adames, as the
shooter.   T. 535-38.   Defendant also gave a clothing
description for the guy he saw running away from the victim
at this interview: a black pea-coat and Timberland boots.
T. 539.   The statement defendant made was written down and
signed at approximately 6:30 p.m.   Defendant was allowed to
leave the District Attorney's office shortly after signing
the statements at 6:30 p.m., with the understanding that he
would come in to clear up an outstanding misdemeanor bench
warrant on Monday morning.   T. 544-46.   Detective Rivera
received a call from defendant at approximately 4:40 p.m.
on December 14 where defendant expressed doubts about
talking to police any further.   T. 548-49.

Detective Edwin Gomez testified he was working the
8:00 a.m. to 4:00 p.m. shift on December 13, 2002 when he
saw defendant in the precinct on that morning.   He

recognized defendant as "Chumpy" from the neighborhood and asked him why he was at the precinct.   He spoke to defendant at approximately 10:00 a.m. and did not read defendant Miranda warnings because he was speaking to defendant as a witness.   T. 606-07.   When he spoke with defendant, Gomez claims defendant told him that he and the victim had been hanging out with a couple of other friends when he observed two people walking towards them up the block from Avenue B to C, he knew one of the people as Kitty, but did not know the other person's name.   He then told the victim he was leaving, they slapped five's and defendant walked off with another friend, Kevin.   Upon getting about five steps away, he heard a loud sound and began to run. He ran for about another ten steps before he turned and saw the individual he knew as Kitty; a light-skinned Hispanic male, approximately five four, chubby with a moustache and goatee, wearing black boots, black pants, a black coat and black skully cap running from the scene. Defendant continued running and heard a second shot. He turned to see and the victim laying on the ground not moving, at which point he ran into his friend's at 205 Avenue C, where he played video games until morning.   T. 608-10. After speaking with defendant, Detective Gomez took him to look at photographs and defendant picked out a

photograph of Jose Adames as being the shooter.   T. 618-19. Gomez spoke to the defendant again at approximately 2:00 p.m. putting the statement in writing.   T. 619-24.

Detectives Rivera and Gomez then escorted defendant to the District Attorney's Office to speak to A.D.A Luanney. T. 625.   Detective Gomez went to the Manhattan House of Detention to interview Jose Adames, who was incarcerated there since October 24, 2002.   T.626-27.   Gomez returned to the District Attorney's Office to find defendant still being questioned.   Defendant was allowed to go home after coming to an understanding that he would come in on Monday morning to clear up an outstanding misdemeanor bench warrant.   T. 628-29.

Gomez testified that he next spoke with defendant between 11:00 a.m. and 12:00 noon on Saturday, December 14, 2002.   Defendant informed him he was in the Bronx doing some shopping, but would try to make it to the precinct to speak with him.   When defendant failed to come to the precinct by 2:30 p.m., Detective Gomez called the defendant again and received the same response as earlier.   On Sunday, December 15, 2002, Detective Gomez called defendant again, at which time defendant informed him that he was having second thoughts about being a witness.   T.633-35. Defendant did not show up at the Precinct on Monday

morning.    Detective  Gomez  issued  a  Wanted  Card  for defendant.    Detective  Gomez  later  learned  that  defendant might  be  in  Newburgh,  New  York  with  an  uncle.    At approximately  1:00  a.m.  on  December  17,  2002,  Detective Gomez,  Sergeant  Malloy  and  Detective  Martin  traveled  to Newburgh,  N.Y.  to  locate  defendant.    Defendant  was  at  his uncle's  residence  in  Newburgh,  New  York  and  after  patting him  down  and  putting  handcuffs  on  him,  Defendant  was  placed in  the  backseat  of  an  unmarked  police  car  and  transported back  to  the  9th  Precinct.    T.  636-42.

During  the  late  afternoon  on  Tuesday,  December  17, 2002,  Detective  Gomez  says  he  returned  to  the  crime  scene, accompanied  by  Assistant  District  Attorney  Launay  and Detective  Martin.    While  there,  Gomez  claims  Ryan  Navas approached  him  asked  to  speak  with  him.    They  walked  toward Avenue  B  and  12th  Street  entered  a  building  at  10th  Street between  Avenues  B  and  C,  where  Ryan  Navas  told  him  that  he had  witnessed  the  shooting  and  that  defendant  was  the shooter.    T.  644-45,  675-76.

Gomez  went  on  to  explain  that  Ryan  Navas  met  with  him again  at  the  precinct  at  approximately  6:00  P.M.  on December  17.    It  was  not  until  after  this  meeting  that defendant  was  read  his  Miranda  rights.    Gomez  claimed  that after  being  read  his  rights,  defendant  made  a  statement

admitting that he had been the shooter, which was written down by Detective Gomez and signed by him and defendant. T. 684-87, 690-98, 702-07).

Detective Jose Martin testified that he came to work at the 9th Precinct around 8:00 a.m. on Friday, December 13, 2002 and was assigned to the homicide.   T. 959, 995. After he read all the paperwork, he discovered that there was a witness to the crime was in the precinct.   T.961.   He first spoke to defendant that day between 11:30 A.M. and 12:00 noon.   T.969, 995.   Defendant told him that he had observed two individuals pass by, one of whom he knew as Kitty, who he believed to be a cousin to Ramon Adames, and one of these individuals had been the shooter of the victim.   T. 970.   Defendant was shown photographs from the PIMS machine and identified Jose Adames as the shooter.   T. 971.

Detective Martin became aware that defendant expressed a reluctance to get involved over the next several days. Despite his promise to come in to the precinct, Defendant never did come to the precinct.   T.973-74, 999.   He was, also, aware that Detective Gomez had issued a Wanted card for defendant on Monday, December 16, 2002 and that there was an outstanding misdemeanor trespass bench warrant out for defendant.   Detective Martin said that it was his

understanding regarding the bench warrant that defendant would come in on December 16, 2002, and have the warrant vacated, but defendant did not come in.  T. 974-75.

Detective Martin, Sergeant Malloy, and Police Officer Edwin Gomez traveled to Newburgh, New York at approximately midnight on December 16th into December 17th to locate defendant and bring him back to the 9th Precinct.  Detective Martin claims he did this because he thought defendant knew more than what he had told the police.  They found defendant in Newburgh, New York they placed him in handcuffs and put in the backseat of an unmarked police car with an officer.  They transported defendant back to the 9th Precinct, where he was placed in a secure interview room on the second floor of the precinct and the handcuffs were removed.  He was given a blanket and he slept in the interview room on the floor until approximately 8:00 a.m., when he was given breakfast.  Police spoke with defendant between 8:00 a.m. and 9:00 a.m.  Detective Martin claims had arrested defendant in Newburgh, New York for the misdemeanor bench warrant and his status relative to the homicide was strictly that of a witness, so he was not immediately taken to court on the bench warrant because he wanted to question him about the homicide.  T.976-78, 1006-1007.

18

During the questioning of defendant at between 8:00 a.m. and 9:00 a.m., defendant said he was afraid of the individual involved in this shooting and proceeded to tell a story about a fifty-thousand dollar contract on the life of the victim  and an individual named Chilly Willy, who he said was the shooter.  T.979-81, 1008.

Ryan Navas came to the precinct at approximately 5:00 P.M., at which time Mr. Navas was interviewed and made a written statement identifying the defendant as the shooter. T. 987-90, 1046, 1048.

