Docket and File

# <u>09 CV-6593 (LGS)(JCF)</u>

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 8|14|14
```

Felix Garcia,

Petitioner,

-V. -

Harold D. Graham

Respondent.

### MEMORANDUM OF LAW IN SUPPORT OF HABEAS CORPUS PETITION

PRINCIPAL BRIEF FOR PETITIONER –APPELLANT FELIX GARCIA

Felix Garcia 04A2384
*Pro-Se*
SING –SING C.F.
354 Hunter St.
Ossining NY, 10562

Karen Schlossberg
A.D.A.  For Respondent

**Table of Contents**

                                                                 Pages

Procedural History……………………………………………………1-4

Standard of Review………………………………………………....4

Statement of Facts………………………………………………….5

The suppression hearing……………………………………………7

Suppression Argument……………………………………………11

The suppression decision…………………………………………13

The trial……………………………………………………………14

Summation………………………………………………………....24

Ineffective assistance of appellant counsel………………………25

Arguments…………………………………………………………26

Conclusion…………………………………………………………3

**TABLE OF CASES**

## FEDERAL AUTHORITIES

FEDERAL STATUES

28 U.S.C. 2254 § 1(b).................................................... *passim*
Fourth Amendment......................................................... *passim*
Fifth Amendment........................................................... *passim*
Sixth Amendment.......................................................... *passim*
Fourteenth Amendment.................................................. *passim*

FEDERAL: CASES

Banks v. Dretke, 540 U.S. 668..............................................39
Brown v. Illinois, (1975).........................................27,29,30
California v.  Beheler, 463 U.S. 1121 (1983)............................26,33
Dunaway v. New York, 442U.S.200, (1979)........................... *passim*
Gigolo v. United States, 405 U.S. 150 (1972)...........................36
Green v. Scully, 850 F.2d 894 at 901.) (1988)..........................34
Hayes v. Florida470 U.S. 811,815 (1985)................................30
Kaupp v. Texas, 123 S.Ct. 1843 (2003)..................................30
Malloy v. Hogan, 378 U.S. 1, 8, (1964)..................................34
Miranda v. Arizona, 384 U.S. 436 (1966)............................... *passim*
Mayo v. Henderson 13F.3d 528............................................25
New York v. Quarles, 467 U.S. 649, (1984)..............................26
Pou v. Kean, 977 F.Supp.  577, 583 (N.D.N.Y.1997)....................33
Stone v. Powell 428U.S.465. (D.N.J. 1984)..............................31
Su v. Filion, 335 F.3d 119 (2003)..........................................36,38
Taylor v. Alabama; 457 U.S. 687, (1982)................................27
Thompson v. Keohane, 516 U.S. 99, 112 (1995)..........................33
United States v. Agurs 427 U.S. 97 (1976)...............................36,38
United States v. Bagley, 473 U.S. 264 (1985)............................36
United States v. Wallach 935 F.2d 445, (2d Cir. 1991)...................36
Wong Sun v. United States 371 U.S. 471.................................28

## STATE AUTHORITY

STATUE

Penal Law 125.25.............................................................1
Penal Law 265.02.............................................................1
Penal Law 265.03.............................................................1
C.P.L.440.10....................................................2,3,24,39,40
C.P.L.460.15...................................................................3
C.P.L. 710.40...............................................................35,37

Cases

People v. Figliolo, 207 A.D.2d 679.........................................25
People v. Garcia, 40 A.D.3d. 541(2007).....................................2
People v. Huntley, 15 N.Y.2d 72, (1965)..................................8,29
People v. Leandry, 130 A.D.2d 351 (1987)................................30
People v. Napier, 261 A.D.2d 347..........................................25
People v. Misuis 47 N.Y. 2d 979 (1979)...................................28

People v. Rogers, 48 N.Y.2d 167..............................................25
People v. Savvides, 1 N.Y.2d 554 (1956)....................…..…...........36

# QUESTIONS PRESENTED

### POINT I

THE PROSECUTION FAILED TO MEET ITS BURDEN OF DEMONSTRATING THE LEGALITY OF PETITIONER'S ARREST AND DETENTION, THUS, RENDERING THE HEARING COURT'S DENIAL OF PETITIONER'S MOTION TO SUPPRESS HIS POST *MIRANDA* STATEMENT'S ABSENT AN APPROPRIATE RESOLUTION OF THE FOURTH AMENDMENT VIOLATION ALLEGED BY DEFENSE AN ABUSE OF DISCRETION AND ERROR OF LAW (U.S. CONST., AMEND. 4,6,14).

Sub points

A. THE HEARING COURTS DECISION REGARDING THE VOLUNTARINESS OF MR. GARCIA CONFESSION WAS ERRONEOUS AS A MATTER OF LAW FOR FIFTH AMENDMENT PURPOSES WHEN THE HEARING COURT FAILED TO CONSIDER ALL THE CIRCUMSTANCE OF THE ILLEGALITY OF THE ARREST, DETENTION, WHICH WAS USED TO CONFINE MR. GARCIA TO AN INTERROGATION ROOM, WHILE CREATING THE MOST COERCIVE ATMOSPHERE, AND GRILLING MR. GARCIA UNTIL A CONFESSION WAS PRODUCED 4th , 5th ,14th )

B. MR. GARCIA WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE THE TRIAL COURT ADMITTED THE CONFESSIONS INTO EVIDENCE WITHOUT RESOLVING WHETHER THEY WERE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT (U.S. CONST., AMENDS. 4 AND 14)

### POINT II

PETITIONER WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL AND FAIR PRE-TRIAL PROCEEDINGS WHERE THE PROSECUTION SUBORNED PERJURED TESTIMONY WHICH WAS RELEVANT AND MATERIAL, U.S. CONST., AMEND. 4TH, 6TH & 14th )

### POINT III

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO ADVISE PETITIONER THAT THE RIGHT TO TESTIFY WAS HIS AND THAT THE ULTIMATE RIGHT TO TESTIFY IS HIS, AND FAILING TO ADVANCE AN AFFIRMATIVE DEFENSE OF EXTREME EMOTIONAL DISTURBANCE/FAILING TO PROPERLY INVESTIGATE SUCH DEFENSE U.S. CONST., AMEND. 5th,6th )

PROCEDURAL HISTORY

This appeal is taken from a judgment-convicting Mr. Garcia, after a trial, of murder in the second degree (Penal Law 125.25 [1]), criminal possession of a weapon in the second degree (Penal Law 265.02), criminal possession of a weapon in the third degree (Penal Law 265.03).

This underlying state Court criminal action was commenced on December 31, 2002, by the filing of an indictment, (8065/2002). On February 27,2004, after a Huntley hearing, judge Carol Berkman suppressed the defendant exculpatory statement defendant made while he was in custody but was not Mirandized and denied defendant's motion with respect to his other statements; ultimately never ruling on the reason why defendant was in custody, but only that he was in custody. On March 9, 2004 defendant proceeded to trial before the Honorable James Yates and a jury.

A judgment of conviction was rendered on March 31, 2004. On April 21, 2004 defendant was sentenced to a term of twenty-five (25) years to life, and determinate sentences of five and seven-year terms were imposed to run concurrently. On or about August 4, 2006 defendant's appellant attorney filed a brief before the Appellate Division. In that brief, Counsel raised seven Claims:

(1) That written and oral statements made after he was arrested on one matter during interrogation of an unrelated mattered should have been suppressed because defendant was represented by counsel;

(2) That the alleged oral statements made by defendant to the police prior to leaving the precinct and at central booking were made as a direct result of the unlawful police conduct, not spontaneously volunteered and should have been suppressed;

(3) All physical evidence obtained as a result of the statements unlawfully obtained from the defendant should have been suppressed as the fruit of this unlawful conduct.

(4) The trial court failed to charge the jury with the preliminary instructions mandated by C.P.L. §270.40 and §310.10(2) and thus deprived defendant-appellant of a fair trial pursuant to the 14th amendment, United States Constitution and Article I, Section 6, New York State Constitution.

(5) The court improperly charged the jury on numerous issues of the law and provided inappropriate and non-responsive answers to jurors' questions during deliberations, denying defendant of a fair trial and due process of law.

(6) The trial court improperly charged jury regarding a deadlock in deliberations mandating reversal of the conviction.

(7) The maximum sentence imposed by the court was excessive and must be reduced. In April 2007, the people responded to those claims. On May 31, 2007, the Appellate Division denied the judgement. See; People v. Garcia, 40 A.D.3d. 541.


By motion dated July 5, 2007 Appellate counsel sought leave to the New York State Court Of Appeals raising the same claims addressed to the Appellate Division. The People opposed that motion, and on October 3, 2007, the honorable Robert S. Smith issued a certificate denying leave.

On December 18, 2008 defendant filed a pro se motion pursuant to C.P.L. 440.10 to vacate the judgment.  In that motion defendant raised claims that his trial counsel was rendered ineffective because trial counsel:

(1) Should have advance a claim of Extreme Emotional Disturbance, because defendant was diagnosed with a learning disability and emotional disturbed, and failed to investigate, prepare, and understand that defense; coupled with the fact that surrounded the time of the crime;

(2) That trial counsel prevented defendant from testifying, and failed to explain that the ultimate decision was Mr. Garcia is to make.  The People opposed the motion.  A

decision an order dated April 6, 2009, Justice Yates it was reasonable for counsel to have forgone asserting an EED defense, but that the record was silent as to whether or not counsel prevented him from testifying. Therefore, Judge Yates ordered a hearing on that question.

On July 24, 2009, defendant filed a pro se petition to the court for a writ of Habeas Corpus pursuant to 28 U.S.C. §2254. That petition advanced the same claims raised at the Appellate Division on direct appeal. On August 13, 2009, that petition was amended to include the claim of ineffective assistance of counsel, and the related claims argued in this petition. On September 13, 2012, this court denied defendant's original seven claims. On September 23,2010 this court recalled the order dismissing the petition and stayed the matter pending exhausting of defendant's claims of ineffective assistance of counsel and related claims that were to be addressed on the <u>Error</u> <u>Coram</u> <u>Nobis</u>.

On May 16, 2012 the hearing on the 440.10, motion was conducted before the Honorable Lewis Bart Stone, essentially holding that defendant testimony as incredible and credited trial counsel's testimony that although he did not specifically recall his discussion with the defendant he knew it to be his ethical obligation to his client to do so.

Defendant sought leave to appeal the denial of the 440 motions pursuant to C.P.L.460.15. On August 20, 2013, the appellate Division, first department denied that application; the Honorable James M. Burke denied a re- argument on September 27, 2013.

Defendant subsequently filed a motion for a writ of Error <u>Coram</u> <u>Nobis</u> on or about September 15, 2013, raising the following point:

(1), Did the hearing and trial court error when it denied counsels request for a hearing pursuant to Dunaway/Mapp during/conclusion of the Huntley hearing and/or during /after trial

based on it's misapprehension of the facts/law, thus denying appellant the protection of the statute under the United States & New York State Constitution.

> b. Did the prosecution compound the courts error when the people lead trial counsel to believe what was a detention of a witness/arrest on a bench warrant, was in turn an arrest for a homicide on less than probable cause?

> c. Was trial counsel rendered ineffective by the hearing courts insistence that he failed to advance facts; raise a Fourth Amendment suppression claim/file a timely omnibus motion.

> d. Appellant was denied due process and a fair trial, where the trial court admitted confession that was based upon an unresolved Fourth Amendment violation (U.S. Const., Amends. 4 and 14)

(2) Appellant was denied due process of law and fair trial, where the prosecution suborned perjured testimony, which was relevant and material U.S. Const., Amends. 6 & 14 and N. Y.S. const., article 1 § 6.

The Coram Nobis petition was summarily denied on May 22, 2014.

By letter dated June 2, 2014, leave was sought to appeal that petition to the Court of Appeals.

Decision was rendered for that appeal on August 5, 2014. Garcia has exhausted all his state remedies.


Standard of Review

Mr. Garcia brings this action in accordance to 28 U.S.C. § 2254(d)(1)(2) claiming that the pretrial and trial judge failed to afford Mr. Garcia a full and fair opportunity to raise and argue the Forth and Fifth Amendment claims in accompany to violating the Fourteenth Amendment. In- addition, adjudication of a such claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2).

STATEMENT OF FACTS

On December 13, 2002, at approximately 1:00 a.m., Police responded to the area of 635 East 12th Street in New York County to investigate what had been reported as a homicide. Following a preliminary investigation, the Officers went to Mr. Garcia's apartment at approximately 3:30 a.m. in an attempt to locate Mr. Garcia, who they had been told might have witnessed the alleged crime committed. Mr. Garcia was not present at the apartment at that time, but the Officers did speak with someone present and asked that Mr. Garcia be advised to call the police station when he returned. The Officers returned to the apartment later on that morning at approximately 7:00 a.m. and Mr. Garcia was present and agreed to accompany the Officers to the Ninth precinct to be interviewed, accompanied by his girlfriend. At the precinct, Mr. Garcia was deposited in a waiting area. He was later interviewed; gave a statement indicating that an individual by the name of Kitty to be the alleged shooter. Mr. Garcia was, thereafter, taken to the District Attorneys office, where he repeated his statement before he was allowed to leave to go home. During this period, it was revealed that Mr. Garcia had an outstanding misdemeanor bench warrant that he agreed to return on Monday to clear up. Police over the week attempted to have Mr. Garcia come into the precinct to talk with them; however, Mr. Garcia expressed reservation about cooperating with the Officers and did not show up at the precinct to talk with the police.

Subsequent to Mr. Garcia not showing up to talk with the Officers they learned that he might be with an uncle in Newburgh, New York. At approximately 1:00 a.m. on December 17, 2002, police traveled to Newburgh, New York to locate Mr. Garcia, where they did locate him at his uncle's apartment and after placing he in handcuffs transported him back to the ninth precinct, where the handcuffs were removed and Mr. Garcia was placed in secure-investigation

room on the second floor of the precinct.  Mr. Garcia was given a blanket and slept in the interview until approximately 8:00 a.m., when he was given breakfast.  At approximately between 8:00 a.m. and 9:00 a.m., the police interviewed Mr. Garcia.  Mr. Garcia remained at the precinct and was interviewed (a few more times), without ever being told that he was free to leave, until he made an inculpatory statement following Miranda warnings Miranda v. Arizona, 384 U.S. 436 (1966) and was supposedly placed under arrest at approximately 9:30 p.m., on December 17, 2002. A Huntley hearing People v. Huntley, 15 N.Y.2d 72(1965), was conducted in this case and the hearing Court ruled that the statement made after the administered Miranda was admissible. Judge Berkman never ruled whether or not Mr. Garcia was in custody for either the bench warrant or the homicide, but found that Mr. Garcia was in custody.  (H.M. 298-300). During the hearing after conflicting testimonies arose between Officers Gomez and Martin concerning the impropriety of the seizure, which implicated a Forth Amendment violation relating to the initial seizure up in Newburgh.  Trial counsel moved to address the violation when Justice Berkman claimed that the illegality of the arrest was not an issue and the seizure in Newburgh was not raised in defense counsel's original omnibus motion, due to untimeliness.

The case proceeded to trial without ever resolving the Forth Amendment violation, resulting in Mr. Garcia being convicted of murder in the second degree, and criminal possession of a weapon in the second; and third degrees and he was sentenced to twenty-five years to life.