Detective Daniel O'Connell was working the night watch on December 13, 2002 and responded to the location of 635 East 12th street at approximately 1:30 A.M. in connection with the homicide with Detective Rivera.  T. 1092-93.  He spoke to Adam Bailey and Ryan Navas.  T. 1095.  He learned from a woman that the victim always hung-out in front of the building with defendant and gave him defendant's nickname, Chumpy, and an address. At approximately 3:30 a.m. he proceeded to the address and discovered that defendant was not there.  He left a message to have defendant contact police upon his return.  He returned to the address at approximately 7:00 a.m. and found defendant present.  Following a brief conversation, defendant agreed to accompany him to the precinct along with his girlfriend.

He left the defendant sitting in the hallway and he informed the supervisor and Detective Martin that defendant was in the hallway.  T. 1097-99, 1100-01.

LEGAL ARGUMENT

POINT I

WRITTEN AND ORAL STATEMENTS MADE BY DEFENDNAT TO
POLICE WHILE IN CUSTODY ON ONE MATTER DURING INTERROGATION
OF AN UNRELATED MATTER MUST BE SUPPRESSED BECAUSE DEFENDANT
WAS REPRESENTED BY COUNSEL.

Prior to trial, the defendant filed an omnibus motion requesting a Huntley hearing to suppress statements obtained by the police in this case.  The trial court held a Huntley hearing on February 24 and 27, 2004.  The Honorable Carol Berkman held that oral and written statements made by the defendant to the police and the New York County District Attorney's Office on December 13, 2004 were admissible because the defendant was questioned as a witness and not subjected to custodial interrogation without Miranda warnings.  H.T. 298.  The court further held that a statement made by the Defendant to the police on December 17, 2004 between 8:00 and 9:00 a.m. (the "Chilly Willy" statement) is suppressed because it was the subject of custodial interrogation without Miranda warnings.  H.T. 299.  The court then went on to say in general terms that statements made in the afternoon starting around 4:00 p.m., after Miranda warnings were given, would not be suppressed.  The court apparently ruled strictly as a Miranda issue and not as probable

cause/attenuation issue. The court never specifically addressed the alleged "spontaneous" statements made by the defendant to the police while he was being transported and booked on the murder charge. The court further rejected as incredible defendant's argument that he invoked his right to counsel. The hearing court's decision must be overturned and the December 17 statements must be suppressed for the reasons set forth below.

On November 18, 2002, the defendant was arrested in the 9th Precinct of the New York City Police Department for the charges of Criminal Possession of a Weapon in the Fourth Degree (P.L. 265.01(1)) and Criminal Trespass in the Third Degree (P.L. 140.10), both misdemeanor offenses. See Defendant's Hearing Exhibit E (copy of warrant and rap sheet). The defendant was arraigned in New York County Criminal Court on November 19, 2002 under an accusatory instrument with docket number 2002NY081303. Id. The matter was adjourned until December 11, 2002 for the defendant to appear. Id. On December 11, 2002, the defendant failed to appear in court and a bench warrant was issued for the defendant's arrest. Id.

The defendant filed an omnibus motion on or about March 11, 2002 requesting:

> An Order, pursuant to CPL §710.20(3) and CPL §60.45, the Fifth and Sixth Amendments to the Constitution of the United States, and Article One of the New York State Constitution, suppressing as evidence at trial any statements attributed to the defendant which were made in the course of his interrogation by law enforcement officers investigation this case, and for suppression of all physical items retrieved by a search that was based on the statements for which suppression is sought, or, in the alternative, for an evidentiary hearing on this motion." See Defendant's Omnibus Motion.

Pursuant to this request, Judge Berkman granted a <u>Huntley</u> hearing.

During the hearing, the People called six police witnesses to demonstrate the legality of the police conduct in obtaining statements in this case. The hearing revealed that the police drove to Newburgh, New York in the early morning hours of December 17, 2002 to find the defendant and return him to New York City. Detective Martin, Detective Gomez, Detective Rivera, Detective O'Connell and Sergeant Malloy all testified that the defendant was wanted for an outstanding misdemeanor bench warrant out of New York County at the time they proceeded to Newburgh. H.T. 81, 92-93, 102, 104, 122, 131, 148-150, 233, and 261.

Detective Martin was the lead Detective in charge of this case. H.T. 33. Detective Martin made the determination to arrest the defendant in Newburgh and bring him in on the outstanding bench warrant. H.T. 92-93.

Although the hearing did not specifically address probable cause issues under the fourth amendment, it is crystal clear from the hearing and trial testimony of this case that the police did not have probable cause to arrest the defendant on December 17, 2002 in Newburgh for the homicide of Ray Villanueva.   Prior to the seizure of the defendant in Newburgh, Detective Martin, Detective O'Connell and Detective Gomez went so far as to say that they felt the defendant was a witness and not a suspect in the homicide case.   H.T. 81, 103, 111, 168.   The only legal basis to arrest him and bring him back to New York rested with the outstanding bench warrant.

During closing arguments after the hearing, the People argued that the police were relying on a bench warrant to arrest the defendant and that the defendant was a witness and not a suspect on the homicide.   H.T. 280.   Defense counsel conceded that there was a bench warrant for the defendant and that if he was arrested on the warrant, it was not done in compliance with the mandates of C.P.L. 120.90(3).   Defense counsel went further to argue that he believed that the evidence showed the true motive of the police was to arrest and seize the defendant for the homicide and not the warrant and that they did not have probable cause to make such an arrest.   H.T. 287.

The Hearing Court in its ruling held that the defendant was taken into to custody by the police in Newburgh but never cleared ruled as to why the defendant was in custody.  H.T. 299.  The court went on to suppress the "Chilly Willy" statement that was made by the defendant between 8:00 and 9:00 a.m. on December 17, 2002 because the defendant was subjected to custodial interrogation without Miranda warnings.  H.T. 299.  The court went further to state that since the defendant was given Miranda warnings in the early afternoon around 4:00 p.m. before subsequent statements made by defendant on December 17, 2002 while in custody, that these statements were admissible.  H.T. 302. The court also ruled that the defendant did nor request counsel.  H.T. 302.  The court completely failed to address the spontaneous statement issues and make conclusions of law and findings of fact.

Under C.P.L. §1.20(30), a bench warrant is defined as:

> [A] process of a criminal court in which a
> criminal action is pending, directing a police
> officer...to take into custody a defendant in
> such action who has previously been arraigned
> upon the accusatory instrument, by which the
> action was commenced, and to bring him before
> such court.  The function of a bench warrant is
> to achieve the court appearance of a defendant in
> a pending criminal action for some purpose other
> than his initial arraignment in the action.

The police have lawful authority to arrest a person wanted on a bench warrant under C.P.L. §120.60.  It seems clear that the police had the legal authority to arrest the defendant on the bench warrant and return him to court. Whether the police processed this arrest on the warrant according to the statute is a valid complaint raised by counsel below and will be discussed later.  However, the issue of greater import is whether the defendant was arrested on the warrant and how does that impact on whether the police may interrogate the defendant or not.

On appeal, the defendant agrees that his arrest in Newburgh is supported by the existence of the bench warrant.  The hearing court allowed the warrant attached to the defendant's rap sheet to be admitted into evidence as Defendant's Exhibit E.  The evidence is thus uncontroverted that the police had probable cause to arrest defendant on a warrant for an open criminal case from New York County Criminal Court.  During the hearing, defense counsel attempted on numerous occasions to elicit more detailed testimony from the police as to their knowledge of the warrant, whether the warrant was processed after the arrest, whether the defendant was represented by counsel on the warrant, etc., but Judge Berkman sustained a series of objections on this issue.  H.T. 93, 149-150.