THE SUPPRESSION HEARING

A <u>Huntley</u> hearing was held before the honorable Carol Berkman, in part 71 of the Supreme Court, New York County, on February 27, 2004 (hereinafter H.M. 9-12, 295)[1]


<u>DETECTIVE DANIEL O'CONNELL</u>, was working the night watch in the Ninth precinct on December 13, 2002, and responded to the vicinity of 635 East 12th street, at approximately 1:00 a.m., in connection with a reported homicide (H.M.99) Following a preliminary investigation, he went to an apartment seeking to locate Mr. Garcia, who he had learned might have witnessed the alleged crime, at approximately 3:00 a.m., Mr. Garcia was not present and the Officer spoke to someone who was present and left a message for Mr. Garcia to contact the police squad, when he returned and the Officer proceeded to the stationhouse (H.M.99-101). He returned to the apartment to locate Mr. Garcia at approximately 7:00 a.m., and Mr. Garcia was present and agreed to accompany them with his girlfriend to the precinct (H.M.101-102).

At the precinct, he seated Mr. Garcia and his companion on a bench outside the detective's squad room and went into the office to inform the detectives that Mr. Garcia was outside on the bench. He never gave Mr. Garcia any special instructions regarding him coming and going (H.M. 102-104).

<u>DETECTIVE JOSE MARTIN</u> was assigned to the Ninth precinct Detective squad on December 13, 2002. He came to work at 8:00 a.m. that morning and was assigned to work on the Ray Villanueva homicide (H.M. 13-14).

---

[1] All numbers in parentheses proceeded by "H.M." refer to pages of the Hearing minutes.

He first saw Mr. Garcia in the precinct in the squad room at 8:00 a.m., when he came in to work. He had been informed that Officers O'Connell and Rivera had brought Mr. Garcia to the precinct because he had apparently witnessed the shooting (H.M. 14-15).

He first spoke to Mr. Garcia between 11:30 and 12:00 noon in the interview room. He did not read him any Miranda warnings at that point because considered him a witness. Mr. Garcia gave a statement identifying an individual known to him at Kitty, as the shooter, who he later identified as Jose Adames (H.M. 15-18).

Following an investigation of the information Mr. Garcia had given him, it was discovered that the individual Mr. Garcia had identified from the PIMS was incarcerated. Though Mr. Garcia had remained at the precinct, he did not see him any more until December 17, 2002, in Newburgh, New York (H.M. 18-19).

He accompanied Police Officer Edwin Gomez and Sergeant Malloy to Newburgh, New York, on December 17, 2002, at approximately 1:00 a.m., Mr. Garcia was located in Newburgh, New York at his uncle's apartment, he placed handcuffs on Mr. Garcia, and he was transported back to the Ninth precinct in an unmarked police car. At the precinct, the handcuffs were removed and Mr. Garcia was placed in a secure interview room and given a blanket and Mr. Garcia fell asleep in the interview room, where he slept until approximately 8:00 a.m., when he was given breakfast. Between 8:00 a.m. and 9:00 a.m. that morning, he interviewed Mr. Garcia (H.M. 74-75, 76-82). He interviewed Mr. Garcia later that day, but did not make a record of the interview (H. 87-88). That was the; Last time he interviewed Mr. Garcia, before preparing a complaint follow-up report indicating Officer Gomez and effected the arrest of Mr. Garcia at 9:30 p.m. (H.M. 90).

DETECTIVE EDWIN GOMEZ was working the 8:00 a.m. to 4:00 p.m. shift out of the Ninth precinct on December 13, 2002. He arrived at the precinct approximately 8:00 a.m. that morning and shortly thereafter saw Mr. Garcia in the precinct. He recognized Mr. Garcia from having seen him grow-up in the neighborhood, as Chumpy. He greeted Mr. Garcia and asked why he was there, to which Mr. Garcia responded that his friend had been killed (H. 107-109, 156).

At approximately 10:00 a.m., he was asked to talk to Mr. Garcia to one of the detectives and he did. He did not read him any Miranda warnings, because he viewed him only as a witness. Mr. Garcia gave him a statement identifying an individual known to him as Kitty, who was later identified from the PIMS as Jose Adames. He spoke to Mr. Garcia at greater length about this statement at approximately 2:00 p.m. (H.M. 110-111, 115, 120, 158).

It was discovered during this period that Mr. Garcia had an outstanding misdemeanor bench warrant, which Mr. Garcia agreed to come in on Monday and be cleared up. Mr. Garcia was, thereafter, transported to the District Attorney's office by Officer Gomez and his partner, Officer Rivera, where he repeated the statement he had earlier given to Officer Gomez (H.M. 121-123, 149). Mr. Garcia, then, indicated he wished to leave and after providing Officer Gomez, his cell-phone number and was permitted to leave (H.M. 126).

He next spoke with Mr. Garcia via phone on Saturday, December 14, 2002, in an attempt to get more information from Mr. Garcia (H.M. 127, 163). He, again, spoke with Mr. Garcia via telephone on December 15, 2002, at approximately 9:30 a.m. and Mr. Garcia appeared reluctant to continue talking to police. On Monday December 16, 2002, he issued a *Want card* see (Ex, "A") for Mr. Garcia (H.M. 166-167). Thereafter, he discovered that Mr. Garcia may be in Newburgh, New York with his uncle and at approximately 1:00 a.m. on December 17, 2002, he

|P a g e                                                                                              9

traveled to Newburgh, New York accompanied by Sergeant Malloy and Detective Martin to locate Mr. Garcia.  Mr. Garcia was located in Newburgh, New York at his uncle's apartment, where he was placed in handcuffs, placed in the backseat of an unmarked police car and transported back to the Ninth precinct. Upon arriving at the precinct, the handcuffs were removed and Mr. Garcia was placed in a secure interview on the second floor of the precinct, where he slept until approximately 8:00 a.m. (H.M. 128-129, 131-132, 134-135, 150-151, 171-172).

Detective Gomez, subsequently, claimed that he acquired information that led him to belief that Mr. Garcia was a suspect and read him Miranda warnings at approximately 4:00 p.m. (H.M.134-138, 181).  Thereafter, he interrogated Mr. Garcia and Mr. Garcia allegedly gave a statement admitting that he had been the shooter, which was entered evidence as People's #3 (H.M. 139-145, 178, 181).

Mr. Garcia allegedly made another statement to detective Gomez at approximately 8:00 p.m. that evening (H.M. 146-147).  Defense counsel, thereafter, raised a Fourth Amendment violation with the Court, which the Court denied (H.M.185-187).

DETECTIVE ENRIQUE RIVERA was partnered with Detective Gomez on December 13, 2002, and saw Mr. Garcia at the precinct when he came in to work at approximately 8:00 a.m. (H.M. 219-221, 237-238). He later escorted Mr. Garcia, along with Detective Gomez, to the District Attorney's office.  He remained with Mr. Garcia and witnessed his statement about the homicide (H.M.222-226, 230-231, 243-244).  At approximately 9:00 p.m., Mr. Garcia expressed his wish to go home and was permitted to leave (H.M. 232).

On Saturday, December 14, 2002, he received a telephone call from Mr. Garcia expressing doubts about being a witness (H.M. 234-235, 247).

| P a g e                                                                                                10

DETECTIVE RICHARD STARK, who knew Mr. Garcia from the time he'd spent patrolling the neighborhood, as Chumpy, escorted Mr. Garcia to Central Booking on December 17, 2002, where Mr. Garcia allegedly made a spontaneous statement to him indicating that he had to get him because he was going to get him (H.M. 250-253).

SERGEANT CHARLES MALLOY was working as a supervisor in the Ninth squad on the night of Monday, December 16, 2002 going into the morning of Tuesday, December 17, 2002. At around midnight, he left New York City, accompanied by Detective Martin and Police Officer Gomez, to travel to Newburgh to pick up Felix Garcia, who had an outstanding trespass warrant and was a witness in a homicide on the lower Eastside (H.M. 255-256). They took Felix Garcia into custody in Newburgh, New York, where he was handcuffed and placed into the backseat of a police car and transported back to the Ninth precinct and Mr. Garcia did not request an attorney during this time (H.M. 257-259).

Upon arriving at the precinct, the handcuffs were removed and Mr. Garcia was placed in a secure interview room on the second floor of the precinct, where the door was locked and Mr. Garcia was given a blanket and went to sleep on the floor of the interview room (H.M. 259-260, 274-275).

Defense counsel, again, raised the Fourth Amendment violation with the Court and the Court responded by informing counsel that the Fourth Amendment issue had been waived (H.M. 270-273).

SUPPRESSION ARGUMENTS

While acknowledging that the Court had already ruled the Fourth Amendment, issue was not raised, and the Court would not deal with that issue, the Court invited the prosecution to give its legal position on the custody issue relative to December 17, 2002 (H.M. 280).

The prosecution's position was that Mr. Garcia was taken into custody on the trespass warrant and in connection with the homicide (H.M. 284). With the prosecution's legal position stated, the Court heard the defense argument and, then, the prosecutions argument (H.M. 285).

The defense argued that the handcuffing of Mr. Garcia and his placement in a locked interview room would lead a reasonable person not guilty of any crime to believe he was in custody. The question then becomes whether there was any legality to the custody (H.M.285-286); and further stated that the testimony of the Officer's was not apprehension on the Bench warrant, but apprehension on the homicide on less then probable cause. Trial counsels further attempted to educe whether or not probable cause existed for the homicide, but was precluded from doing so by the hearing Court. Facts were elicited from the officer's only in a circumscribed way; which did reveal an arrest on the homicide on less than probable cause. Mr. Garcia was not, according to police, taken into custody on the misdemeanor warrant for they had not followed any of the lawful procedures that would have validated such custody. Additionally two of the arresting officers' testimony revealed that the purpose of this seizure was not on the bench warrant. Moreover, there was no evidence presented that would have supported the legality of this custody as a material witness. Therefore, there was no legality to Mr. Garcia's detention and everything that happened thereafter is the product of the illegal detention throughout the day of December 17, 2002 (H.M. 287-288). Defense counsel also argued that the People had failed to present any evidence of attenuation. Moreover, the defense argued Mr. Garcia was illegally in custody on December 13, 2002, and all statements made on that date should be suppressed, as well (H.M. 286-290).

The prosecution argued that relative to December 13, 2002, Mr. Garcia was not in custody but had voluntarily accompanied police to the precinct (H.M.290). Relative to the

morning of December 17, 2002, the prosecution argued that, if the Court found that Mr. Garcia was, in fact in custody illegally, the illegality was attenuated. Mr. Garcia, she argued, was given a blanket, allowed to sleep and given breakfast that morning. He was not interrogated within the meaning of interrogation and the first statement should stand for those reasons. As for the statement made after being given his Miranda warnings, there was a considerable break between the first statement at 8:00 A.M. and the signed statement, as well as the subsequent statements that had not resulted from interrogation (H.M.291-293).

Defense counsel reiterated his prior argument that he in no way waived the Fourth Amendment constitutional issue. However, counsel addressed the hearing court by making aware to the Court that after review of his records he notified the People that a Fourth amendment violation presented itself which counsel was not aware of prior to the hearing, and that if the People had any evidence of attenuation they should bring it forward. The People brought none forth before or at that time of the Hearing (H.M., 288-289, 294).

THE SUPPRESSION DECISION

The Court stated at the outset that defense counsel's pre-trial motion was untimely and did not properly raise or timely address any Fourth Amendment claims (H.M.295-296) The Court found essentially, that the prosecutions witnesses were credible and the Court accepted their testimony. The Court also found beyond a reasonable doubt that defendant was not in custody on December 13, 2002. However, was unable to say whether defendant was in custody on December 17, 2002. Thus, the hearing Court found that the "chilly Willy" statement given at 9:00 a.m. would be suppressed; however, the statements that succeeded Miranda warnings came after a considerable break and would be admissible.

As to the issue of defendant's request for counsel, the Court found it was not credible and the suppression motion was accordingly denied (H.M. 300-302). The defense moved via written motion to reargue the Fourth Amendment violation (R.M. 2-4)[2]

The defense had called only one witness, CHARLES TRAVELLA, the uncle of Mr. Garcia who testified that he was present in Newburgh, New York, when the police took Mr. Garcia into custody and heard Mr. Garcia request an attorney (H.M. 201-212).

THE TRIAL

POLICE OFFICER PEDRO VELASQUEZ a police Officer for eighteen (18) years was working patrol out of the Ninth precinct on December 12, 2002, into the morning of December 13, 2002, with his partner, Police Officer Jung. They were patrolling in a marked police car, in which he was the driver and his partner the recorder (T. 41-43)[3]. At approximately 1:10 a.m., they received a radio call from central for shots fired at 635 East 12th Street; they were only a few blocks away and headed towards that location, which was between Avenues B and C (T. 43-44). En route to the location they were flagged down by Ryan Naves, who told them that his friend had just been shot, after which he was told to get into the backseat of the police cruiser and they continues to the location (T. 45, 76-78). Upon arriving at 635 east 12th street, they observed a black S.U.V. parked in front of the location with a male in front of the S.U.V. They, also, observed a male lying facedown on the sidewalk by the columns to the entrance of the building (T.46). He directed his partner to assist the victim and he attended to the crime scene to insure that the person standing in front of the S.U.V. was not the perpetrator or witness and make

_____

[2] All numbers in parentheses preceded by "R.M." refers to pages of the re-argument proceeding minutes.

[3] All parentheses proceeded by "T. refers to pages of the trial minutes.

sure he stayed there. He learned the individual's name was Diagne and that he was there to pick up someone, and that he was employed by taxi agency. He also, patted down Diagne because he was not sure the assailant; whether he possessed any type of weapons. Before the ambulance arrived, he approached the victim, who was bleeding from the face area but conscious. E.M.S. workers cut the victim's jacket away and left it behind before removing him from the scene (T.48-52). He remained on the scene probable 10 to 15 minutes, took no steps to interview any witness; though he talked with Ryan Naves on the drive from the location, who merely told him that his friend had been shot and where he was, information he related to detective Jose martin. He then turned Ryan Naves over to his supervisor and left the scene and proceeded to another job (T.53-66, 74).

ADAM BAILEY Who lived on the lower east side on 11th street, between Avenues B and C, was at home on December 13, 2002. At approximately 1:00 a.m. in the morning, while watching television with his girlfriend, heard a gunshot and looked outside his window, where he saw someone lying down on the pavement. He then called 911, as he continued to out the window (T. 125). He informed the 911 operators that someone appeared to be shot and gave him or her, the location. After hanging up the phone, he continued to look out the window and observed someone slowly approach from out of the Housing complex and up to the body lying down on the pavement. Shortly, thereafter, he saw a second individual coming from the other side from a different angle and walk up and the first individual he had seen started to run away. He saw the second shoot the person lying down and then run away. The person shot was lying face-down and wearing a big black jacket and the person who came out of the building and did the shooting was wearing a similar jacket, though not as big as the victim's. The first person, which came out and approached the victim, was wearing a thinner jacket and he had approached

| P a g e                                                                                            15

within 3 to 4 feet of the victim before running away. The shooter walked up to the victim towards the head area, took a gun, shot, and then walked away (T.90-104, 132). Afterwards, he saw the police come to the scene and he went downstairs and spoke with a detective, before going back to his apartment. There came a time, after speaking with the police on December 13, 2002, that he, again, spoke to the police before the commencement of the trial (T. 106-107).