Despite this inappropriate limiting of questions regarding this issue, this court can take notice of the trial testimony in this case.   During trial, Detective Martin, the lead detective in the case, testified that the police were aware prior to the seizure of the defendant in Newburgh that he was represented by counsel and made no effort to notify counsel that the defendant was arrested on the warrant or that the police wanted to question the defendant.   T. 1032.   Even without this trial testimony, the members of this court can determine based on the Defendant's Hearing Exhibit E in evidence and their familiarity with procedural law in New York and specifically New York County Criminal Court, that the defendant was arraigned on November 19, 2002 and either had a private counsel or was provided a court appointed attorney to represent the defendant on the misdemeanor charges in New York County Criminal Court.

In summation to the jury, the prosecutor concedes that "[w]e know that he has an open bench warrant.   And by definition the open bench warrant means he had a lawyer and he has had a case..." T. 1239.

The Court of Appeals has addressed the issues presented in this brief point and the rule is unambiguous. "Once an attorney has entered the proceeding, thereby

signifying that the police should cease questioning, a defendant in custody may not be further interrogated in the absence of counsel." People v. Rogers, 48 N.Y. 2d 167, 169 (1979).   This ruling was further discussed in People v. Bing, 76 N.Y. 2d 331, 340 (1990), where the Court of Appeals stated that the Rogers holding "emphasized that since defendant was represented on the charge on which he was held in custody, he could not be interrogated in the absence of counsel on any matter, whether related or unrelated to the subject of the representation (id., at 169)."

One of the more recent Court of Appeals cases that addressed this issue is People v. Burdo, 91 N.Y. 2d 146 (1997).   In Burdo, the defendant was arrested and incarcerated on rape and parole violation charges.   The police went to question him about an unrelated homicide case and obtained a waiver of Miranda rights from the defendant.   The police were aware that the defendant was represented by counsel on the pending charges.   The officers did not question the defendant regarding the pending charges.   A Huntley hearing was held and the trial court held that the waiver of rights by defendant was invalid and suppressed the confession because the defendant was in custody on an unrelated matter, represented by

counsel and the police were aware of this. _Id_. at 149. The court emphatically stated "[n]otwithstanding the fact that defendant's statements might pertain to a matter unrelated to the formal representation on a pending charge upon which defendant was in custody, suppression is mandated under _Rogers_ which, in the absence of a counseled waiver, bars further custodial interrogation of a suspect 'on any matter' (_People v. Bing_, 76 N.Y. 2d, at 340)." _Id_. at 150. In rejecting a request by the dissent to limit the Rogers rule to cases only where an attorney interjects herself into the proceedings to have the police cease questioning, the court concluded its opinion by stating:

> Finally, we underscore that our decision neither expands nor narrows _Rogers_, which established the principle that a defendant represented by counsel on the charge on which he is held in custody cannot be interrogated in the absence of counsel "on any matter." For nearly two decades _Rogers_ has stood as a workable, comprehensible, bright line rule, providing effective guidance to law enforcement while ensuring that it is defendant's attorney, not the police, who determines which matters are related and unrelated to the subject of the representation. _Id_. at 150-151.

Applying Rogers, Bing and Burdo to the instant, this court must conclude that the police obtained the afternoon and evening statements of December 17, 2002 in violation of the defendant's right to counsel under the New York State Constitution.

As mentioned above, the police had the authority to arrest the defendant on the outstanding bench warrant under C.P.L. §120.60. Once the police arrest a person on a warrant, they must then take the next step of bringing him before a court. The duty of the officer is specifically defined as follows:

> Upon arresting a defendant for an offense other than a felony pursuant to a warrant of arrest in a county other than the one in which the warrant is returnable or one adjoining it, a police officer if he be one to whom the warrant is addressed, must inform the defendant that he has a right to appear before a local criminal court of the county of arrest for the purpose of being released on his own recognizance or having bail fixed...If the defendant is in default of bail, the officer must without unnecessary delay bring him before the court in which the warrant is returnable. C.P.L. §120.90(3).

The record of the hearing and the trial clearly demonstrate that the police in no way intended to and in fact did not bring the defendant before the court to which the bench warrant was returnable "without unnecessary delay." The police all but admitted that their true motive to make the arrest was not to process the bench warrant but to question the defendant about the murder the occurred on December 13, 2002. Detective Martin testified that he told the defendant that they picked him up because they felt he knew a lot more information than he had provided. H.T. 75, 78. Detective Gomez conceded that he did not even process

30

the defendant on the bench warrant after they returned him to Manhattan.  H.T. 156.  There can be no dispute that the police failed to bring the defendant before the court without unnecessary delay.  The question that follows is what remedy is available to the court to punish this intentional unlawful act of the police.

This action by the police was a clear attempt to circumvent the requirements of the C.P.L. so that they could question him on the homicide.  The evidence is clear that the police had no intention to return the defendant on the bench warrant until they solve their case.  This is turn was a circumvention of defendant's right to counsel under the Constitution of the State of New York.

One final point, since the parties apparently agreed on the record below that the defendant was represented by counsel on the open bench warrant matter for which he was being held, the defendant has not addressed issues of attenuation under People v. Chapple, 38 N.Y. 2d 112 (1975) and the related cases.  However, should the People raise these issues in their brief, defendant will discuss them in his reply brief.

POINT II

**THE ALLEGED ORAL STATEMENTS MADE BY DEFENDANT TO THE POLICE AT PRIRO TO LEAVING THE PRECINCT AND AT CENTRAL BOOKING WERE MADE AS A DIRECT RESULT OF THE UNLAWFUL POLICE CONDUCT, NOT SPONTANEOUSLY VOLUNTEERED AND SHOULD HAVE BEEN SUPPRESSED**

On December 17, 2002, the defendant was awakened in the middle of the night somewhere between 1:00 and 2:00 a.m. (depending on which testimony the court credits) in Newburgh, New York, arrested by at least four police officers and driven approximately ninety miles over one and a half hours back to Manhattan. He was then locked in an interrogation room and left to sleep in a small locked interrogation room with no bed for only a few hours. He was then awakened at approximately 8:00 a.m. where he was questioned on and off all day by a team of experienced detectives until approximately 9:30 p.m. that night when he was finally arrested on the homicide charges by Detective Gomez. After making a written confession earlier, the defendant at about 8:00 p.m. allegedly told Detective Gomez that he had to kill the victim without being asked any questions. He was then immediately brought a short distance to the Manhattan Criminal Courthouse, Central Booking, where he made the alleged spontaneous statement that "I had to do it, He was going to get me" in the presence of Detective Stark. At the time of his arrest,

the defendant was an eighteen year old youth of limited education.

Again, defendant relies on the Court of Appeals holding in Rogers, supra. After the court determined that the police improperly questioned the defendant in violation of his right to counsel, the court ruled that the inculpatory statements made by the defendant while he was being processed at the police station for his arrest after the interrogation had been completed were not spontaneous and inadmissible. People v. Rogers, supra., at 174. The court made the following observations:

> Defendant, a youth of limited education, was vigorously questioned by two experienced detectives. Although no physical force was employed, the interrogation covered an extensive period approximately six hours and during this entire time defendant was manacled to furniture. A coercive atmosphere had been affirmatively created by the continuous interrogation and the significant restriction on defendant's freedom of movement. The Defendant's statement was made in the interrogation room when defendant was still handcuffed and while the police processed the paper work in his presence. It cannot be doubted that the psychologically coercive influence of the police tactics had its effect on defendant and induced the statement apparently directed to himself. (citations omitted)." Id.