RYAN NAVES was mopping the hallway of his apartment at approximately 1:00 a.m. on the morning of December 13, 2002, when he heard a shot and a thud outside. He looked out the window and saw Ray's feet sticking out from the pillar. He then, put on his cloths, grabbed his cell phone, and ran outside. Arriving downstairs, he observed Ray lying facedown on the ground bleeding profusely with his cell phone to his ear (T. 158-159, 178). Ray said he did not know who shot him and asked Ryan to call him an ambulance but before he could do so he observed someone appear from behind the pillars and he back peddled away, as the person came closer to Ray, aimed a gun to the back of Ray's head and shot him. He, then, ran away towards Avenue C and flagged down help from police in a squad car coming down Avenue C (T. 160-161, 179). He got into the backseat of the police car, the Officer asked him what happened, and he told them that he had heard shots and came down and saw Ray was lying there. He did not tell them that he saw Mr. Garcia shoot Ray, because he claimed he did not wished to get involved (T. 162-163, 216, 443). He spoke to detectives at the precinct approximately a week later, after someone he knew approached the detectives investigating the case, at which time he told them he knew who had did the shooting (T.164, 167, 223). He had been about 5 to 10 feet away from Raymond Villanueva, when he first saw Mr. Garcia peek out from behind the pillar, creep closer, pull out a gun, aim the gun to the back of Ray's head and pull the trigger. After which Mr. Garcia put the gun back into his pocket and jog off back into the building (T.182 –186, 432).

Assistant District attorney Jeanine Launay, on re-direct, elicited testimony from Ryan that when he came to the precinct was the first time he had told the police that he'd seen Mr. Garcia shoot Ray (T. 448). Following an off-the-record discussion, the prosecution was permitted to recall Ryan to the stand and reveal that he had in fact given false testimony during his earlier sworn testimony, (T.450-455).

HAMMLETT CUELLO, a paramedic employed at Cabrini Medical Center, started work at 11:00 p.m. on December 12, 2002, with his partner, Julie Markowski; and received a call approximately 1:14 a.m. on December 13, 2002, for a person shot at East 12th street and Avenue B. He proceeded to that location within three minutes of the call (T. 231, 235-236). Upon his arrival at the location, his attention was directed to a person shot, which lay facedown on the sidewalk. The person was breathing, and a cell phone was in his hand and he was fully clothed (T.237-238). The person's jacket was cut off, as well as his shirt, and injuries to the person's head were observed and to his left cheek; he was removed to Bellevue Hospital (T.239, 240-243).

REGINA WARD, Worked as a civilian worker for the New York City police Department, as a communication technician, who makes reproductions of 911 calls, which are kept as part of the regular and ordinary course of business (T.252-253). Her office received a subpoena related to the December 13, 2002, approximately 1:00 a.m. referring to the call that matched this information and, then, made a reproduction of two 911 calls related to the incident and the reproductions accurately represented those two telephone call (T.256-258).

DR. THOMAS GILSON, a medical examiner employed by the City of New York, performed an autopsy on Ray Villanueva on December 13, 2002, which was assigned case number MO2-6571, preparing a report of the autopsy that is kept in the regular, ordinary course

of business in the medical examiner's office. Based upon this autopsy, Dr. Gilson determined Ray Villanueva's cause of death to be the gunshot wounds that he received to his head with the injuries he'd described and the manner of death to be homicide (T. 288-289, 296, 303, 323-324).

DETECTIVE RICHARD STARK was working out of the Ninth precinct on the night of December 17, 2002, and transported Mr. Garcia, whom he knew as Chumpy from his years patrolling the neighborhood where Mr. Garcia grew-up, to Manhattan Central Booking (T. 343-346, 349). While waiting in the hallway for Mr. Garcia to be lodged into central Booking, Mr. Garcia allegedly said to him, spontaneously, "I had to do it. I had to get him; he was going to get me"; a statement he never wrote down (T.347, 357).

DETECTIVE ENRIQUE RIVERA was partnered with Detective Edwin Gomez and was working the 8:00 a.m. to 4:00 p.m. shift on December 13, 2002 (T. 530- 532). He saw Mr. Garcia on that day in the squad room of the Ninth precinct with a female companion. He later accompanied Mr. Garcia and Detective Gomez in a patrol car to the District Attorney's office, at approximately 5:00 p.m. (T.532-533). While in the car on the drive to the District Attorneys Office, Mr. Garcia had said that he had run during the shooting because he was afraid that he, too, might be shot, because he looked like Ray. After arriving at the District Attorney's office, Mr. Garcias was interviewed at approximately 6:00 p.m. and during the interview he said that he had been hanging out with a few friends and Ray Villanueva, when he observed Robert Adams and an individual known to him as Kitty, later identified as Jose Adams, walk towards them. He shook Ray's hand and said he was leaving and as he left, he turned around and heard a shot and started to run. When he turned around again, he saw Ray on the ground and he heard another shot and, then, he ran away and he saw Kitty running away (T. 535-538). Mr. Garcia gave a clothing description for the person he saw running away from Ray; a black pea coat and

timberland boots, which he did not remember the color of (T.539). The statements Mr. Garcia made were written down and signed at approximately 6:00 p.m. Mr. Garcia, was allowed to leave the District Attorney's office shortly after signing the statements at 6:30 p.m., with the understanding that he would return, to clear up an outstanding misdemeanor bench warrant on Monday morning (T.544-546). He received a call at the Ninth precinct on December 14, 2002 from Mr. Garcia at approximately 4:40 p.m., in which Mr. Garcia, essentially, expressed doubts about further assisting the police any further (T. 548-549). The Court discussed methods of evaluating voluntariness and truthfulness of statements with the jury (T.566-567).

DETECTIVE EDWIN GOMEZ was working the eight a.m. to four p.m. shift on December 13, 2002 at the Ninth precinct and saw Mr. Garcia in the precinct on that morning when he began his shift. He recognized Mr. Garcia, as "Chumpy" from the neighborhood, and asked why he was at the precinct. He was later asked to speak with Mr. Garcia, by Detective Jose Martin (T. 602-606, 717). He spoke to Mr. Garcia at approximately 10:00 .am; and did not read him Miranda warnings because he was speaking to him as a witness (T. 606-607). When he spoke with Mr. Garcia, Mr. Garcia told him that he and Ray had been hanging out with a couple of there friends, when he observed two people walking towards them up the block from Avenue B to Avenue C, he knew one of the individuals as Kitty, but did not know the other person's name. He told Ray he was leaving. They slapped five's, he, and another friend, Kevin, walked off. Upon getting about five steps away, he heard a loud sound and began to run. He ran for about another ten steps before he turned and saw the individual he knew as Kitty; a light-skinned Hispanic make, approximately five-four, chubby with a moustache and goatee, wearing black boots, blacks pants, a black coat and black scully cap running from the scene. He continued running and heard a second shot. He turned around and ran back and Ray was on the ground not

moving, at which point he ran into his friend's at 205 Avenue C, where he played video games until morning (T. 608-610).

Subsequently to speaking with Mr. Garcia, he took him to the PIMS machine to look at photographs and Mr. Garcia picked out a photograph of Jose Adams, as being the shooter (T. 618-619).   He spoke to Mr. Garcia, again, at approximately 2:00 p.m. and Mr. Garcia, essentially, repeated the story he had told earlier, which was put into writing and signed by himself and Mr. Garcia (T. 619-624).

Thereafter, accompanied by his partner, Detective Rivera, he escorted Mr. Garcia to the District Attorney's office with his partner, while he went to the Manhattan House of Detention to interview Jose Adames who was incarcerated there since October 24 (T. 626-627).   After interviewing Jose Adames, he returned to the District Attorney's office and found that Mr. Garcia was still there. Mr. Garcia, then, was allowed to leave to go home, after coming to an understanding that he would come in on Monday morning to clear up an outstanding misdemeanor bench warrant (T. 628-629).

He next spoke with Mr. Garcia between 11:00 a.m. and 12:00 noon on Saturday, December 14, 2002 and Mr. Garcia had told him he was in the Bronx doing some shopping, but would try to make it to the precinct to talk with him.  When Mr. Garcia had not made it to the precinct by 2:30 p.m., he spoke with Mr. Garcia, again, via telephone, at which time Mr. Garcia informed him that he was having second thoughts about being a witness (T. 633-635).   Mr. Garcia did not show up at the precinct on Monday morning, as planned, and he issued a Want card  for Mr. Garcia.  He learned from Mr. Garcia's grandfather on Monday that Mr. Garcia might be in Newburgh, New York with an uncle, so at approximately 1:00 a.m. on December 17, 2002, he traveled to Newburgh, New York, accompanied by Sergeant Malloy and Detective Jose

Martin, to locate Mr. Garcia.  They located Mr. Garcia at his uncle's residence in Newburgh, New York and after patting him down and placing him in handcuffs, he was placed in the backseat of an unmarked police car and transported back to the Ninth precinct (T. 626-642).

During later afternoon, on Tuesday, December 17, 2002, he returned to the crime scene, accompanied by Assistant District attorney Launay and Detective Martin, where an individual who asked to speak with him approached him.  They walked toward Avenue B and 12th street, entered a building at 10th street between avenues B and C, where he spoke with Ryan Naves, who told him that he had witnessed the shooting and that Mr. Garcia was the shooter

Following a conference out of their presence of the jury, the defense argues that Ryan Naves had testified falsely before the jury and the prosecutor was aware that he was testifying falsely, because she had been present during an unrecorded interview with Ryan Naves, which had not been disclosed to the defense (T. 652-655, 668-670).  The prosecution admitted that this unrecorded interview with Ryan Naves had served to make Mr. Garcia a suspect (T.659). Following this conference out of the presence of the jury, the prosecution was permitted to pursue a line of questioning which, essentially, impeached Ryan Naves; testimony regarding when he first told police that he had saw Mr. Garcia shoot Ray Villanueva (T. 681-687).

Subsequent to this conversation with Ryan Naves, detective Gomez retuned to the precinct, where Ryan Naves later came at approximately 6:00 p.m.  He, thereafter, read Mr. Garcia his Miranda rights and Mr. Garcia, allegedly, made a statement admitting that he had been the shooter, which statement was written down by detective Gomez and signed by him and Mr. Garcia; entered into evidence as people's 27 (T. 684-687, 690-698, 702-707).

Defense, subsequently, advised the Court that Judge Berkman had prevented him from going into the Fourth Amendment violation at the suppression hearing, to which the prosecution conceded to be the case (T.757-758)

DETECTIVE JOSE MARTIN, came to work at the Ninth precinct at 8:00 a.m. on Friday, December 13, 2002, and was assigned to work the Raymond Villanueva homicide (T. 959,995). He read all the paperwork that had been filled out by those working the night before and discovered that there were witnesses to the crime and one, Felix Garcia, was in the precinct (T.961) He had seen Mr. Garcia by the sergeant's office when he had first come into the squad room (T.962)

He first spoke to Mr. Garcia on December 13, 2002, between 11:30 a.m. and 12:00 noon (T.969, 995). Mr. Garcia told him, in substance, that he had observed two individuals pass by, one of whom he knew as kitty, which he believed to be a cousin to Ramón Adames, and one of these individuals had been the shooter of ray Villanueva (T.970) Mr. Garcia was shown photographs from the PIMS machine and identified Jose Adames as the shooter (T.971)

He was aware that Mr. Garcia was reluctant to get involved over the weekend and, though, he had promised to come in to the precinct, he never did come in (T.973-974, 999). He was, also, aware that Detective Gomez had issue a Want card (Ex. "A") for Mr. Garcia on Monday, December 16, 2002 and he was aware that there was an outstanding misdemeanor trespass bench warrant out for Mr. Garcia. It was his understanding regarding the bench warrant that Mr. Garcia would come in on December 16, 2002, and have the warrant vacated, but he did not come in (T.974-975)

He learned that Mr. Garcia might be in Newburgh, New York with an uncle and he traveled to Newburgh, New York at approximately midnight on December 16th into December

17th, accompanied by sergeant Malloy and police Officer Edwin Gomez, to locate Mr. Garcia and bring him back, because he thought Mr. Garcia knew more than what he was saying. They found Mr. Garcia in Newburgh, New York and he was placed in handcuffs before being placed in the backseat of an unmarked police car and transported back to the Ninth precinct, where he was placed in a secured interview room on the second floor of the precinct. The handcuffs were removed, he was given a blanket and he slept in the interview room on the floor until approximately 8:00 a.m. that morning, when he was given breakfast. Martin spoke with Mr. Garcia between 8:00 a.m. and 9:00 a.m. he had arrested Mr. Garcia in Newburgh, New York allegedly for the misdemeanor bench warrant. His status relative to the homicide was strictly that of a witness, so he was not immediately taken to Court on the bench warrant because he wanted to question him about the homicide (T.976-978, 1006-1007)

During the questioning of Mr. Garcia at between 8:00 a.m. and 9:00 a.m., Mr. Garcia had said he was afraid of the individual involved in this shooting and proceeded to tell a story about a fifty-thousand dollar contract on the life of Ray Villanueva and an individual named Chilly Willie, who he said was the shooter (T.979-981, 1008)

Prior to speaking to Mr. Garcia on December 17, 2002, he had gone to interview Ryan Naves (T.983). Following this interview with Ryan Naves, Naves came to the precinct at approximately 5:00 p.m., at which time Mr.Naves was interviewed, again, and made a written statement identifying Mr. Garcia as the shooter (T.987-996, 1046, 1048) The Court, again, advised the jury regarding voluntariness (T.1070-1071)

DETECTIVE O'CONNOR, WALSH, assigned to the microscopic section of the forensic division, received property on December 17, 2002, for analysis relating to a case that occurred on

December 13, 2002. Following analysis he determined that both shell casings submitted were fired from the same weapon (T.1074, 1082, 1086)

DETECTIVE DANIEL O'CONNELL was working the night watch on December 13, 2002(T.1092). He received a call about a homicide and he went to the location of 635 East 12th Street at approximately 1:30 a.m. in connection with that call, accompanied by detective Rivera (T.1093). He spoke to a couple of witnesses at that location, including Adam Bailey and Ryan Naves to develop contact information (T.1095). He learned from a woman that ray Villanueva always hung-out in front of the building with Mr. Garcia and gave him Mr. Garcia's nickname Chumpy, and an address. At approximately 3:30 a.m. he proceeded to the address and discovered, that Mr. Garcia was not there; however, he spoke to some else at the address asking them to have Mr. Garcia contact police upon his return. He returned to the address at approximately 7:00 a.m. and found Mr. Garcia present. Following a brief conversation, Mr. Garcia agreed to accompany him to the precinct, accompanied by his girlfriend, he voiced some concerns about going to the precinct on the drive there, upon arriving at the precinct Mr. Garcia was left sitting in the hallway and he informed the supervisor and Detective Martin that Mr. Garcia was in the hallway (T.1097-1099, 1100-1101).

SUMMATION

The only issue, which arose at summation, was trial counsel admitting the error of electing to forgo Mr. Garcia's right to testify. Attached to this petition and Affixed to the annexed (See Ex. "F", memorandum of law of the 440.10 motion) motion is an exhibit of the trial transcript of trial counsel (Daniel Nobel) admitting that it was his decision for mister Garcia not to testify, which the court took Judicial Notice of at the 440 Hearing.

Ineffective Assistance of Appellant Counsel

Mr. Garcia makes claims of ineffective assistance of appellant counsel for purposes efficiency. All issues raises herein were preserved through either through Error Coram Nobis, or 440.10 vehicles.