The Court of Appeals has stated that "the spontaneity has to be genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed." People v. Mearling, 46 N.Y. 2d 289, 302-

303 (1978).   The court explained the justification for the breadth of this rule and added that "interrogation tactics often may be more destructive of a defendant's rights than are blatantly coercive techniques."   Id. at 303.

The facts in this case are even more supportive of a conclusion that the defendant was subjected to "psychologically coercive influence of the police tactics." The court therefore must make a finding that this statement made by the defendant was not a spontaneously made statement and thus is inadmissible.

## POINT III

**ALL PHYSICAL EVIDENCE OBTAINED AS A RESULT OF THE STATEMENTS UNLAWFULLY OBTAINED FROM THE DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS THE FRUIT OF THIS UNLAWFUL CONDUCT**

Assuming the court agrees that the confession was unlawfully obtained by the police, than the physical evidence obtained as a result of illegally obtained statements must also be suppressed. These items include the defendant's coat, phone records, bank records and watch.

The Court of Appeals has ruled that where physical evidence is recovered as a result of an illegally obtained confession, the "fruit", i.e., the physical evidence, will also be suppressed. People v. Paulin, 25 N.Y. 2d 445 (1969); People v. Robinson, 13 N.Y. 2d 296 (1963). The evidence in this case is clear that the police obtained these items as a result of defendant's confession and after the confession was obtained by the police. The police did not have any independent grounds to obtain such evidence.

POINT IV

**THE TRIAL COURT FAILED TO CHARGE THE JURY WITH THE PRELIMINARY INSTRUCTIONS MANDATED BY C.P.L. §270.40 AND §310.10(2) AND THUS DEPRIVED DEFENDANT-APPELLANT OF A FAIR TRIAL PURSUANT TO THE 14TH AMENDMENT, UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 6, NEW YORK STATE CONSTITUTION**

After the jury has been sworn and before the people's opening statement, the court must instruct the jury generally concerning its basic functions, duties and conduct. Such instructions must include the following five admonitions:

1.) the jurors may not converse among themselves or with anyone else upon any subject connected with the trial;

2.) they may not read or listen to any accounts or discussions of the case as reported by the newspapers or other new media;

3.) they may not visit or view the premises or place where the offense or offense charged were allegedly committed or any other premises or place involved in the case;

4.) prior to discharge, they may not request, accept, agree to accept, or discuss with any person receiving or accepting, any

> payment or benefit in consideration for supplying any information concerning the trial;
>
> 5.) they must promptly report to the court any incident within their knowledge involving an attempt by any person improperly to influence any member of the jury.   C.P.L. §270.40.

These preliminary instructions are necessary to ensure that the defendant receives a fair trial before an impartial jury that is open to all evidence.   The clear purpose of these instructions are to avoid premature deliberations by the jury and undue influence that would prevent the jurors from keeping an open mind throughout the course of the trial and prior to reaching a verdict.

In the within case, the court failed to give these statutorily prescribed admonishments in their entirety during the preliminary instructions.   (T. 1-17).   The trial court compounded this error by failing to give these basic instructions during the course of this trial at breaks and end of the day recesses.   In fact, the court recessed the jury twenty-four consecutive times during the course of testimony after the preliminary charge without giving any one of these admonishments (T. 66, 111, 191, 223-224, 272-

273, 333, 391, 449, 461-462, 504, 527, 550-551, 599, 650, 728, 766, 853, 898, 955, 990, 1018, 1072, 1105).

After the jury has been charged by the court or commenced its deliberations, "the court must admonish the jury as provided in section 270.40 of this chapter and direct it not to resume its deliberation until all twelve jurors have reassembled in the designated place of the termination of the declared recess." C.P.L. §310.10(2). In this case, there were four recesses after the commencement of deliberation.

At the first recess, the court advised the jury to cease deliberations, not talk among themselves or to anyone about the case and not to resume deliberations until all twelve jurors return the next day.  (T. 1415-1417).  The court failed to make four of the five admonitions required by C.P.L. §270.40 at this first recess in deliberations.

At the second recess, the court advised the jury to not talk to anyone about the case, not to do any research on their own and not to resume deliberations until all twelve jurors return to the jury room on the next day.  (T. 1469).  This admonition was insufficient to comply with C.P.L. §270.40 because the court again failed to provide four of the five admonitions required by statute.

Prior to the third recess in deliberations, the court

38

told the jury to cease deliberations, not to talk to anyone about the case, not to talk among themselves about the case and not to resume deliberations until all twelve jurors returned the next day. Again, the court failed to provide four of the five admonitions require by C.P.L. §270.40.

At the last recess in deliberations, the court advised the jury only to cease deliberations and not to talk to anyone about the case. This time the court not only failed to provide the last four admonitions required under C.P.L. §270.40, but also failed to tell them not to resume deliberations until all twelve jurors were reunited in the jury room the next day. (T. 1495).

The record is clear that defense counsel did not object to the preliminary instructions and the instructions at the end of each day of deliberations by the trial court. However, Defendant-Appellant requests that this court use its discretion as provided in C.P.L. §470.15(6)(a) to reverse this conviction in the interest of justice because this combination of errors resulted in prejudice to the defendant and deprived him of a fair trial.

This case is distinguishable from those cases where the appellate courts denied to overturn the convictions for failure to give the preliminary instructions to the jury as required by C.P.L. §270.40. See People v. Moore, 161 A.D.

2d. 733 (2d Dept. 1990)(although objection never preserved, most of the instructions were eventually given); People v. Fleming, 270 A.D. 2d 498 (2d Dept. 2000)(although objection never preserved, the instructions given adequately conveyed to the jury its function, duties and conduct); People v. Barnmore, 11 A.D. 3d 629 (2d Dept. 2004) (although objection never preserved, the instructions given adequately conveyed to the jury its function, duties and conduct); People v. Robinson, 8 A.D. 3d 502 (2d Dept. 2004) (although objection never preserved, the instructions given adequately conveyed to the jury its function, duties and conduct); People v. Giddens, 202 A.D. 2d 976 (4th Dept. 1994)(where court failed to provide the admonition that jurors were prohibited from arranging for payments or a benefit in return for information regarding the trial and that they had a duty to report any attempt to influence the jury).

In this case, the court never gave the required preliminary instructions to the jury.  The jury was not given a clear picture of their function, duties and conduct as required to ensure a fair trial.  The jury had no idea during the entire course of testimony in this trial that they could not talk to each other about the case, form opinions about the evidence, go to the scene of the alleged

40

crime, talk to others about the case, accept money or some other benefit for information about the trial, or that they had a duty to report any attempt to improperly influence them.

From opening statements until the end of testimony, the trial lasted for seven days. On the seventh day of trial, March 24, 2004, the court instructed the jury at the end of testimony that the jury should not jump to conclusions and not talk about the case when sending the jury for a half hour break before summations. The jury later returned to hear summations, and at the end of summations the court sent the jury home for the night and merely said "[p]lease don't talk to anyone about the case" and "[k]eep an open mind." (T.1276).

The failure to properly instruct the jury during the course of testimony was compounded by the subsequent failure to properly instruct the jury at the end of each day of the four days of deliberations. This is not a minor error. This is an egregious error that deprived this defendant of a fair trial pursuant to Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the New York State Constitution. This course of inaction by the court regarding these important instructions demands that this court review this issue in

the interest of justice and reverse this conviction.

In reversing a conviction, the Second Department recently held that before each recess in the course of deliberations, the trial court was required to repeat the admonitions to jurors required by C.P.L. §270.40 §310.10(2), and the court's failure to so admonish constituted reversible error.  People v. Cotterell, 7 A.D. 3d. 807, 808 (2d Dept. 2004).