The issues appellate counsel rose on appeal were deemed by this court to be non-cognizable or preserved for federal review. Nor were those issues stronger than the claims trial counsel vigorously argued and made him aware of. For example Mr. Dilorenzo would have made a better use of raising the illegal seizure, and Abuse of Discretion issue in the context of Dunaway, 442 U.S. 200, and People v. Figliolo, 207 A.D.2d 679.

Compared to the Right to Counsel rationale under (see People v. Rogers, 48 N.Y.2d 167, also See, People v. Napier, 261 A.D.2d 347. Because a ["rearrest on a bench warrant, followed by immediate questioning at the police station prior to any court proceedings or reincarceration on the warrant, is not the type of custody contemplated by the Rogers rationale".

Quite ostensible, the defendant did not remain in "continuous custody" with respects to arguing that the police arrested Mr. Garcia under the guise of the unrelated bench warrant matter. Let alone does the right to counsel argument meet a federal standard under

Consequently, when Appellate counsel raised the Right to Counsel issue, over the Dunaway violation and Abuse of Discretion arguments; by ever sense of definition, appellate counsel undermined and compromised the defendant appeal. "Although appellate counsel is not required to raise every non-frivolous issue on appeal, counsel will be deem ineffective if he or she omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson 13F.3d 528, 533. (2d Cir. 1994)

POINT I

THE PROSECUTION FAILED TO MEET ITS BURDEN OF DEMONSTRATING THE LEGALITY OF MR. GARCIA'S ARREST AND DETENTION, THUS, RENDERING THE HEARING COURT'S DENIAL OF MR. GARCIA'S MOTION TO SUPPRESS HIS POST *MIRANDA* STATEMENT'S ABSENT AN APPROPRIATE RESOLUTION OF THE FOURTH AMENDMENT VIOLATION ALLEGED BY DEFENSE AN ABUSE OF DISCRETION AND ERROR OF LAW (U.S. CONST., AMEND. 4,6,& 14).

It is well established that "the prosecution must show not only that the statements meet the Fifth Amendment standard, but also that the causal connection between the statement and the illegal arrest is broken sufficient to purge the primary taint of the illegal arrest in light of the distinct policies and interest of the Fourth Amendment", Dunaway *v.* New York; 442 U.S. 200, at 204 (1979).  The New York Court of Appeals has also held that, "Unless the People establish that the police had probable cause to arrest or detain a suspect, and unless the defendant is accorded an opportunity to delve fully into circumstances attendant upon his arrest and detention, his motion to suppress should be granted.  People v. Misuis 47 N.Y. 2d 979, at 980.  (1979)

The respondents failed to also show any reasonable explanation for taking Mr. Garcia into custody on the homicide, other than for questioning as a "witness" and thus, rendering this justification an illegal rationale for such a detention and any explanation regarding handcuffing Mr. Garcia for safety purpose is inapplicable as well.

The very fact that Garcia was dragged out his uncle's home in Newburgh, New York, and forced into handcuffs, leaves no room for doubt that he was in custody at that time for Fourth Amendment analysis.  See, New York v. Quarles, 467 U.S. 649, 655, (1984) (holding that: ["the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"] [quoting]; California v. Beheler; 463 U.S. 1121, 1125).  (1983).  Here the police testified that Mr. Garcia was not apprehended for either the

homicide or pursuant to any bench warrant, but was detained and handcuffed for the purpose of questioning. The Respondent's posited, for the first time at the pretrial hearings, that Mr. Garcia was seized as either witness to the homicide or arrested on the bench warrant. This Court should bear in mind that the respondents initially stated in their Voluntary Disclosure Form that Mr. Garcia was arrested for the homicide.

Of equal import, the "Case Reports" filed by Officer, Gomez and Detective Martin state that this case was closed with one arrest on the <u>homicide</u>. (Ex. "B") In fact, the computer printout of which details Mr. Garcia's arrest on the December 17th of 2002 unequivocally states that Mr. Garcia was arrested as a suspect on the homicide, (Ex. "C"). Additionally, a portion of the probation report which reflects Mr. Garcia's pending chargers at that time, specifically show Mr. Garcia as being returned on the bench warrant on 12/18/02, the next after the case was closed by the arresting officers (Ex. "D"). The respondents can not, will not, and have never produced, at any time before pretrial hearings or after, any reliable evidence that Mr. Garcia was lawfully arrested on the outstanding bench warrant. All evidence demonstrates contrary to what the respondents claim.

<u>THE HEARING COURT'S ERROR</u>

Under well-established precedent, (["the fact that [a] confession may be 'voluntary' for purpose[s] of the Fifth Amendment, in the sense that <u>Miranda</u> warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. In the instant situation, "a finding of 'voluntariness' for purpose of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis."] ); <u>Taylor</u> *v.* <u>Alabama</u>; 457 U.S. 687, 690. (1982) <u>Dunaway,</u> supra, 442 U.S. 200, at 217-218. (1979), <u>Brown</u> *v.* <u>Illinois</u>, supra at 602, (1975).

In this case only a <u>Huntley</u> hearing was held, and, indeed, the hearing Court severely limited defense counsel from litigating the probable cause issue. Consequently, what ensued was the hearing Court analyzed the voluntary nature of Mr. Garcia's confession using solely a Fifth Amendment standard of review, and then applying temporal proximity and intervening factors, without ever considering whether the "purpose of flagrancy" of the police in this case could withstand Fourth Amendment scrutiny. As the United States Supreme Court held in <u>Brown v. Illinois</u>, supra at 602, "<u>Wong Sun</u> v. <u>United States</u> 371 U.S. 471 thus mandates consideration of a statement's admissibility in light of the distinct polices and interests of the Fourth Amendment."

As the <u>Brown</u> Court (Supra) has established that three factors are to be considered when considering a Fourth Amendment violation with regards to attenuation ;( 1) <u>Temporal proximity</u>; (2) <u>Intervening factors</u> ;( 3) and the <u>Purpose of flagrancy</u>.

TEMPORAL PROXIMITY

The time between the illegal arrest and the exculpatory statement made in this case, which was approximately six hours in duration, Courts have found this time-period to be insufficient in certain cases and sufficient in others. Compare, <u>Taylor</u> v. <u>Alabama</u>, at 691 (Supra) (Six hours *not* sufficient), <u>People</u> v <u>Leandry</u>, 130 A.D.2d 351, (1987) (seven hours sufficient). Generally, this factor alone is not determinative by itself but should be considered in the totality. Although the temporal proximity between the illegal arrest and inculpatory statement which was fifteen hours. The prolongation of this temporal proximity in all regards had a more significant impact here.

Justice Stevens had the foresight of recognizing that this type of prolonged exposure to an illegal detention to be a significant factor, which should be considered by a reviewing court. He essentially related that two factors of significance might be considered with respects to a

statement obtained through exploitation of an illegal arrest.   "[T]he temporal relationship between the arrest and the confession may be an ambiguous factor; if there are no relevant intervening circumstances, a *prolonged detention* may well be a more serious exploitation of an illegal arrest than a short one" [Emphasis supplied].   Dunaway; Supra *at 220-221*.   The hearing court applied this factor to the Fifth Amendment analysis.

INTERVENING EVENTS

The general signs Courts analyze are those that are intervening such as: change of location, different interrogating Officers; (not those part of the illegal arrest), phone calls; and the administration of Miranda warnings.   *Miranda* warnings, being significant, but, independently will not suffice, [unless the statement 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion] Brown supra, at 603-604.

The record, here, establishes that in the approximately 21 to 22 hours, Mr. Garcia was illegally held in custody at the ninth Precinct between the illegal arrest and the alleged confession.   Mr. Garcia was not permitted to make any phone calls, the location never changed; there was no intervening event of significance, with the exception of the Miranda warnings that could have attenuated the taint of the illegal arrest.   It was erroneous as a matter of law for the state hearing Court to apply two of the factors of a Fourth Amendment analysis to a Fifth Amendment ruling, then deny counsel a Dunaway hearing and an opportunity to address--the third--Purpose of Flagrancy prong when the officers' and the prosecution's theory of the arrest became constitutionally suspect.

<u>PURPOSE OF FLAGRANCY</u>

Mr. Garcia asks this Court to consider that on Monday December 16, 2002 Officer Gomez issued a "Want Card" and the next day an arrest was made at 1:00 a.m. on December 17, 2002, three Officers, Gomez, Martin, and Malloy went up to Newburgh, New York to seize Mr. Garcia for the *sole purpose of questioning Mr. Garcia*.  Upon concluding that Mr. Garcia was present, the Officers gained entry into the house through a tenant of the house.  Upon making their presence known, Officer Gomez apprehended Mr. Garcia, rear cuffed Mr. Garcia, brought him 90 miles to the ninth Precinct and physically threw him into an interrogation room.[5]  Around 9:00 a.m. (that morning), questioning continued without interruption until 9:00 p.m.  All the Officers who were party to the arrest participated in the interrogation as well, with the exception of Malloy.

As in <u>Brown</u> and <u>Dunaway</u>, the arrest and detention, the manner, which the police used to gain possession of Mr. Garcia, was in all regards flagrant and the most compelling because it had possessed a *"quality of purposefulness"* id at 605.

Mr. Garcia urges this Court to discount any purported claim the respondent makes about the bench warrant being the cause for Mr. Garcia's detention.  The respondent posits the presence of this bench warrant as a justification for the flagrant police action, because it is convenient to profess such as a primary basis of some legal explanation for justifying probable cause.  The investigation was still active and there was no reason for the Officers to disavow

---

[5] The People cannot imply that Mr. Garcia volunteered to accompany the officer's to the precinct.  Surly this position should not be valid, See e.g. <u>Kaupp</u> *v.* <u>Texas</u>, 123 S.Ct. 1843 (2003), quoting <u>Hayes</u> *v.* <u>Florida</u>, 470 U.S. 811,815 (1985). ([W]e have never "sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes…absent probable cause or judicial authorization."

probable cause and illegally detain Mr. Garcia as a prerequisite to circumvent probable cause for the homicide.

The Hearing Court never found Mr. Garcia to have been in custody regarding the bench warrant, making this justification baseless, (H.M. 299). The intrinsic principals embodied in the Fourth Amendment were founded to preclude and deter this type of impropriety.

Essentially, by apprehending Mr. Garcia in order to investigate the homicide, disregards the Courts rationale espoused in Dunaway (that the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in hope that something might turn up") Id., at 605. As detective Martine testified, the reason for Mr. Garcia's apprehension was to question him [Garcia], "Because we knew he had a lot information than he was willing to us" (H. M. 75). Notably, detective Gomez testified that Mr. Garcia was not arrested on the bench warrant or the homicide.(H. M. 157).

Mr. Garcia has demonstrated that he was not provided a full and fair opportunity to litigate the fourth Amendment claim. "[W]here the state has provided an opportunity for full and fair litigation of a fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief of the grounds that evidence obtained in an unconstitutional search or seizure was introduced at trial Stone v. Powell 428U.S.465, 494. (D.N.J. 1984)

The state court's adjudication of a such claims resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States and was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2).

As an alternative should this court, conclude that the pretrial courts decision was proper, based upon any arguments that the branch omnibus motion was insufficient; petitioner reserves

the right to respond and argue that issue in full.  In any event, the respondents forfeited the right to advance any arguments predicated upon the omnibus motion being insufficient. Petitioner has afforded the respondents an opportunity to challenge that portion of his <u>Coram</u> <u>Nobis</u>, which entailed those related claims, and the people did not address it.  In fact, when the petitioner appealed the denial of the <u>Coram</u> <u>Nobis</u>, the people did not even respond to that motion as well.

Mr. Garcia asks that any formulated contention the respondent may attempt to advance, should be stricken and not be taken in good faith.

**B.THE HEARING COURTS DECISION REGARDING · THE VOLUNTARINESS OF MR. GARCIA CONFESSION WAS ERRONEOUS AS A MATTER OF LAW FOR FIFTH AMENDMENT PURPOSES WHEN THE HEARING COURT FAILED TO CONSIDER ALL THE CIRCUMSTANCE OF THE ILLEGALITY OF THE ARREST, DETENTION, WHICH WAS USED TO CONFINE MR. GARCIA TO AN INTERROGATION ROOM, WHILE CREATING THE MOST COERCIVE ATMOSPHERE, AND GRILLING MR. GARCIA UNTIL A CONFESSION WAS PRODUCED**

The facts bear out that the arresting officer's sole intent and purpose was to detain Garcia-without probable cause-while subjecting him to the most coercive circumstance in order to obtain a confession from Mr. Garcia.  What developed forthwith was an 18 year old,  (being of below reading level average, having diagnosis as being "<u>Emotionally</u> <u>Disturbed</u>" and "<u>Learning</u> <u>Disabled</u>" (See Ex. "E" psychiatric documentation of Mr. Garcia's past history) kid, being the subject of a constant barrage of questioning by experienced Officers, until Mr. Garcia, confessed.

Even when viewing the circumstances of the arrest objectively, it becomes clear that the purpose, flagrancy and the coercive atmosphere of the intentionally prolonged detention and the prolonged interrogation were designed to overbear Mr. Garcia's will.  ["A confession is not the product of free choice, however, when "brought about by circumstances that caused Petitioner's will to be overborne at the time he confessed" <u>Miranda</u>], at 458.

|P a g e                                                                                                          32

It is difficult to imagine how Mr. Garcia, just a kid, with all these mental impairments, being the area under discussion to these occurrences for this period; his repeated request for attorney ignored, would not be coerced into confessing.  Mr. Garcia reasonably believed himself to be under arrest for the homicide (it clear by the manner in which the officers used in Newburgh, indicated to Mr. Garcia that he was under arrest for the homicide) and after such prolonged detention and interrogation, believed that the only way to extricate him from the situation was to confess.

In no way possible would Mr. Garcia have been able to leave until the police requisitioned those confessions from Mr. Garcia.  (See, Thompson v. Keohane, 516 U.S. 99, 112 (1995) (Essentially relating that Courts are to first view "what were the circumstances surrounding the interrogations; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave).  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry") Beheler, at 1125.

From the time of the illegal arrest until the inculpatory statement, Mr. Garcia was the focus of a continuous 17 hour-long interrogation, without any Miranda warnings.  In addition, even after Miranda warnings were given, the detectives continued questioning Mr. Garcia, non-stop, for approximately another 5 hours.

In applying the totality of the circumstances test, the pertinent factors which merit consideration are (1) the characteristics of the accused, (2) the conditions of [the] interrogation, and (3) the conduct of [the] law enforcement officials." Pou v. Kean, 977 F.Supp. 577, 583 (N.D.N.Y.1997).  Thus, "only those statements a suspect makes in the unfettered exercise of his

own 'will' may be used against him, and a confession is voluntary only when it is 'truly'... the product of his free choice." Malloy v. Hogan, 378 U.S.1, 8, (1964)

The developed record reveals that the Hearing Court failed to consider;(1) the characteristics of the accused (Mr. Garcia's youth, evidence of his learning disability, his educational background, evidence of Mr. Garcia's history of mental and emotional disturbance, his below average reading level) (2) the conditions of the interrogation (Mr. Garcia being dragged from his house in the middle of the night to be thrown in an interrogation room to sleep on the floor–then questioned for 15 hours); and (3) the conduct of the law enforcement officials (the record without a doubt demonstrates the illegal conduct of the arresting officer's).