Another conviction was overturned by this court where the trial court failed to admonish the jury regarding the prohibited acts under C.P.L. §270.40 and told the jury they were not prohibited from visiting the scene.  People v. Wright, 215 A.D. 2d. 299 (1st Dept. 1995).  This court stated that "[t]he trial court's failure to follow the clear and unambiguous mandates of C.P.L. §270.40 was error."  Id. at 299, citing People v. Hepburn, 52 A.D. 2d 958, 959 (2d Dept. 1976);People v. Townsend, 111 A.D. 2d 636 (1st Dept. 1985), aff'd. 67 N.Y. 2d 815 (1986).  In Hepburn, the appellate court, in addition to other conclusions, found that it was "error for the trial court to neglect to charge the preliminary jury instructions mandated by C.P.L. §270.40."  People v. Hepburn, supra. at 959.

By failing to give these instructions throughout the

42

entire course of testimony in this case and at the end of each day of deliberations, the trial court invited this jury to engage in premature deliberation. At a minimum, the lack of instructions created the possibility of premature deliberations and such error cannot be considered harmless. See People v. Mollica, 267 A.D. 2d 479 (2d Dept., 1999); see also People v. Townsend, supra. at 638.

Because of these failures by the trial judge, defendant was denied a fair trial. Therefore, the judgment must be reversed and a new trial ordered.

POINT V

**THE COURT IMPROPERLY CHARGED THE JURY ON NUMEROUS ISSUES OF THE LAW AND PROVIDED INAPPORPRIATE AND NON-RESPONSIVE ANSWERS TO JUROR QUESTIONS DURING DELIBERATIONS, DENYING DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF LAW**

In the Huntley hearing, Judge Berkman ruled that the "Chilly Willy" statement made by the defendant was unlawfully obtained in that is was made pursuant to custodial interrogation without Miranda warnings. H.T. 299. Despite that ruling, defense counsel chose as a strategy to introduce this statement during trial to support his argument to the jury that the ultimate confession by defendant was involuntarily made and untruthful. However, this tactic did not abrogate the fact that the "Chilly Willy" statement was unlawfully obtained. This was never explained to the jury during the court's charge to the jury after summations. In fact, the jury charge regarding the statements failed to properly address it.

The court allowed the jury to consider an argument from the prosecution that defendant was not entitled to Miranda warnings prior to the late afternoon of December 17 when he became a so-called "suspect." The court specifically charged:

> Accordingly, the People contend there was no need to give him Miranda warnings until later in the

44

afternoon when he became a suspect.   They contend
that the interview process from 8 AM to sometime
between 4 to 6 PM was not custodial interrogation
but that the conditions of confinement—and that
the conditions of confinement or the nature of
the questioning don't raise a reasonable doubt
about whether he freely and knowingly and
voluntarily waived his right to remain silent and
his right to speak to counsel.   They contend that
the delay in giving him Miranda warnings was
justified because he was not a suspect, and that
the fact that he was in custody from 1 AM to 6
PM, because he was—excuse me—and that the fact he
was interviewed and gave an earlier statement
also doesn't raise a reasonable doubt as to
whether he voluntarily waived his rights later
he later statement.   T. 1341-1342.

...The defendant therefore contends that the
police instead intentionally held him at the
precinct because their true purpose was to
interrogate him in custody without counsel before
advising him of his right to counsel and bringing
him to court.   T. 1343.

The People deny this contention.   It is the
People's contention that the police testified
truthfully when they said that Mr. Garcia was not
a suspect and was not actually interrogated until
after 4 PM.   That he was in handcuffs in the car
and held at the Precinct because they intended to
return him on the warrant and as well was
questioned only as a witness before 4 PM and he
wasn't in need of Miranda warnings prior to that
time.   T. 1343.

The court went on to give more instructions on the law

and Miranda, etc.  What the court did was to allow the jury

to reconsider and rule in their deliberations on the issue

of the "Chilly Willy" statement and whether the police

complied with the law.   The court never told the jury that

Judge Berkman already ruled as a matter of law that the

defendant was in custody and subjected to custodial interrogation without <u>Miranda</u> rights being given and waived at the time of the statement made after 8:00 a.m. and prior to the statements made in the afternoon between 4:00 and 6:00 p.m. subsequent to <u>Miranda</u>. In fact, during the entire course of deliberations over several days, the jury was never told during additional charge requests that the court already found as a matter of law that the "Chilly Willy" statement was obtained by the police in violation of the defendant's constitutional rights. If the jury was clearly advised of this ruling, they would have been in effect told that the police did something wrong or improper while the defendant was in there custody. This would have been important for the jury to consider in applying the charge as to the confession that occurs later in the afternoon of December 17. Because of the substantial prejudice resulting to the defendant by allowing this debate during deliberations, this error cannot go uncorrected.

This prejudice was compounded by the court after deliberations began and the court received the first several notes. In one note, the jury requested a definition of custody. T. 1376; Court Exhibit 3. The answer to this question is simple and well defined in the

law.   A person is in custody when he or she is physically deprived of his or her freedom of action in any significant way.   People v. Rodney, 21 N.Y. 2d 1, 9 (1967).   It is also clearly defined and explained in the CJI charge "Issue As To Custody of Defendant."   That charge goes on to define the reasonable person test and lists a variety of factors for a jury to consider in determining custody.   See People v. Centano, 76 N.Y. 2d 837 (1990).

The next two questions were "Was Felix in custody when he was returned to the precinct?" and "Did Felix ask to leave at any time and was he denied?"   T. 1376; Court Exhibit 3.   These questions also were easy to answer.   The answer should have been:   "These are factual issues for you the jury to answer based upon the testimony and evidence of the case."

In answering these questions, the court stated:

> First of all, generally, the definition of custody, you are free to leave but in this case, I think there is no disagreement between the parties that he wasn't free to leave from 8 AM to 4PM when he was in the precinct.   The issue is, was he in custody as a suspect on the homicide?
>
> Was he held in the Precinct, not free to leave because they wanted to hold him there for questioning on the homicide, or was he in custody on the misdemeanor warrant.   T. 1376-77.

The jury did not ask if they had to determine that the defendant was in custody on the homicide versus custody on

the warrant.   To say that is the issue to this jury is wrong.  Not only is it wrong, it is non-responsive to their question.   In addition, the evidence was very clear that he was being held on the warrant as a justification for his arrest in Newburgh.  The police all but conceded that they did not have evidence to hold him as a suspect in the homicide until the end of the day.

In addition, the facts of the case reveal that the defendant was in police custody when they picked him up and handcuffed him in Newburgh in the early morning hours, likely to be between 1:30 and 3:00 a.m. based upon the testimony.  Thus, the court erred in summing up evidence before the jury and by making it sound like the defendant was in custody at least five less hours than the facts demonstrated.   The court repeated this error several times during subsequent charges on the law and responses to jury questions.  T. 1381, 1383, 1385, 1393.

It is instructive to note the court's response to the question "Is it common police practice for detectives to write our statements instead of the witness himself?"  T. 1377; Court Exhibit 3.   The court properly responded by saying:

> That is a factual question that I can't answer.
> That is the kind of thing a lawyer could ask a
> witness, but I can't, I'm not a witness.   I can't

> give you that answer.   And the case is closed.
> Whatever the record is it is the record.   I can't
> make up testimony for you.   I can't answer that.
> T. 1377.

The court should have given a similar response to the

earlier two questions.