Most significantly, Judge Berkman relied on one single factor the assurance of the questionable police testimony. Courts should not rely upon one single factor concerning a ruling of voluntariness. "No single criterion controls whether an accused's confession is voluntary: [but] whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." Green v. Scully, 850 F.2d 894 at 901) (1988). The Court never considered the totality of the circumstances of Mr. Garcia's confession; thus denying Mr. Garcia a full and fair opportunity to litigate the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

C. MR. GARCIA WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE THE TRIAL COURT ADMITTED THE CONFESSIONS INTO EVIDENCE WITHOUT RESOLVING WHETHER THEY WERE OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT (U.S. CONST., AMENDS. 4 AND 14)

The trial court should not have admitted Mr. Garcia's confessions in to evidence without a determination having been made of whether they had been obtained in violation of the Fourth Amendment.  For absent a resolution of the Fourth Amendment taint, such a determination

would not withstand constitutional attack under Due Process Clause of the Fourteenth Amendment.

Indeed, in the particular circumstances of the case, it was clear that the confession was not sufficiently attenuated from the taint of the illegal arrest and detention. There was no probable cause for this arrest as Mr. Garcia has demonstrated previously above.

There is very little doubt that the deliberating jury was clearly conflicted and confused regarding Mr. Garcia's custodial status. Mr. Garcia relies upon the substantial amount of jury requests (36 in total) inquiring into the propriety of Mr. Garcia's arrest, Miranda warnings, the length of Mr. Garcia's detention and other questions relating to probable cause (See Ex "J" of Appendix to the Respondent's opposition). Furthermore, the conviction would not have held up sans the confessions.

In addition, the jury should not have been considering questions of the illegal Police conduct, where the Hearing Court should have resolved it earlier. Lastly it was further error, by the trial Court in not remitting the unresolved Fourth Amendment issue and the developed trial testimony of Officer Gomez; who intentionally omitted Ryan Naves first coming forwarding implicating Mr. Garcia as the shooter. See C.P.L. 710.40(4). The evidence in front of both Courts regarding the Fourth Amendment violation was clearly in conflict, thus, it was reversible error for the trial Court to have submitted the confession to the jury for a determination of voluntariness.


## POINT II
**MR. GARCIA WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL AND FAIR PRE-TRIAL PROCEEDINGS WHERE THE PROSECUTION SUBORNED PERJURED TESTIMONY WHICH WAS RELEVANT AND MATERIAL, (U.S. CONST., AMEND 6TH & 14th)**

It is well established that knowing use of false testimony by a prosecutor deprives a person of due process of law, whether the prosecutor makes false statements or allows false statements of a witness to go uncorrected, and it makes no difference that materially false testimony goes only to credibility of a witness.  Prejudice is readily shown in such cases and "reversal is virtually automatic"; see, United States v. Wallach 935 F.2d 445, 456 (2d Cir. 1991)("Indeed, if it is established that the government knowingly permitted the introduction of false testimony 'reversal is virtually automatic.").  United States v. Agurs 427 U.S. 97 (1976); Giglio v. United States, 405 U.S. 150 (1972); Su v. Filion, 335 F.3d 119 (2003); People v. Savvides, 1 N.Y.2d 554 (1956).  United States v. Bagley, 473 U.S. 264 (1985).

In essence, when a prosecutor allows false testimony to go uncorrected it constitutes error so fundamental and so substantial, that it breaches his or her obligation as an officer of the Court who is supposed to insure fairness in the proceeding.  In addition, it denies a Mr. Garcia the opportunity to forthrightly prepare to defend such testimony, when the prosecution knows it to be false.

The testimony of Gomez at pretrial was that the transformation of Mr. Garcia from a witness, to a suspect, was after Mr. Naves came to the precinct; two hours after the implementation of the Miranda warnings.  Naves never testified at the pre trial.  At trial Naves was *specifically* asked by trial counsel, when was the first time he directly implicated Mr. Garcia as the shooter; Naves stated when he arrived at the precinct; after the Miranda warnings.  (T.T. 433) Subsequently, Gomez got on the stand and testified that he acquired independent information prior to the administration of Miranda warning; from Naves, thus giving him probable cause to arrest Mr. Garcia.

If Mr. Naves's testimony holds true, it invalidates Gomez's declaration in three respects, (i) it facially discredits Gomez's testimony in total; (ii) it shows Gomez and his fellow officers viewed Mr. Garcia as a suspect and illegally arrested Mr. Garcia before issuing <u>Miranda</u> warnings; (iii) that the arrest lacked probable cause[6] and the trial court should have remitted this issue back to the hearing court to determine the propriety, and the credibility of the officer's and illegality of the arrest in Newburgh. (See C.P.L. 710.40(4) which gives a trial court discretion to reopen a suppression hearing before or during trial ["upon a showing by the defendant, that the additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion"]).

On the other hand, if Gomez testimony is true it tells us three things (i) Gomez and the A.D.A Jeanine Launay failed to reveal this information to the pre trial judge;(ii) Naves was lying and withheld this information during his testimony;(iii) Naves testimony should have been corrected and exposed, to explore the reliability of this event.  Logic explains that Naves (in this respect only) benefited nothing for concealing this event.  This eliminated conclusion directs us to view Gomez's and the people's motive and benefit.  For all reasons delineated above all indication of fallacy, rests with Gomez and the People.

The significance of this suborned perjury by the People is twofold: Assuming Gomez's testimony was truthful; then Naves's testimony is false and the prosecution, up until the middle of Gomez' trial testimony, never revealed this information to trial counsel and allowed Naves' testimony to go uncorrected when Gomez's testimony contradicted Naves' testimony.

---

[6] The trial court allowed Gomez's testimony to come in under the exception to the hearsay rule.  In any event, the People were allowed the benefit of having Gomez bolster Naves' identification of Mr. Garcia as the shooter and to prove that the police purportedly had probable cause to arrest Mr. Garcia before the *Miranda* warnings.

It seems the stance that the Respondent Karen Schlossberg took in her opposition to Mr. Garcia's Coram Nobis ("Naves came forward to the precinct and named defendant as Villanueva killer") stands diametrically opposed to A.D.A. Jeanine Launay's stance at trial. A.D.A. Jeanine Launay admitted that she was present when Gomez interviewed Naves in the building when Navas (before the administered Miranda warnings) allegedly implicated defendant as the shooter. In addition, Ms. Launay, at a side bar during trial stated (referring to the withholding of the event in the building), that "if there is, if your [trial counsel's] allegation it is bad faith on my part I apologize for the error," (T.T.670). This error of admitting false testimony of Ryan Naves/ Gomez went uncorrected and violated the defendant's right to a fair trial.

The Court in Su v. Filion *Supra* relayed that the requirements to be met when assessing such a claim are; (1) Whether false testimony was introduced; (2) whether that testimony either was or should have been known to the prosecution to be false; (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in Agurs; (Filion supra at 127). Clearly, Mr. Garcia has demonstrated that he has met all the requirements set forth in Agurs to satisfy a claim of prosecutorial misconduct.

Under the circumstances of this case, the prosecution disregarded the fundamentals of a fair trial and pre-trial proceedings when A.D.A. Jeanine Launay either intentionally withheld [Naves's] false testimony or knowingly allowed [Gomez's] to give false testimony at trial.

The United State Supreme Court has explicitly explained over and over that, [these games prosecutors indulge in are unconstitutional]; and [A rule thus declaring "prosecutors may hide, defendant must seek" is not tenable in a system constitutionally bound to accord defendant due process]; Banks v. Dretke, 540 U.S. 668, at 696.

POINT III

<u>*TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
ADVISE MR. GARCIA THAT THE RIGHT TO TESTIFY WAS
HIS AND THAT THE ULTIMATE RIGHT TO TESTIFY IS HIS,
AND FAILING TO ADVANCE AN AFFIRMATIVE DEFENSE
OF EXTREME EMOTIONAL DISTURBANCE/FAILING TO
PROPERLY INVESTIGATE SUCH DEFENSE</u>

*For the purpose of clarity and convenience of the Court, Mr. Garcia asks this Court to consolidate the complete *Memorandum of Law* regarding the 440.10 Motion Filed by Hearing Counsel Gary R. Sunden. This is requested with respects only to the portion of the argument concerning trial counsels failure to advance an Extreme Emotional Disturbance Defense; advise Mr. Garcia of his right to testify; and that such decision is solely Mr. Garcia's and counsel's failure to investigate an E.E.D. Defense. (See Exhibit F)

<u>CONCLUSION</u>

FOR ALL THE REASONS STATED HEREIN, the state courts adjudication of a such claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2), and therefore the statement should be suppressed and anew trial ordered or in the alternative granted an evidentiary.

DATED: _11th_ Day of _August_ 2014.

Respectfully Submitted,

Felix Garcia, *Pro Se*

# EXHIBIT "A"

(COPY OF POLICE ISSUED WANT CARD)

**COMPLAINT - FOLLOW UP**
PD 313-081A (Rev. 4-89)-31

| | | | | | PAGE 1 OF 1 | |
|---|---|---|---|---|---|---|
| | Homicide 1* | | 009 | 60576 | 12/13/02 | |

| Date of Orig. Report | Date Assigned | Case No. | Unit Reporting | Follow-Up No. |
|---|---|---|---|---|
| 12/13/02 | 12/13/02 | 1534 | 009 Detective Squad | |

Complainant's Name - Last, First, M.I.
PSNY for Raymond Villanueva

Victim's Name - If Different

DETAILS: Investigation: Homicide 1/ 2002
Subject: Raymond Villanueva M/H 25
Contents: Want card submitted for suspect

1. On 12/16/02 at 1630 hrs. the undersigned submitted a want card for Felix Garcia AKA "CHUMPY" in regards to this case. The undersigned submitted the want card via fax (646)805-6298 and was assisted by PAA Graffe who informed the undersigned that that the want card was assigned control #I2002007071.

2. Case active.

DEFENDANT'S EXHIBIT

| CASE | ☑ACTIVE ☐CLOSED | DATE REVIEWED / CLOSED | IF ACTIVE, DATE OF NEXT REVIEW | |
|---|---|---|---|---|
| REPORTING OFFICER: | RANK PO | SIGNATURE | NAME PRINTED GOMEZ, EDWIN | TAX REG. NO. 903136 | COMMAND 009PRCNX |
| REVIEWING / CLOSING SUPERVISOR: | CASE CLOSED: | ENTER DESIGNATION ORS | SIGNATURE | C.O.'s INITIALS |

# EXHIBIT "B"

### (COPY OF POLICE ARREST REPORT DD5)

**Complaint Follow Up**
PD 313-081 (Rev 1-86)-11

| Additional Copies For | Jurisdiction | 5 Pct of Report | OCCB No | 12 Complaint No | PERP 1 |
| | 00 | 009 | | 60576 | 14 |

| 17 Date of this Report | 30 Day/Week of | 31 Date Orig Report | Date Assigned | Case Number | Unit Reporting | PERP 2 |
| 12/18/2002  WEDS. | M 12  13  '02 | 12/13/02 | | 1534 | 009 DETECTIVE SQUAD | |

Victim's Last Name, First Name, M.I. — **PEOPLE STATE OF NEW YORK FOR RAYMOND VILLANUEVA**   Address, Include City, State, Zip   Apt No — PERP 1 — 15

| Residence | Commercial | Home Telephone | | Business Telephone | | Aided L/Accident No | PERP 2 |
| | | | | | | 1807 | |

Previous Classification — **CASE ACTIVE**

| 45 | 48 | 49 | 50 | 51 | 52 | 53 Pct Arrest | 56 Arrest Numbers(s) | PERP 1 |
| | | | | | | 009 | M02615236L | 16 |

Classification Changed to — **CASE CLOSED WITH ARREST**

| 61 Rep Agency Code | Case No | Unit Serial No | Referral Changed From | To | Case Status | Invoice No | |
| 00 | | | INVESTIGATION | ARREST ☐Dom ☒Closed | L643522/23/24/25 | |
| | | | | | Follow Up No | |

**Companion Cases**

| | | | CHOICE 2 |
| | | | 16 |

Vehicle section:

| Plate | License No | State | Exp | Type | No Of Plates | Vin No | CHOICE 1 |
| ☐Lost ☐Stolen ☐Rec'vd | | | | | | | CHOICE 2 |
| Year | Make | Model | Style | Color | Value | Ins Code | Policy No. | Larceny of Motor Vehicle Only |
| | | | | | | | | P-Parking Lot / O-Public Garage / S-Street / M-Other | 17 CHOICE 1 |
| Invoice No | Vehicle was: ☐ Stolen ☐ Used in Crime ☐ Rec'vd | Alarm No | Pct | Time | Date | | CHOICE 2 |
| Vehicle Obtained At | Precinct | Towed by | Rotation Tow ☐ Yes ☐ No | Location Stored | | CHOICE 1 |
| Alarm Cancelled ☐ Yes ☐ No | Date | Time | Operator | Owner Ntfd. ☐ Yes ☐ No | By | Date | Time | |

Property section:

| LOST ☐ | STOLEN ☐ | If stolen, was property ☐ Business ☐ Personal ☐ Both | Owner Identification No | | | Property Summary | | 18 CHOICE 1 |
| Quantity | Article | Description-Brand, Model, Serial No | | | | | | CHOICE 2 |

| Item | 64 | 66 Value Stolen | 72 Value Recovered |
| --- | --- | --- | --- |
| Motor Vehicle Stolen-Rec'vd | 01 | | |
| M.V. Recv'd By Or For Other Auth | 02 | | |
| Currency | 04 | | |
| Jewelry | 05 | | |
| Furs, Clothing | 06 | | |
| Firearms | 07 | | |
| Office Equip | 08 | | |
| TV's Radios Cameras | 09 | | |
| Household Goods | 10 | | |
| Consumables | 11 | | |
| Misc | 13 | | |

| Total No. of Perpetrators 01 | Wanted | Arrested 01 | Weapon ☒ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) .9MM |

Perpetrator No. 1:

| Wanted ☐ | Arrested ☒ | Last Name, First, M.I. **GARCIA, FELIX C.** | Address, Include City, State, Zip  441 EAST 12TH STREET, NY, NY 10009 | Apt. No 2D | Res. Pct. 009 | 21 |
| Sex M | Race W/H | Date of Birth 10/16/84 | Age 18 | Height 05 Ft 06 In | Weight 150 | Eye Color BROWN | Hair Color BROWN | Hair Length SHORT | Facial Hair GOATEE | NYSID No. 22089041 | |
| ☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias **CHUMPY** | Clothing Description. | Scars, Marks, M.O. Etc. (Continue in "Details") | | |

Perpetrator No. 2:

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No | Res. Pct. | 22 |
| Sex | Race | Date of Birth | Age | Height Ft In | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. | |
| ☐ Eyeglasses ☐ Sunglasses | Nickname, First Name, Alias | Clothing Description. | Scars, Marks, M.O., Etc. (Continue in "Details") | | |

DEFENDANT'S EXHIBIT G

Blumberg No. 5114

**Details:**

**INVESTIGATION:**  HOMICIDE #01/2002
**SUBJECT:**  RAYMOND VILLANUEVA, M/H/25
**CONTENTS:**  CASE CLOSED WITH ARREST

1. ON 12/17/02 AT 2130 HOURS PO EDWIN GOMEZ, SH.#29975 EFFECTED THE ARREST OF FELIX C. GARCIA, AKA CHUMPY (DESCRIBED ABOVE) IN THE 009TH DETECTIVE SQUAD AND CHARGED HIM WITH MURDER 2°, CRIMINAL USE OF A FIREARM 1° AND CRIMINAL POSSESSION OF A LOADED FIREARM 2° UNDER 009TH PRECINCT COMPLAINT#60576 AND 009TH PRECINCT DETECTIVE SQUAD CASE#1534/2002.