The jury also asked the court repeat its instructions

as to "what constitutes a 'voluntary statement' and what

the People have to prove." T. 1377; Court Exhibit 4.   In

response, the court again marshaled the evidence and at one

point restated the position of the prosecutor:

> The People on the other hand contend that the
> defendant was not in custody as a suspect when he
> was picked up in Newburg at 1 AM.   They contend
> that he was merely a witness being interviewed
> and that he was held at the Precinct for return
> later to court on a misdemeanor warrant.
>
> Accordingly, the People contend that there was no
> need to give him Miranda warnings until later in
> the afternoon when he became a suspect.
>
> They contend that the interview process from 8 AM
> to some time between 4 and 6 PM was not a
> custodial interrogation.   That the conditions of
> confinement or the nature of the questioning
> don't give raise to a reasonable doubt whether he
> freely, knowingly, voluntarily waived his right
> to remain silent and his right to counsel.   They
> contend the delay in giving him Miranda warnings
> was justified... T. 1382.

The problem with the above instructions is that the court

made it sound like it was permissible for the police to

question the defendant while in custody prior to the

alleged waiver of rights at 4:00 to 6:00 p.m. without the

benefit of <u>Miranda</u> warnings.   The hearing court already ruled that this was impermissible police conduct and in violation of the defendant's constitutional rights.   Why did this court ask this jury to make an independent determination of the legality of the "Chilly Willy" statement that occurred pre-<u>Miranda</u> in the morning of December 17?  The court made the following instruction:

> If the People fail to prove that the defendant was not in custody and not interrogated, or you have a reasonable doubt thereof, then you must find any statement made prior to being advised of his rights was involuntarily made.

> Obviously, on the other hand, if the People prove to your satisfaction beyond a reasonable doubt that the defendant was not in custody, and wasn't subjected to custodial interrogation without having waived his rights, then you find the statement was voluntarily made.  T. 1386-87.

The trial judge made it sound like this is a permissible issue for the jury to decide all over again in total disregard to the original ruling of law.   The jury should have been told at this point that although the "Chilly Willy" statement was unlawfully obtained in violation of his constitutional rights and thus involuntary, you still need to evaluate the later statement and determine whether the earlier violation of defendant's constitutional rights gave rise to reasonable doubt as to

the voluntariness of the later confession that occurred by 6:00 p.m.

The charge at this point was very detailed and contained more than just the law. The court made substantial statements regarding the arguments of both the defense and the prosecution. This marshaling of evidence also was misleading and prejudicial. The court should have discussed the law and not each party's position in detail.

The court also incorrectly charged the law regarding questioning of a defendant in custody. The charge in relevant part as follows:

> You were right to ask me about the custody issue. One of the things you have to decide, when he was being held at the Precinct from 8 to 4, were they holding him because they wanted to question him about the homicide, or were they holding him there because they were returning him on the warrant. I have already given you the instruction about unnecessary delay, etcetera, so I won't repeat all of that but there is one additional point I should mention, that is if you find that he was being held on the warrant, and that, in other words, that beyond a reasonable doubt he was not being held there for questioning on the homicide, but just on the warrant, then it is not wrong for him to be asked about the homicide while he is being held on the warrant.
>
> So first ask yourself why was he being held there? If he was being held there for questioning, not on the warrant, then that is custody on the homicide. If he was being held there on the warrant, then the fact that he was asked questions about the homicide is not improper. T. 1393-94.

51

This charge directly contradicts what the law is on this issue. The defendant's attorney objected to this charge and preserved this issue. T. 1394-95. The analysis was already detailed above regarding questioning of a person in custody on one matter for an unrelated matter when he is represented by counsel. <u>People v. Burdo</u>, <u>supra</u>.; <u>People v. Rogers</u>, <u>supra</u>. Incorporating the earlier analysis of these cases, this court is compelled to find that the trial court erred in its instruction on the law to the jury and must grant a new trial.

The jury should have been clearly told that the first "chilly Willy" statement was obtained in violation of <u>Miranda</u> and thus involuntarily made under the law. They should have also been told that it was only let in to assist the jury in determining whether the subsequent statements obtained after <u>Miranda</u> around 4:00 to 6:00 p.m. were made involuntarily. The prosecutor in her argument with the judge even refers to the "Chilly Willy" statement as being involuntarily made. T. 1396.

The court received another series of notes, Courts Exhibits 5, 6 and 7. T. 1395A. The jury wanted to know if <u>Miranda</u> rights needed to be given upon arrest on a warrant, a written copy of charge on "voluntary and truthful" and if a person had to be told immediately after

being cuffed why he was handcuffed by the police.   Id.
Prior to bringing the jury out to answer these three
questions, the court deciding that there was some confusion
on the jury's part stated that he probably erred in his
earlier instruction to the jury.   T. 1395A.   He stated in
relevant part:

> I think that it's clear that questioning—as a
> matter of fact, I probably said that improperly
> at the end when I added the addendum, so I want
> to correct it right away.   That is questioning
> prior to the administration of the Miranda
> warnings was — with regard to this case was
> improper, and, therefore, any statement taken
> before four p.m. was involuntarily obtained.
> T. 1395A.

Even after realizing that he erred earlier and stating that
he was going to correct the error, the court fails to
clarify the issues for the jury and leaves the issue open
for debate in the jury room.

The first of these notes from the jury requested
whether a person arrested on a bench warrant was entitled
to Miranda rights.   T. 1395A; Court Exhibit 5.   The answer
again is not complicated.   The court should have simply
advised when Miranda rights are required.   The court began
its response by saying that the defendant was entitled to
the Miranda warnings while he was custody on the warrant
before questioning was initiated.   T. 1395A.   However, the
court went beyond the question again and marshaled the

evidence and the party's arguments.   This time, the court said the prosecution's argument is as follows:

> Now, the People's argument was, he was being held on a warrant, they talked incidentally about the homicide.  You know, sure he should have been given Miranda warnings on that, but when they had him as a suspect later, after talking to Navas, about the homicide. You know, sure he should have been given Miranda warnings on that, but when they had him as suspect later, after talking to Navas, that's when they gave him warnings and then he freely, voluntarily waived his rights and gave a statement and, therefore, you can consider Number 27.   That's the People's position.   T. 1400-01.

This is in total contradiction to the earlier charge and marshaling of the argument by the People.   This must have led to confusion to this jury.

The court goes further to say "I can see by your notes that you are hung up on the question of what appears to be whether the first statement, the "Chilly Willy" statement or not was voluntarily given or not, but that is not really the issue." T. 1402.   The jury never said they were "hung up" on this issue.   They never asked the court to articulate the arguments of both sides, yet the court did so.

The Court ended by responding the question regarding written instructions and told the jury they could not have them in writing.   However, the court never answered the question concerning what needs to be said by the police

when placing someone in handcuffs.  The jury showed its confusion with the court by sending out a follow-note saying "Would the judge read the last 2 questions aloud and answer them directly?  You misinterpreted our questions to be regarding the Chilly Willy statement."   T. 1410-11; Court Exhibit 8.

Once again the court did not properly respond to the question.  The answer to the question regarding what should be said during handcuffing is simple and the court initially responded properly by saying "If a person is arrested, they should be told the reason for the arrest." T. 1411.  However, the court did not stop there and again went into the issue of voluntariness and truthfulness of a defendant's statement.  T. 1402.  The court went further and discussed that there is a record of what was said to the defendant upon arrest and that the jury could ask for it.  T. 1402.  The jury did not ask for these things and the court should not have been given such instructions.  As a direct result, the jury came back with a note asking for what was said to the defendant at arrest.  T. 1412; Court Exhibit 9.  The court's pattern in giving non-responsive answers to the jury directly influenced the jury's pattern of deliberation and thus is prejudicial and improper.