2. IN VIEW OF THE ABOVE FACTS, I REQUEST THAT THIS CASE BE MARKED CLOSED WITH ONE ARREST.
   009 DETECTIVE SQUAD SUPERVISOR CONFERRED WITH.

CASE CLOSED "A"

| Complaint Report Prepared By **MARTIN, JOSE E.** | Title **DETECTIVE** | Command **009 DET. SQUAD** |
| Reporting Officer's Rank, Signature Command  DET.  009 | Name Printed **MARTIN, J.E.** | Tax Reg No **874898** | Supv'r Signature | C'O's Initials |
| | Choice Choice 11 | Perp 1 Perp 2 | Perp 1 Perp 2 | |

# EXHIBIT "C"

(COPY OF POLICE REPORT)



# New York City Police Department
## Omniform System – Arrests

| **RECORD STATUS: NYSID ENTERD** | **Arrest ID: M02615236 - L** |
|---|---|
| **Arrest Location: INSIDE OF 130 AVENUE C** | **Pct: 009** |

**Arrest Date: 12-17-2002**    Processing Type: **ON LINE**

**Time: 21:30:00**    DCJS Fax Number: **MO083829**

Sector: **A**    Special Event Code: -

Strip Search Conducted:    DAT Number: **0**

Viper Initiated Arrest:

Stop And Frisk: **NO**    Return Date: **0000-00-00**

Serial #: 0000-000-00000

---

**COMPLAINTS:** | **Arrest #: M02615236**

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2002-009-60576 | 2002-12-13 | Valid, No Arrests | 2002-12-13 | 01:00 |

---

**CHARGES:** | **Arrest #: M02615236**

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 125.25 01 F | A | | 1 | MURDER 2ND: INTENTIONAL |
| #02 | No | PL 265.09 01 F | B | | 1 | CRIMINAL USE FIREARM 1ST DEG |
| #03 | No | PL 265.03 02 F | C | | 1 | CPW-2ND DEG:5 OR MORE FIREARMS |

| DWI Arrest from: | # Injured: 00 | # Fatalities: 00 | Test Given: | B.A.C: | Reason Not Forfeit: |
|---|---|---|---|---|---|

---

**DETAILS:** | **Arrest #: M02615236**

AT TPO DEFT DID SHOOT THE VICTIM 2 TIMES IN THE HEAD WITH A LOADED FIREARM CAUSING THE VICTIM'S DEATH.

---

## DEFENDANT: GARCIA, FELIX C    NYSID #: 02208904J    Arrest #: M02615236

| | | |
|---|---|---|
| Nick/AKA/Maiden: **CHUMPY** | Height: **5FT 06IN** | Order Of Protection: **NO** |
| Sex: **MALE** | Weight: **150** | Issuing Court: |
| Race: **WHITE HISPANIC** | Eye Color: **BROWN** | Docket #: |
| Age: **18** | Hair Color: **BROWN** | Expiration Date: |
| Date Of Birth: **10/16/1984** | Hair Length: **SHORT** | Relation to Victim: **FRIEND/ACQUAINTANCE** |
| U.S. Citizen: **YES** | Hair Style: **CREW** | Living together: **NO** |
| Place Of Birth: **NEW YORK** | Skin Tone: **LIGHT** | Can be Identified: **NO** |
| Is this person not Proficient in English? **NO** | Complexion: **UNKNOWN** | |
| If Yes, Indicate Language: | | |
| Accent: **NO** | Soc.Security #: ▮▮▮ | |
| | Occupation: **NONE** | Gang/Crew Affiliation: **NO** |
| Identification ID: | | Name: |
| Identification #: | | Identifiers: |
| Physical Condition: **APPARENTLY NORMAL** | Lic/Permit Type: | |
| Drug Used: **NONE** | Lic/Permit No: | |

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT ▮ | | | ▮ | | ▮ | ▮ |

Phone # and E-Mail Address: **HOME:** ▮▮▮

N.Y.C.H.A. Resident: **NO**   N.Y.C. Housing Employee: **NO**   On Duty:

Development:    N.Y.C. Transit Employee: **NO**

**Physical Force: USED**

2/25/2014

| | |
|---|---|
| **Gun:** | **HANDGUN** |
| **Weapon Used/Possessed:** | **USED/DISPLAYED** |
| **Non-Firearm Weapon:** | |
| **Other Weapon Description:** | |

| | | |
|---|---|---|
| Make: | | Recovered: |
| Color: | | Serial Number Defaced: |
| Caliber: **9MM** | | Serial Number: |
| Type: **PISTOL, SEMIAUTOMATI** | |
| Discharged: **YES** | |

| | |
|---|---|
| **Used Transit System:** NO | |
| **Station Entered:** | |
| **Time Entered:** | |
| **Metro Card Type:** | |
| **Metro Card Used/Poses:** | |
| **Card #:** | |

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | FIRED SHOT |
| CLOTHING | OUTERWEAR - SNORKEL, SKI, HOODED JACKET - UNKNOWN COLOR |
| CLOTHING | HEADGEAR - UNK - UNKNOWN COLOR |
| CLOTHING | FOOTWEAR - UNK - NOT APPLICABLE |
| CLOTHING | ACCESSORIES - UNK - UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | ARM -TATOO WITH WORDS ONLY - DESCRIBE:CHUMPY |
| BODY MARKS | FACE/HEAD -SCAR |
| IMPERSONATION | UNKNOWN |

## JUVENILE DATA:      Arrest #: M02615236

| | |
|---|---|
| Juvenile Offender: NO | Relative Notified: M     Personal Recog: |
| Number Of Priors: 0 | Name: FLORENCE TRAVELLA |
| School Attending: NONE | Phone Called: 2125058495 |
| Mother's Maiden Name: TRAVELLA | Time Notified: 2145 |

## ASSOCIATED ARRESTS:      Arrest #: M02615236

**ARREST ID  COMPLAINT #**

## DEFENDANTS CALLS:      Arrest #: M02615236

| CALL # | NUMBER DIALED | NAME CALLED |
|---|---|---|
| 1 | 212-505-8495 | FLORENCE TRAVELLA |
| 2 | 212-677-8130 | FELIX GARCIA |

## INVOICES:      Arrest #: M02615236

| INVOICE# | COMMAND | PROPERTY TYPE | VALUE |
|---|---|---|---|
| L643522 | 009 | CLOTHING | UNKNOWN |
| L643523 | 009 | FIREARMS/WEAPONS | UNKNOWN |
| L643524 | 009 | ALL OTHER | UNKNOWN |
| L643525 | 009 | ALL OTHER | UNKNOWN |
| L643528 | 009 | CLOTHING | UNKNOWN |

## ARRESTING OFFICER: POM EDWIN GOMEZ      Arrest #: M02615236

| | | |
|---|---|---|
| Tax Numbers: ▓▓▓ | On Duty: YES | **Force Used:** NO |
| Other ID (non-NYPD): ▓▓▓ | In Uniform: NO | Type: |
| Shield: 29975 | Squad: D | Reason: |
| Department: NYPD | Chart: 08 | Officer Injured: NO |
| Command: 238 | Primary Assignment: | |

| | | | |
|---|---|---|---|
| Arresting Officer Name: **POM GOMEZ, EDWIN** | Tax #: ▓▓▓ | Command: **238** | Agency: **NYPD** |
| Supervisor Approving: | Tax #: | Command: | Agency: |

| SGT DUKE | | ▓▓▓▓ | | 238 | | NYPD |
|---|---|---|---|---|---|---|
| Report Entered by:<br>DT2 WIGDOR | | Tax #: | | Command:<br>238 | | Agency:<br>NYPD |
| **END OF ARREST REPORT**<br>M02615236 | | | | | | |

[ Print this Report ]

2/25/2014



# New York City Police Department
## Omniform System - Complaints

| Report Cmd:<br>804 | Jurisdiction:<br>N.Y.C. HOUSING AUTHORITY | Record Status:<br>No Arrests | Complaint #:<br>2002-009-60576 |
|---|---|---|---|

**Occurrence Location: FRONT OF 635 EAST 12 STREET**

Name Of Premise:
    Premises Type: RESIDENCE - PUBLIC H
Location Within Premise: .
    Visible By Patrol?: YES

Precinct: 009
Sector: B
Beat: 6
Post:

**Occurrence From: 2002-12-13 01:00 FRIDAY**

Occurrence thru:
    Reported: 2002-12-13    08:30
Complaint Received: RADIO

Aided # 000001807
Accident #
O.C.C.B. #

**Classification: HOMICIDE**
Attempted/Completed: COMPLETED
Most Serious Offense Is: FELONY
    PD Code: 139   MURDER,UNCLASSIFIED
    PL Section: 12525
    Keycode: 101   MURDER & NON-NEGL. MANSLAUGHTE

**Case Status: OPEN**
Unit Referred To: P.D.U.
Clearance Code:
    Log/Case #: 0
    File #: 1
Prints Requested? NO

| Is This Related To Stop And Frisk Report<br>NO | SQF Number:<br>0000-000-00000 | Was The Victim's<br>Personal Information<br>Taken Or Possessed? | Was The Victim's Personal<br>Information Used To Commit A<br>Crime? |
|---|---|---|---|
| Gang Related?<br>NO | OCCB FOD Log #: | Name Of Gang: | Child Abuse Suspected?<br>NO |
| DIR Required?<br>NO | | Child in Common? | Intimate Relationship? |

| If Burglary:<br>Forced Entry?<br><br>Structure:<br>Entry Method:<br>Entry Location: | Alarm:<br>Bypassed?<br>Comp Responded?:<br>Company<br>Name/Phone:<br>Crime Prevention<br>Survey Requested?:<br>Complaint/Reporter<br>Present?: | If Arson:<br>Structure:<br>Occupied?:<br>Damage by: | Taxi Robbery:<br>Partition Present:<br>Amber Stress Light Activated:<br>Method of Conveyance:<br>Location of Pickup: |
|---|---|---|---|

| Supervisor On Scene - Rank / Name / Command :<br>LT WALTERS 804 | Canvas Conducted:<br>YES | Translator(if used): |
|---|---|---|

**NARRATIVE:**
AT T/P/O VICTIM WAS SHOT IN THE HEAD, AND WAS PRONOUNCED DOA AT BELLEVUE HOSPITAL BY DR. STRATION DAMES AT 0342HRS. PO FLORIO #28532 CSU COLLECTED 2 SHELL CASINGS, BLOOD STAINED CLOTHING OF VICTIM, AND VARIOUS OTHER EVIDENCE FROM SCENE AND ASSIGNED RUN #02-1535

| N.Y.C.H.A: | Complaint # 2002-009-60576 | | | |
|---|---|---|---|---|
| Development Name:<br>CAMPOS | Housing Report #:<br>99999 | PSA #:<br>4 | Field Report Prepared: | Field Report Number: |

**VICTIMS, REPORTERS, WITNESSES, SUSPECTS:**    Complaint # 2002-009-60576

| Name | Sex | Race | Age |
|---|---|---|---|
| VICTIM VILLANUEVA,RAYMOND | MALE | HISPANIC WHITE | 25 |

**ARRESTS:**    Complaint # 2002-009-60576

2/25/2014

| Arrest ID | Status | Defendant Name | Sex | Race | | AGE | Arrest Date |
|-----------|--------|----------------|-----|------|---|-----|-------------|
| M02615236 | ACTIVE | GARCIA, FELIX | MALE | HISPANIC | WHITE | 18 | 12/17/2002 |

### NOTIFICATIONS / ADDITIONAL COPIES:

Complaint # **2002-009-60576**

**Notifications to:**

| Rank/Title | Name | Unit/Agency | Log # |
|------------|------|-------------|-------|
| SGT | ZINES | NIGHTWATCH | |
| LT | LOCORAZA | 9PCT LT. | |

| Reporting/Investigating M.O.S. Name: POM BRENDAN BRADY | Tax #: | Command: PSA 4 | Rep.Agency: NYPD |
|---|---|---|---|
| Supervisor Approving Name: SGT GEORGE MIFSUD | Tax #: | Command: PSA 4 | Rep.Agency: NYPD |
| Complaint Report Entered By: PAA WAY | Tax #: | Command: PSA 4 | Rep.Agency: NYPD |
| Signoff Supervisor Name: SGT SWAIN | Tax #: | Command: PSA 4 | Rep.Agency: NYPD |

**END OF COMPLAINT REPORT**
**# 2002-009-60576**

Print this Report

# EXHIBIT "D"

(COPY OF GARCIA'S PROBATION REPORT)

GARCIA, FELIX                           -3-                    CASE # NSO402062

## PENDING CHARGES

| 11/18/02 | CPW 4°; CRIMINAL TRESPASS 3° | NY CRIMINAL COURT DKT. #2002NY081303 | CASE ADJOURNED 5/5/04 PART B; RETURNED ON WARRANT ON 12/18/02 |

## PRESENT OFFENSE

*The account which follows is based upon information obtained from the court papers and per conversation with the ADA.*

Complainant:  *Raymond Villanueva, age 25, former friend of the defendant.*

*On 12/13/02, at about 1AM, in front of 635 E. 112th Street in New York, the defendant approached the victim, Raymond Villanueva and shot him twice in head with a loaded pistol.  ·  The defendant and Villanueva had a verbal altercation earlier that evening.   Villanueva, age 25, asked the defendant to borrow his watch. When the defendant refused to lend Villanueva his watch, Villanueva stated in substance, "You ain't gonna let me hold it, you dead."   The defendant then told his friends about what transpired between himself and Villanueva.   The defendant later came back and shot Villanueva in the head.   The bullet went straight through Villanueva's head and exited his left cheek, however, he did not die.   Villanueva took out his cell phone and called 911, stating that he was shot in the head from behind and did not see who shot him.   When the defendant realized that Villanueva was not dead and was on the telephone, the defendant came back and shot Villanueva in the head again.*

# EXHIBIT "E"

(COPY OF GARCIA'S PSYCH EVALUATION)

PINE HILL CENTRAL SCHOOLS
Special Education Committee
1234 Pine Hill Road
Pine Hill, New York 11020
(516) 666-6666

BOARD OF EDUCATION NOTICE

August 18, 1997

Mr. Felix Garcia                    Ms. Florence Garcia
612 E. 14th Street #15C             196 E. 12th Street #1AB
New York, New York 10009            New York, New York 10009

RE: Felix Garcia

Dear Mr. Garcia

On behalf of the Board of Education, I am writing to inform
you that the Board has formally met on July 24, 1997 to arrange
for the special education services recommended by the Special
Education Committee.  A summary of the Committee's recommendation
follows:

**RECOMMENDATION:**

**DISABILITY:** Emotionally Disturbed  Learning Disabled

**PLACEMENT:** Greenburgh Eleven

**PROGRAM:** Special Class

**RELATED SERVICES:**
Speech/Language              2 individual sessions
Counseling                   2 group sessions

If there are any questions, please do not hesitate to call.