The court also erred in its original and subsequent charges on admissibility of the defendant's alleged confession by failing to provide the CJI charge for custodial statements. In that charge, the court should state the following:

> There is testimony that, while the defendant was in custody he/she was questioned by the police and made certain {oral and/or written] statement(s).

> Under our law, before you may consider any such statement as evidence in the case, you must first be convinced that the statement attributed to the defendant was in fact made [or adopted] by him/her. In determining whether the defendant made [or adopted] the statement, you may apply the tests of believability and accuracy that we have already discussed. CJI #.

The court completely omitted this statement of the law. This is particularly troubling because the defendant through cross-examination and in his summation challenged the authenticity of the wording of the alleged confession signed by the defendant. For example, in summation counsel argued:

> Let's look at the statements because in the statements you will find a mixture. You will find a mixture of things that are completely unproven and unprovable; you find a mixture of things that would have been known to Detective Gomez. What would Detective Gomez have known? Well, we heard a lot of things that he would know, and there is this image that everybody is trying to create, that everybody is operating in splendid isolation of everybody else. T. 1181.

Later he added, "But if you go through the statement, you will see a lot of things that just don't ring true, and a lot of them come from that pool of information that was available to Gomez."   T. 1183.   The clear tone of these comments is that Detective Gomez, the officer who wrote out the alleged confession for the defendant, fabricated things in the statement.   This type of defense compels the necessity of instructing the jury as discussed above.

On the next day of deliberations, March 26, 2004, the jury had more questions for the court.   During midday, the jury asked "What is custodial detention?"; "And what rights does the person have while held in custody?" and "Can the police hold you in custody as a witness without informing you of your rights?"   T. 1440.   In response to these questions and in discussion with the attorneys prior to bringing out the jury, the court surmised that "they are getting hung up on legal issues that go beyond the question they are being asked to address."   T. 1441.   Defense counsel cautioned the court not to go beyond answering the questions and discuss the issues of voluntary, knowing, intelligent waiver, etc.   T. 1440-46.

When the jury came out, the court answered the question regarding the rights of a witness in custody.   The error occurred when the court tried to answer "What is

custodial detention?"   Instead of the simple definition of

"custody," the court says:

> I don't want you to be hung up on this.   It is
> not disputed between the parties from 1 AM in
> Kingston (sic) until 4:00 PM or 6:00 PM the next
> afternoon,   Mr.   Garcia   was   in   custody,   in
> detention, so, I mean basically the definition of
> custodial detention, you are not free to leave,
> but when you are asking me the definition, the
> only reason I'm volunteering this, the parties
> agree he was in custody.   There was a dispute
> about the purpose of him being is custody—was
> whether it was on the warrant for questioning.
> No one is argue he wasn't in custodial detention.
> T. 1450-51.

The jury did not ask for all this information.   There was

no reason to again bring about why he was in custody.

The court goes on to address the following questions:

"What rights does a person have while held in custody?   Is

it lawful for the police to hold in custody someone for

questioning as a witness?   And does he have a right to use

a cell phone?"   T. 1451.   The court tells them it is not

lawful to hold a witness in custody.   T. 1451.   The court

then goes further to say "[a] person can only be held

because a court ordered it or because there is, or because

he is being held as a suspect."   T. 1451.   This is not a

correct statement of the law.   The police cannot hold a

person just because he is a suspect.   They can only hold a

person if they have probable cause to believe they

committed a crime.

The court next addressed the phone issue.  T. 1451-52.  However, the court again acts in a non-responsive manner to the last question of "What rights does a person have in custody?"  The answer is simple.  The court should have read the Miranda rights again and the question would have been answered.  Instead, the court marshaled the evidence and arguments.  He was so bold as to tell the jury "I really want to focus you back on the following…"  T. 1452.  The entire content of his answer to this question is contained on T. 1452-55.  None of it answers the question.  The court once again goes into a full depth discussion of "voluntary and truthful."

At one point the court says, "You are not going to rule whether the police did something right or wrong here."  T. 1453.  This is not entirely correct.  The jury was being asked to decide whether the police acted in a manner that resulted in an involuntary or untruthful statement.  In effect, they were being asked to decide whether the police did something wrong to obtain the statements from defendant.  He again failed to answer the question.

The defendant objected to this last charge and asked for a curative instruction.  T. 1455.  He emphasized that the court "trivialized" his defense.  He elaborated that the entire defense was focused on the misconduct of the

police which led to an involuntary waiver of rights and involuntary and untruthful statement.   T. 1455-56.   The court declined to correct it.

In sum, the accumulation of these errors of charge on the law and inappropriate non-responsive answers to juror questions was prejudicial to the defendant and denied him a fair trial and due process of law under the Constitution of The United States and The State of New York.

POINT VI

## THE TRIAL COURT IMPROPERLY CHARGED THE JURY REGARDING A DEADLOCK IN DELIBERATIONS MANDATING REVERSAL OF THE CONVICTION

The jury in this case issued three separate notes on three separate days of deliberation indicating a problem in coming to a verdict. The first such note came at the end of the first day wherein the jury stated that "Can we adjourn for until tomorrow, we are at an impasse." Court Exhibit 11. The court's response was to adjourn for the day. T. 1415-17.

The second note came toward the end of the second day of deliberation where they stated "We are at an impasse—We have looked at/discussed all evidence—What would you suggest we do now?" Court Exhibit 26. The court's response was to give them read back as per another request and say "Obviously I suggest listen to all this testimony. It might give you food for thought. So I think it would be premature to do anything other than that." T. 1465.

On the third day of deliberation at approximately 3:00 p.m., a juror named Linda Taylor sent a note to the judge indicating the following: "I am becoming ill-I do not think we can come to an agreement." T. 1473. Court Exhibit 30. Just prior to this note, a juror named Linda Taylor, was very upset regarding the situation in the

61

deliberation room and revealed her serious concerns to the court and counsel. T. 1474-75. The court briefly interviewed this juror and learned that although she was not physically ill but rather she was extremely distressed by conditions of deliberations in the jury room. T. 1474. The court then responded by telling her to "go back in" and "take a deep breath." T. 1475. He gave her no guidance at that time. It is logical to conclude the Ms. Taylor was a juror with an opinion in the minority in this case.

Shortly after this occurred, the jury sent a note saying: "We the jury are completely deadlocked. How do you know when your hung jury." Court Exhibit 31. At this point, defendant requested an Allen charge. T. 1477. The court gave its version of an Allen charge. T. 1480-83. Once again, the court did not utilize the standard CJI charge. CJI 42.60. The court should have used the standard charge to instruct the jury on how to proceed in this situation. Instead the court crafted its own charge. At the end of the charge, defense counsel objected to the charge expressing his concern on how this charge may impact negatively and in effect create undue pressure on a juror who was in the minority in deliberations. T. 1484-85. The court did not make any corrections.