Sincerely,

Thomas F. Reap, Psy.D.
Chairperson
Special Education Committee

boeyes
Encl: 1. Due Process Information

# EXHIBIT "F"

(COPY OF MEMORANDUM OF LAW IN SUPPORT OF CPL § 440.10 MOTION)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>        –against–<br><br>FELIX GARCIA,<br>                *Defendant.* | Indictment 8065/02 |

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO SET ASIDE JUDGMENT OF CONVICTION
ON GROUNDS OF INEFFECTIVE ASSISTANCE OF COUNSEL**

GARY R. SUNDEN
*Attorney for Felix Garcia*
**299 Broadway
New York, NY 10007
(212) 925-4848**

# TABLE OF AUTHORITIES

**Federal Cases**

*Brown v. Artuz,*
    124 F.3d 73 (2d Cir. 1997), *cert. denied* 522 U.S. 1128,
    118 S. Ct. 1077, 140 L. Ed.2d 135 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*Castillo, United States v.,*
    14 F.3d 802 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*DeLuca v. Lord,*
    77 F.3d 578 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12

*Edwards, United States v.,*
    897 F.2d 445 (9ᵗʰ Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Faretta v. California,*
    422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed.2d 562 (1975) . . . . . . . . . . . . . . . . . . . . . . 6

*Ferguson v. Georgia,*
    365 U.S. 510, 81 S. Ct. 756, 5 L. Ed.2d 783 (1961) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Harris v. New York,*
    401 U.S. 222, 91 S. Ct. 643, 28 L. Ed.2d 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Jones v. Barnes,*
    463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed.2d 987 (1983) . . . . . . . . . . . . . . . . . . . . . . 6

*McMann v. Richardson,*
    397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed.2d 763 (1970) . . . . . . . . . . . . . . . . . . . . . . 8

*Rock v. Arkansas,*
    483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed.2d 37 (1987) . . . . . . . . . . . . . . . . . . . . . . . 6

*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Teague,*
    953 F.2d 1525 (11ᵗʰ Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Valenzuela-Bernal,*
    458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed.2d 1193 (1982) . . . . . . . . . . . . . . . . . . . . 6

*Vargas, United States v.,*
    920 F.2d 167 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Washington v. Texas,*
    388 U.S. 14, 87 S. Ct. 1920, 28 L. Ed.2d 1019 (1967) . . . . . . . . . . . . . . . . . . . . . . 6


**New York State Cases**

*Casassa, People v.,*
    49 N.Y.2d 678, 427 N.Y.S.2d 769, 404 N.E.2d 1310 (1980) . . . . . . . . . . . . . . 10, 11, 12

*Cosby, People v.,*
    82 A.D.3d 63, 916 N.Y.S.2d 689 (4ᵗʰ Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Crique, People v.,*
    63 A.D.3d 566, 882 N.Y.S.2d 39 (1ˢᵗ Dept. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gargiulo, People v.,*
    2012 WL 4040351, 2012 N.Y. Slip Op. 51785(U) . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Harris, People v.,*
    109 A.D.2d 351, 491 N.Y.S.2d 678 (2d Dept. 1985) ........................... 10

*Mason, People v.,*
    263 A.D.2d 73, 706 N.Y.S.2d 1 (1st Dept. 2000) ............................. 6

*Patterson, People v.,*
    39 N.Y.2d 288, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976),
    *aff'd sub nom. Patterson v. New York,*
    432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed.2d 281 (1977) ....................... 11

*Roche, People v.,*
    98 N.Y.2d 70, 745 N.Y.S.2d 775, 772 N.E.2d 1133 (2002) ................... 11, 12

*Windley, People v.,*
    28 Misc.3d 1232(A), 2010 WL 3503526,
    2010 Slip Op. 51569(U) (Sup. Ct. Bronx Co. 2010) .......................... 6

## Constitutional Provisions and Statutes

United States Constitution, Am. V ........................................... 6
United States Constitution, Am. VI ..................................... *passim*
United States Constitution, Am. XIV ....................................... 6
N.Y. State Constitution, Art. I §6 ........................................... 1
N.Y. Crim. P.L. §440 ...................................................... 1
N.Y. P.L. §125.25 ....................................................... 10

By *pro se* motion dated December 12, 2008, Felix Garcia moved this Court, pursuant to Article 440 of the Criminal Procedure Law, to vacate a judgment convicting him of murder, judgment having been entered by the Honorable James Yates upon a jury verdict of guilty. The grounds for the motion are that his attorney did not advise him of his right to testify or permit him to testify and did not do sufficient investigation to appreciate the viability of an extreme emotional disturbance defense, thereby rendering ineffective assistance within the meaning of the Sixth and 14th Amendments of the United States Constitution and Article I, section 6 of the New York State Constitution. Counsel was assigned to represent Mr. Garcia. This Court conducted a hearing on May 16, 2012. Mr. Garcia called two witnesses, *i.e.* himself and Daniel Nobel, the attorney who represented him at trial. Following the hearing, the Court fixed a briefing schedule. The facts set forth are taken from the transcript of that hearing; the letters in parentheses are the initials of the person who gave the quoted testimony, and the numerical references are to the page of the transcript where the cited material appears.

## FACTS

Felix Garcia, 27 years old, is serving a sentence of 25 years to life for causing the death of an individual by the name of Raymond Villanueva ("Villanueva") in 2002, when Garcia was 18 years old. At the time of the crime Garcia had a seventh grade education and was living with his grandparents. He had attended special education classes and seen multiple psychiatrists over the years, having been diagnosed in his childhood as emotionally disturbed and learning disabled; he also suffered from attention deficit disorder (FG:40). He was "a low intelligence kid" who could not read and other children picked on him; though his mother "tried to do what she could," his father was using drugs and Garcia himself "couldn't function" (FG:38-30); *see* FG:72 ("I mean I'm a kid with below reading average"). Although he had been the subject of

Family Court proceedings, he had never been through a jury trial and did not have a criminal record.

Villanueva was older than Garcia by several years and he had a reputation for being violent (FG:12 ["(W)here I come from, as long as I've known Ray, he had a reputation for harming people"]; FG:17 ["Mr. Villanueva was known for having a proclivity for violence"]; DN:109 ["a really bad reputation"]; DN:111 ["dangerous"[1]]). Nonetheless, Garcia knew Villanueva and looked up to him (FG:27). He regarded Villanueva as "cool." Though Garcia grew up in Villanueva's building and had known him since 1995, they apparently did not spend time together until the month before the shooting, when they began going to clubs together and shopping (FG:27-28); also, Garcia bought a few pounds of marijuana that they attempted to sell (FG:29). The source of this activity was evidently a $29,000.00 personal injury settlement that had been held in trust for Garcia but was turned over to him when he turned 18 in October 2002 (FG:28). It was then that he started "hanging out with Raymond" and spending the money (FG:29); as Mr. Nobel explained it, Villanueva had learned about the money and had "glommed" onto Garcia and taken advantage of him. Although by the time of the hearing Garcia had realized that Villanueva was not his friend, and before he came into the money Villanueva was just "a cool guy" whom Garcia liked but with whom he did not have "a real friendship" (FG:27), during the 28 days leading up to the shooting they spent a lot of time together and he believed otherwise (see, e.g., FG:28). With Villanueva's help rather than that of an uncle who had wanted to invest the money for him, Garcia "blew through" all of the funds from the settlement during that 28-day period (DN:111).

Among the things Garcia had done with the money was to buy two "Locman"

---

[1]     Garcia's attorney testified that his own investigation had confirmed that Villanueva had a violent reputation.

the night of the shooting, Mr. Villanueva was going out "clubbing" and was attired for that purpose (FG:17; 23). He was wearing Garcia's red Locman watch but wanted to borrow the black one, and Garcia refused. Villanueva replied, "Oh, you don't want to let me hold the watch? You dead. And when I come back, you know what it is" (FG:17; 77). He was "crushed. Like I got tooken (sic) advantage of, everything. Zit (sic) seems like everything that happened that he was doing wrong to me flashed in that minute, and I was like no. I mean I'm going to just let him keep stomping over me and taking advantage of me? I got to have some dignity at some point. I feel like I'm not a human being, so I said no. When I said no, he threatened" (FG:83). Villanueva then departed the scene in an automobile.

Garcia, however, expected Villanueva to return and kill him (FG:17; 83 ["I was scared of him"]; 84 ["I didn't shoot him because I was angry. [....] [...] The threat was why I shot him"]; 17 [That whole time I'm just thinking, What am I supposed to do? This man is known for harming people, and I went and got a gun"]). He decided to get a gun of his own and borrowed one from a friend (FG:17, 18). He was "confused" and "emotional," felt "taken advantage of," "scared" and a little "angry" (FG:19-20). He waited in the housing project for Mr. Villanueva to return, which he did. Garcia was physically close to Villanueva, though they did not speak (FG:22) and from the record it appears they did not make eye contact. But Garcia saw that Villanueva had one hand in his pocket and was glancing around while talking on a phone, and Garcia perceived, from his own experience, that Villanueva was about to shoot him but was acting as though he were not (FG:23-24) ("From that gesture, normally, from my experience ; he said that if he were going to hit someone he would turn just the way Villanueva had "like I'm not going to do it, and then I would do something. That's just a subtle sign that I grabbed off of his body language, is when I pulled the gun out and shot") (FG:24). His "thinking was the ultimate,

3

that [Villanueva was] coming to kill" him, *id.* Asked on cross-examination whether the gesture might not only have signaled that Villanueva was preparing to fight him, Garcia replied, "A man like Raymond does not fight" (FG:25). In fact, Villanueva kept on his person newspaper clippings covering the deaths of two different people that he claimed to have killed (FG:76), and all along Garcia had known of his reputation. Despite the shot to the head, though, Villanueva was not dead. Garcia was worried about what Villanueva would do to Garcia's family if Villanueva survived and Garcia was arrested (FG:26). He returned to the scene and saw Villanueva on the ground, telephone in hand, and shot him again (FG:26), killing him.

Unquestionably, Mr. Nobel was opposed to the notion of Garcia's testifying in his own defense. He testified that it would have been "a horrendous idea" for Garcia to testify and that he himself was "very strongly committed" to that view (DN:109). However, he had no specific recollection of any specific conversation with Garcia, including any bearing on the viability of an extreme emotional disturbance defense (DN:95; 96). He knew Garcia had spent time at Children's Village and had seen mental health professionals but thought that specific details of the case would make an extreme emotional disturbance defense "very problematic" (DN:96-97). Moreover, although he understood his ethical obligations to require him to allow a client to testify if that was what the client wanted (DN:100), he had no standard practice for how to deal with the issue (DN:102). He confirmed that Garcia genuinely feared Villanueva and that his own investigation established that Villanueva had "a really bad reputation" (DN:110).

For his part, Garcia testified that he himself initially told his lawyer that "he wanted to testify regarding all of the circumstances of Ray, how he threatened [Garcia] and [Garcia] was scared," (FG:48). But Nobel said he would not "let" Garcia testify, *id.*; (*see also* FG:71 ["I told him I want to testify, he said no;" "He said no, it's not going to happen. He said

4

no, it's not going to happen"]; FG:72 ["Q. Was there anything specific that you can recall saying you wanted to do that he said no, you cannot do? Anything specific? A. To testify. I wanted to testify"]; FG:89 ["I asked him. I wanted to. He said no"]), and formulated a strategy that there were other, dangerous, people who might have been motivated to kill Villanueva (FG:53). This strategy was apparently partly grounded in false statements Garcia had made to the police implicating third persons in Villanueva's murder.

At no time did Garcia and Nobel discuss the fact that Garcia had an absolute right to testify (FG:80). As for the possibility of an extreme emotional disturbance defense, they did not discuss it (FG:54; 78), but Mr. Nobel obviously knew about a potential psychiatric defense (FG:55; 79). From the record it appears he determined that the defense would not work because of the delay between the first shots and the fatal shot and on that ground neither interviewed anyone who had treated Garcia nor consulted an expert witness, even though he was aware of certain factors that supported such a defense **(DN:  )**. In this posture, Garcia told his attorney the truth about what had happened, and Mr. Nobel decided on a strategy (FG:54); Garcia went along with it because "I'm a young kid. I'm on trial for my life." *Id.* It was in this context that he agreed with the strategy presented by counsel. Though he told Mr. Nobel he wanted to testify, he himself was "mentally inferior" and his attorney had "been in law for a long time" (FG:55).

## ARGUMENT

### *Point*
### THE CONVICTION SHOULD BE SET ASIDE:
### COUNSEL DID NOT ADVISE GARCIA OF HIS RIGHT TO TESTIFY
### AND A "REASONABLE PROBABILITY" EXISTS
### <u>THAT THE RESULT WOULD HAVE BEEN DIFFERENT HAD HE TESTIFIED</u>

It is well settled law that the defendant in a criminal action has the right to testify

in his own behalf, and that the right is secured to him through the Fifth, Sixth and 14th

Amendments of the United States Constitution. *Faretta v. California*, 422 U.S. 806, 95 S. Ct.

2525, 45 L. Ed.2d 562 (1975), *Ferguson v. Georgia*, 365 U.S. 510, 81 S. Ct. 756, 5 L. Ed.2d 783

(1961) (14th Amendment; due process clause); *United States v. Valenzuela-Bernal*, 458 U.S. 858,

102 S. Ct. 3440, 73 L. Ed.2d 1193 (1982), *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920, 28

L. Ed.2d 1019 (1967) (Sixth Amendment; compulsory process clause); *Rock v. Arkansas*, 483

U.S. 44, 107 S. Ct. 2704, 97 L. Ed.2d 37 (1987); *Harris v. New York*, 401 U.S. 222, 91 S. Ct.

643, 28 L. Ed.2d 1 (1971) (Fifth Amendment); *see People v. Windley*, 28 Misc.3d 1232(A), 2010

WL 3503526, 2010 Slip Op. 51569(U) (Sup. Ct. Bronx Co. 2010).  The law is equally well

settled that the right is a "fundamental" one, such that the decision whether or not to exercise it

belongs to the defendant alone, *Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed.2d 987

(1983); *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997), *cert. denied* 522 U.S. 1128, 118 S. Ct. 1077,

140 L. Ed.2d 135 (1998); *People v. Mason*, 263 A.D.2d 73, 706 N.Y.S.2d 1 (1st Dept. 2000).

Accordingly, "'trial counsel's duty of effective assistance includes the responsibility to advise

the defendant'" concerning the latter's right to testify, including the fact that the decision

whether to exercise the right is reserved to the defendant alone. *People v. Cosby*, 82 A.D.3d 63,

6

916 N.Y.S.2d 689 (4th Dept. 2011) (quoting *Brown*, 124 F.3d at 74).[2]

Because it is primarily the duty of counsel for the defendant to protect the defendant's right to testify, claims that counsel defeated the right implicate the guarantee of effective assistance of counsel. *United States v. Teague*, 953 F.2d 1525 (11th Cir. 1998); *Brown*, 124 F.3d 73 ("Because the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel, we conclude that this burden is a component of the effective assistance of counsel. As a result, any claim by the defendant that defense counsel has not discharged this responsibility–either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify–must satisfy the two-prong test established in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 [1984], for assessing whether counsel has rendered constitutionally ineffective assistance"); *see also Cosby*, 82 A.D.3d 63, 916 N.Y.S.2d 689. To prevail on a Sixth Amendment claim of ineffective assistance, a defendant must show (1) that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). It is equally well settled that investigation is essential to the presentation of a defense and the failure to present a defense grounded in extreme emotional disturbance may rise to the level of ineffectiveness within the meaning of the Sixth Amendment. *DeLuca v. Lord*, 77 F.3d 578 (2d Cir. 1996); *see Strickland*, 466 U.S. at 690

---

[2]       Waiver is not readily inferred. *See United States v. Vargas*, 920 F.2d 167 (2d Cir. 1990) ("We regard as highly questionable the proposition that a defendant's failure to object at trial to counsel's refusal to allow him to take the stand constitutes a waiver of the defendant's constitutional right to testify on his own behalf"); *United States v. Castillo*, 14 F.3d 802 (2d Cir. 1994). Instead, while there is some division on the point whether silence at trial can constitute a waiver of the right, *see, e.g., United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990) (finding that it was), cases in the Second Circuit, at least, consider that proposition "highly questionable," *Vargas*, 920 F.2d 167, 170. Any argument by the People that a waiver should be inferred from defendant's failure to speak up when counsel told Justice Yates that he might not testify should be rejected out of hand.