When faced with a deadlock, a trial court must decide whether to declare a mistrial or give the jury a supplementary instruction directing it to continue deliberating and try to reach agreement. If a court gives a supplementary instruction, the instruction must meet the criteria set by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 501 (1896); People v. Ali, 65 A.D. 2d 523, 514 (1st Dept. 1978), aff'd for the reasons stated in the Appellate Division memorandum, 47 N.Y. 2d. 920 (1979). An appropriate Allen charge "encourages the jurors to continue their deliberations in an attempt to reach a verdict." People v. Shortridge, 294 A.D. 2d 182 (1st Dept., 2002), lv. denied 98 N.Y.2d 681. However, such a charge "must not attempt to persuade jurors to abandon their beliefs or convictions, must not attempt to coerce dissenting jurors to reach a particular verdict, and must not attempt to shame the jury into reaching any verdict." People v. Cowen, 249 A.D. 2d 560 (2d Dept., 1998). The instruction must respect the opinion of the minority in the case. The charge must also stress that "'the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion' of others (citation omitted)." People v. Ali, supra.

In this case, the trial court's supplementary instructions failed to inform the jurors that, while they each should be open to considering the views of the others, no juror should feel compelled to abandon conscientiously held beliefs. People v. Alvarez, 86 N.Y.2d 761 (1995). Instead, the instruction simply stressed the need to get a result because this was the jury that the parties selected and they wanted a verdict from this jury. A charge that stresses the need for a verdict at the expense of the individual juror's judgment mandates reversal. People v. Aponte, 2 N.Y. 3d 304, 308 (2004); People v. Huarotte, 134 A.D. 2d 166, 170 (1st Dept., 1987; People v. Pagan, 45 N.Y. 2d 725, 726 (1978).

The trial judge in this case failed to respect the views and opinions of the minority. He failed to explain that they should not abandon their individual beliefs and that the jury verdict must be the verdict of each individual juror. He failed to discuss that the verdict must be unanimous. He failed to advise that if they could not reach a verdict, a new trial could be scheduled with another jury. These are all factors derived from caselaw over the years and contained in the standard CJI Allen charge.

As a result, the supplemental charge given to this jury failed to negate the coercive implication it made. Since the defendant is entitled to a unanimous and uncoerced verdict, untainted by improper jury instructions, the defendant is entitled to a new trial.

## POINT VII

### THE MAXIMUM SENTENCE IMPOSED BY THE COURT WAS EXCESSIVE AND MUST BE REDUCED

Defendant was convicted of Murder in the Second Degree. The permissible sentence range for this crime is a minimum of fifteen years to life and a maximum of twenty five years to life imprisonment. The trial court in this case impermissibly ignored legitimate mitigating circumstances and factors when they imposed the maximum twenty five years to life sentence. The failure of the trial court to consider and apply all appropriate criteria requires a reduction of the sentence.

An Appellate Court has the power to order a reversal or modification of a sentence where the sentence is unduly harsh. CPL 470.15(6)(b). The decision to modify or even reverse must be based on a determination made upon the facts, the law and/or as a matter of judicial discretion in the interest of justice. CPL 470.15(3). The reviewing court may use its own discretion when reversing or modifying, it does not have to find an abuse of discretion. People v. Suitte, 90 A.D. 2d 80, 85-86 (2d Dept., 1982).

In determining the appropriate punishment for a particular crime the sentencing judge is compelled to

consider the four main objectives of punishment: deterrence, rehabilitation, retribution, and isolation. Suitte, supra, 90 A.D. 2d at 83. Moreover, the court must consider the defendant's personal background and character. People v. Notey, 72 A.D. 2d 279, 282 (2d Dept., 1982). A trial court's failure to do so can justify a reduction of the sentence. People v Sanchez, 112 A.D.2d 840 (1st Dept., 1985). In Sanchez, the Appellate Court reduced a sentence for murder in the second degree from twenty years to fifteen years. The court concluded that this was defendant's first conviction and the imposition of the maximum sentence for a first offender is unusual and requires additional scrutiny. People v. Diaz, 118 A.D.2d 651, 652 (2d Dept., 1986).

There is considerable precedent of the Appellate Court's use of its discretionary power to reduce the sentence imposed for second degree murder convictions. For example in People v. Young, 113 A.D.2d 852 (2d Dept., 1985), the court reduced the sentence of twenty-five years to life to fifteen years to life for a conviction of second degree and attempted robbery in the first degree based upon the fact that the defendant was a teenager with only one prior arrest. In People v Harrison, 120 A.D.2d 358 (1st Dept., 1986), the court reduced the sentence from twenty

67

two years to life to fifteen years to life where the defendant was convicted of killing a woman and injuring seventeen other people.

An examination of the facts if the case at bar requires a reduction from the maximum sentence. The defendant was only seventeen at the time of the incident and nineteen at the time of his conviction and sentencing. This was his first conviction and he received the maximum possible sentence.

Furthermore, while all murders are heinous and tragic, some murders are more reprehensible than others. The legislature created a range of fifteen to life through twenty five to life for this offense, the upper range of the sentence exists for the more heinous cases and for individuals with a criminal history. This case did not involve any premeditation or underlying offense (e.g. robbery, rape, kidnapping). Appellant's background and the circumstances of this case mandate a reduction of the sentence from twenty five years to life to fifteen years to life.

## CONCLUSION

For the reasons stated above, the defendant's conviction must be reversed.   In the alternative, for the reasons stated in Point , Appellant's sentence should be reduced.

Respectfully submitted,

DATED: July 31, 2006

Chris M DiLorenzo, Esq.
Attorney for the
Defendant/Appellant

## STATEMENT OF PRINTING SPECIFICATIONS

This brief was typed in Microsoft Word; the font is Courier New size 12 and contains 13,934 words.

## CERTIFICATION OF SERVICE

I, Chris M. DiLorenzo, an Attorney of the State of New York, hereby affirm as follows:

I am not a party to this action, and I am over eighteen (18) years of age.

On August 3, 2006, I served the within Brief for Defendant/Appellant along with the statement pursuant to R. 5531, and an appendix upon the Honorable Robert Morganthau, District Attorney, New York County by personal service.

Dated:   July 31, 2006                    By: _____
                                          Chris M. DiLorenzo, Esq.
                                          DiLorenzo & Rush

## CERTIFICATION OF SERVICE

I, Chris M. DiLorenzo, an Attorney of the State of New York, hereby affirm as follows:

I am not a party to this action, and I am over eighteen (18) years of age.

On August 3, 2006, I served the within Brief for Defendant/Appellant along with the statement pursuant to R. 5531, and an appendix upon the Honorable Robert Morganthau, District Attorney, New York County by personal service.

Dated:     July 31, 2006                By: _____
                                        Chris M. DiLorenzo, Esq.
                                        DiLorenzo & Rush

**FELIX GARCIA**
**# 04-A-2384**
**AUBURN CORRECTIONAL FACILITY**
**P.O. BOX 618**
**AUBURN, NEW YORK 13024**

Clerk of Court
United States District Court
500 Pearl Street
New York, N.Y. 10007

# 09-Civ-6593
( CM/JCF )

August 10, 2009

Dear Clerk of Court,

    Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure pleas accept the enclosed  amended petition for filing with the Court. As of date there has been no responsive pleading filed in the matter wherefore, an amended petition is appropriate at this time.

    Furthermore, please note that your petitioner intends to further exhaust additional claims in the New York State Appellate Court (**via Writ of Error Coram Nobis**) where a stay will be requested at that time.

Respectfully,

Felix Garcia, # 04-A-2384
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024

CC: file

2009 AUG 13 P 4: 07

RECEIVED
SDNY PRO SE OFFICE



USM
SDN

To: Clerk of the Court (Pro se office)
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States
Court house
500 Pearl Street, Room 230
New York, NY 10007

LEGAL MAIL

F. GARCIA
04A2384
Auburn C.f.
Po Box 618
Auburn, NY 13024

RECEIVED
SDNY PRO SE OFFICE
2009 AUG 13  P 3 45



Legal Mail