7

(referring to matters of judgment "made after thorough investigation of law and facts relevant to plausible options").

The first prong of the *Strickland* test requires a showing that counsel's performance "'fell below an objective standard of reasonableness,'" *Teague*, 953 F.2d 1525 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). As the Eleventh Circuit observed in *Teague*, where the essence of the defendant's claim is that his attorney refused to call him to the stand or failed to advise him that the decision whether to testify belongs to the client alone, the defendant has "clearly" not received reasonably effective counsel. *Id.* (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *McMann v. Richardson*, 397 U.S. 759, 770-71, 90 S. Ct. 1441, 1448-49, 25 L. Ed.2d at 763 [1970]). *See Brown*, 124 F.3d at 74 ("trial counsel's duty of effective assistance includes the responsibility to advise the defendant" concerning his right to testify); *Cosby*, 82 A.D.3d 63, 916 N.Y.S.2d 689 (quoting *Brown*, 124 F.3d at 74, for the same proposition). Counsel's abridgement of the defendant's right to testify satisfies the first prong of the *Strickland* test. *Teague*, 953 F.2d 1525; *but see Brown*, 124 F.3d 73 (resolving whether defendant had been prejudiced and on that ground not deciding whether he had been ineffective).

It is also noted that trial counsel stated outright that he made the decision as to whether or not the defendant should testify. In his summation, counsel stated as follows: "Another thing I am going to ask you not to do is consider the fact that Mr. Garcia didn't take the witness stand. *That's my decision.* (emphasis added)". Trial transcript page 1154. This is in direct contradiction of the Rules of Professional Conduct Rule 1.2 (a). Note: A copy of page 1154 of the transcript is annexed.

At the hearing Mr. Garcia testified firmly that he did not understand and had not been told that the decision whether to testify belonged to him. Nor can knowledge be inferred from the prosecutor's efforts to show he must have known his rights based on his prior contacts

8

with the criminal justice system; the record clearly demonstrated that Garcia's contacts had been in Family Court and that he had never before been in a jury trial; indeed, he had no criminal record. As for defense counsel, Mr. Noble stated only that he understood his ethical obligations to require that he advise the client that the decision whether to testify belonged to the client, but he had no standard practice, no specific recollection of having done so and no notes. In these circumstances, the court has no means of determining that Noble "must have" advised Garcia. On the other hand, Garcia testified forthrightly and other than his obvious interest in the subject matter the court has no reason to dismiss his testimony, especially given counsel's failure to provide any support for an inference that he in fact advised Garcia. *Compare People v. Gargiulo*, 2012 WL 4040351, 2012 N.Y. Slip Op. 51785(U) (Sup. Ct. Kings Co. 2012) (defendant's testimony alone might not have persuaded the court as to the issue given his interest in the subject matter *coupled with* a previous perjury conviction and acknowledgement at hearing that he had lied during his murder trial). Accordingly, since "effective assistance includes the responsibility to advise the defendant" concerning his right to testify," the first part of the *Strickland* analysis is satisfied.

With respect to the second prong, to show that he has been prejudiced by counsel's errors a defendant need only establish that but for the errors there is a "reasonable probability" that the result would have been different. *Strickland*, 466 U.S. 694, 104 S. Ct. 2067. In this case, the defendant contends that, had he testified, he would have told the jury that he believed Villanueva was about to kill him when he shot Villanueva instead, and that when he discovered he had not killed Villanueva he was terrified not only for himself but also for his entire family and "snapped." In this latter regard, counsel might have called upon Garcia's lengthy history of special education and emotional disturbance, documented throughout his

9

schooling and most recently four years prior to the events in issue, *see* Exhibit B to Supplemental

Addendum of Felix Garcia dated January 12, 2009.[3]  Moreover, this strategy would have enabled

defense counsel to place before the jury Villanueva's own history, which counsel had confirmed

was a violent one and which he was able to put before the jury only in a circumscribed way

because the defense was not that Garcia had killed him but was justified and operating under an

extreme emotional disturbance but that other people would have been inspired to kill him.  And

it would have opened the door to testimony about how the older Villanueva had essentially

preyed on Garcia, pretending to be his friend, before summarily dumping him when Garcia's

funds were exhausted and even casually threatening to kill him over a watch.

Section 125.25 of the Penal Law provides that it is an affirmative defense to

murder that "'[t]he defendant acted under the influence of extreme emotional disturbance for

which there was a reasonable explanation or excuse, the reasonableness of which is to be

determined from the viewpoint of a person in the defendant's situation under the circumstances

as the defendant believed them to be.'"  *People v. Casassa*, 49 N.Y.2d 668, 427 N.Y.S.2d 769,

404 N.E.2d 1310 (1980).  The first component is "wholly subjective—i.e., it involves a

determination that the particular defendant did in fact act under extreme emotional disturbance,

that the claimed explanation as to the cause of his action is not contrived or sham," *id.*  The

defense is an "outgrowth of the 'heat of passion' doctrine which had for some time been

recognized by New York as a distinguishing factor between the crimes of manslaughter and

murder" [....] but is significantly broader," *Casassa*, 49 N.Y.2d at 676-77, 427 N.Y.S.2d 769,

---

3        Obviously, a new evaluation might have been in order.  The point is not that a four-year old diagnosis would have been sufficient to prove that defendant was affected by an emotional infirmity at the time of the crime but only that his history supported that defense.  Stated otherwise, in referring to whether there was an emotional explanation for a defendant's conduct, "certainly a psychiatrist's testimony, giving objective reasons why particular conduct was triggered, would be most probative on the question, even *de riguer*, as a practical matter, with the jury," *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678, 688-89 (2d Dept. 1985).

404 N.E.2d 1310 (citations omitted). The effect of the defense is to reduce the defendant's criminal responsibility from murder to manslaughter. *Id.* 49 N.Y.2d at **675**, 427 N.Y.S.2d at 772-73, 404 N.E.2d at 1313-15; P.L. §125.25(1)(a).

Importantly, although the heat of passion doctrine required that the defendant's action be immediate, such that the existence of a 'cooling off' period completely negated any mitigating effect which the provocation might otherwise have had," *id.*, "'[a]n action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore,'" *Casassa*, 49 N.Y.2d at 677, 427 N.Y.S.2d 769, 404 N.E.2d 1310 (quoting *People v. Patterson*, 39 N.Y.2d 288, 303, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976), *aff'd sub nomine Patterson v. New York*, 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed.2d 281 (1977). Besides, Garcia might have been justified at the time he took the first shot; that would not have meant he could not rely on the extreme emotional disturbance defense to explain why he took the second shot on learning that Villanueva was not dead. *See, e.g., People v. Crique*, 63 A.D.3d 566, 882 N.Y.S.2d 39 (1st Dept. 2009) (referring to Crique's "core defenses" of complete justification and extreme emotional disturbance); *DeLuca*, 77 F.3d at 586 ("presentation of the EED defense did not require giving up the defense of justification. [DeLuca] could have presented both in tandem"); *People v. Roche*, 98 N.Y.2d 70, 745 N.Y.S.2d 775, 772 N.E.2d 1133 (2002) (defense is typically manifested by proof of defendant's loss of self-control).

To make out the extreme emotional disturbance defense, the defendant has to come forth with evidence that he suffered from a mental infirmity not rising to the level of insanity and that there was a reasonable explanation or excuse, the reasonableness of which is to

11

be determined from the point of view of a person in the defendant's circumstances as the defendant understood them to be, rightly or wrongly, *Casassa*, 49 N.Y.2d at 678; *Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138.  The first element is wholly subjective and requires a showing "that the claimed explanation as to the cause of his action is not contrived or sham," *Casassa*, 49 N.Y.2d at 669.  Whether there was a reasonable explanation for the actor's disturbance depends speaks to "the internal situation in which the defendant found himself and the external circumstances as he perceived them at the time, however inaccurate that perception may have been," and asks whether the explanation or excuse for his emotional disturbance was reasonable," *id.* 49 N.Y.2d at 680.

Garcia's lengthy psychiatric and special schooling would certainly have supported a defense grounded in emotional disturbance, and had the jury heard from Garcia how he felt about the way in which Villanueva had preyed on him before suddenly threatening to kill him it might well have concluded Garcia was operating under an extreme emotional disturbance at the time he "snapped" and killed Villanueva; from there it could easily have concluded that the killing was "reasonable" given the internal and external circumstances at play.  *See Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138 ("the Legislature recognized when it created the extreme emotional disturbance defense that some homicides are worthy of mitigation because the 'result from an understandable human response deserving of mercy,'" [quoting *Casassa*, 49 N.Y.2d at 680-81, 427 N.Y.S.2d 769, 404 N.E.2d 1310]).

Importantly, the fact that there was a lag in time between the first shot and the fatal shot did not render the defense impossible, *see DeLuca*, 77 F.3d 578 (defendant hit victim over the head with a bottle, apparently knocking him out for several hour, before returning to scene with her husband and shooting victim four times in the head; *habeas* granted on ground

12

that counsel was ineffective for not utilizing extreme emotional disturbance defense and

depriving client of her right to testify).   Moreover, employing the extreme emotional disturbance

defense would have had the benefit of placing Villanueva's entire history before the jury while

giving the jury an option to punish the defendant, but less severely than it otherwise might have

done.  *See Gargiulo*, 2012 WL 4040351, 2012 N.Y. Slip Op. 51785(U) (recognizing that juries

inclined to reject the top charge might nevertheless hesitate to acquit).  The People would have to

have acknowledged that Villanueva had in fact threatened to kill Garcia before Garcia did

anything to Villanueva (*see* District Attorney Case Information sheet, Exhibit D to January 12,

2009 "Supplemental Addendum" ["On 12/13/2002, victim asks to borrow defendant's $800

watch when he goes clubbing.  Defendant refuses and victim threatens to kill defendant"]).

Finally, had the defense prevailed, Garcia's liability for Villanueva's death would have been first

degree manslaughter rather than second degree murder; in that event he would have avoided a

life sentence.  Given the sentencing options available to the court in the event of a conviction for

manslaughter rather than murder and the trove of evidence concerning Villanueva's reputation

for violence and the way in which he suddenly turned on the defendant, there is a "reasonable

probability" the result would have been different had counsel designed a defense based on

extreme emotional disturbance and assented to Garcia's expressed desire to testify in his own

behalf.

## CONCLUSION

For the forgoing reasons, the motion to set aside the judgment should be granted.

Dated:          New York, NY                              Respectfully submitted,
                November 5, 2012


                                                          GARY R. SUNDEN
                                                          *Attorney for Felix Garcia*

13

Summations                                                                1153

1  streets, lock him in a room, put him under pressure
2  until finally he gave a statement which he might have
3  believed was self-defense, but which the prosecution
4  knew wasn't, and made himself the subject of this
5  prosecution.
6      That's what I am going to be discussing
7  over the next bit of time. I am going to base my
8  arguments on the evidence and not on emotion.
9      And I'd like to pause here to do a couple
10 of things. First, to thank you for service. It's
11 hardly an easy task. As a counsel who has appeared
12 before a number of juries, I never cease to marvel at
13 the willingness of the public to make the sacrifices
14 that are necessary to do what you have done here, and
15 I am going to ask you to make that sacrifice
16 worthwhile, because the Judge has told you a number
17 of times, and he is going to tell you again, you are
18 the judges of the facts. You are not here to toting up
19 somebody said this and somebody said that and
20 somebody said something else and it adds up to the
21 elements of the crime. You are the judge of the
22 facts. You are here to weigh credibility with your
23 God-given common sense and your combined discussions
24 about the evidence.
25      You are not here to respond to emotion. My

Summations                                                                1154

1  perception of the Prosecution's opening was that it
2  did, in fact, tweak at the heart strings. That is
3  easy to do in a case like this. It involves the
4  murder of, the taking of a life. It's an emotional
5  event of itself. But we are here to try to discuss
6  this rationally and if, per chance, Ms. Launay gets
7  up and talks about the gruesome wounds or the tragic
8  loss of life, all of which are true, but in
9  determining who shot Ray Villanueva, they ultimately
10 are irrelevant. Nobody is arguing Ray Villanueva was
11 shot or that he died from those wounds.
12      Another thing I am going to ask you not to
13 do is consider the fact that Mr. Garcia didn't take
14 the witness stand. That's my decision. I perceive
15 there to be an inherent imbalance. When that police
16 officer takes somebody into a closed room where there
17 is just a police officer, and the other person is an
18 18-year-old youth who has no inherent ability to talk
19 about the event, no inherent signs or indicia of
20 reliability that we normally look at, how you are
21 employed, what is your education, what is your family
22 circumstances, what responsibilities have you assumed
23 in life, none of that has happened yet for Felix
24 Garcia. I, as his lawyer, made the judgment that if
25 you listen to these witnesses and if I was permitted

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CAPTION:

*FELIX GARCIA*                    v.

*HAROLD. D. GRAHAM*

**CERTIFICATE OF SERVICE**
Docket Number: *09 CIV. 6593*

I, *FELIX GARCIA*                    , hereby certify under penalty of perjury that on
(name)

*August 11th 2014*                    , I served a copy of *Memorandum of Law*
(date)

*in Support of Habeas Corpus (with Exhibit) and Cover Letter*
(list all documents)

by (select all applicable)*

☑ United States Mail
☐ Federal Express
☐ Overnight mail
☐ Facsimile
☐ E-mail
☐ Hand delivery

on the following parties (complete all information and add additional pages as necessary):

| *Hon James c Francis* | *500 PEARL Street* | *NY* | *NY* | *10007-1312* |
|---|---|---|---|---|
| Name | Address | City | State | Zip Code |
| *KAREN Schlossberg* | *One Hogan Place* | *NY* | *NY* | *10013* |
| Name | Address | City | State | Zip Code |
| | | | | |
| Name | Address | City | State | Zip Code |
| | | | | |
| Name | Address | City | State | Zip Code |

*August 11th, 2014*

Today's Date

Signature

* If different methods of service has been used on different parties, please indicate on a separate page, the type of service used for each respective party.

Certificate of Service Form